05-15-00161-CV

NO. _____

ACCEPTED
05-15-00161-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
2/9/2015 3:21:23 PM
LISA MATZ
CLERK

# In the Fifth Court of Appeals
# Dallas, Texas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
2/9/2015 3:21:23 PM
LISA MATZ
Clerk

**In Re DeSoto Surgicare Partners, Ltd., Successor-in-Interest to Baylor Surgicare at Duncanville LLC; Texas Health Ventures Group, LLC; and United Surgical Partners International, Inc.;**

*Relators-Defendants.*

Original Proceeding From Cause No. DC-13-02334-L
In the 193rd Judicial District Court of Dallas County, Texas
Honorable Carl Ginsberg, Presiding

**SWORN RECORD FOR PETITION FOR WRIT OF MANDAMUS**
**Volume 2 (Pages 0235-0493)**

NORTON ROSE FULBRIGHT US LLP

Jeff Cody
State Bar No. 04468960
jeff.cody@nortonrosefulbright.com
Nathan B. Baum
State Bar No. 24082665
nathan.baum@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone:    (214) 855-8000
Facsimile:    (214) 855-8200

Katherine D. Mackillop
State Bar No. 10288450
katherine.mackillop@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone:    (713) 651-5151
Facsimile:    (713) 651-5246

*Counsel for Relators-Defendants*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

| Description | Page(s) |
|---|---|
| *Volume 1* | |
| Defendants' Motion to Strike Pleadings (with Exhibits), filed December 23, 2014 | 0001-0219 |
| Plaintiff's Response to Defendants' Motion to Strike Pleadings, filed January 7, 2015 | 0220-0234 |
| *Volume 2* | |
| Exhibits to Plaintiff's Response to Defendants' Motion to Strike Pleadings, filed January 7, 2015 | 0235-0493 |
| *Volume 3* | |
| Hearing Transcript Vol. 1, on Defendants' Motion to Strike Pleadings, held on January 12, 2015 | 0494-0561 |
| Hearing Transcript Vol. 2 (Plaintiff's Exhibits), on Defendants' Motion to Strike Pleadings, held on January 12, 2015 | 0562-0828 |
| *Volume 4* | |
| Hearing Transcript Vol. 3 (Defendants' Exhibits), on Defendants' Motion to Strike Pleadings, held on January 12, 2015 | 0829-1123 |
| *Volume 5* | |
| Defendants' Supplemental Letter Brief, filed January 16, 2015 | 1124-1131 |
| Plaintiff's Supplemental Letter Brief (with Exhibits), filed January 16, 2015 | 1132-1171 |
| Order, signed January 19, 2015 | 1172 |
| Original Petition, filed February 26, 2013 | 1173-1177 |
| First Amended Petition, filed March 21, 2013 | 1178-1180 |
| Original Answer, filed April 6, 2013 | 1181-1183 |
| Second Amended Petition, filed July 15, 2014 | 1184-1192 |
| Third Amended Petition, filed August 6, 2014 | 1193-1202 |
| Original Answer to Third Amended Petition, filed September 2, 2014 | 1203-1206 |

| Description | Page(s) |
| --- | --- |
| ***Volume 5, cont'd.*** | |
| Affidavit of Nathan B. Baum in Support of the Defendants' Motion to Strike Pleadings or, in the Alternative, Exclude Evidence, signed January 12, 2015 | 1207-1209 |

Sworn Record 0235

# EXHIBIT A

# Texas Health Ventures Group, LLC

| | |
|---|---|
| **To:** | LaVone Arthur<br>Jonathan Bond |
| **From:** | Brett Brodnax<br>Carolyn Exley<br>Evie Miller<br>Jarod Moss |
| **Date:** | October 19, 2010 |
| **Re:** | Request for Approval – Acquisition of Surgery Center of Duncanville ($1,226,250) |

The purpose of this memo is to request approval to invest a total of $1.2 million to acquire a 50.1% ownership position in Surgery Center of Duncanville ("SCD") located at 1018 East Wheatland Road in Duncanville, Texas, as well as acquire the rights to initiate a new management agreement with the surgery center. The purchase would be consummated by Texas Health Ventures Group, LLC ("THVG"). With your approval, we plan to close by this Friday, October 22, with an effective of November 1, 2010.

## Background

SCD commenced operations in 1985 and is a four operating room, one procedure room facility. SCD's AAAHC accreditation was renewed in May 2009 and expires on May 15, 2012.

SCD is owned 41.01% by Symbion, who is also the current management company for the center, and 58.99% by physician investors. The facility is located approximately three miles from THVG's DeSoto facility, the North Texas Surgery Center. It is anticipated that we will be able to capitalize on synergies available between the two centers and eventually merge the Duncanville facility into the DeSoto facility within twelve months subsequent to closing (see further discussion below).

SCD occupies 10,000 square feet of leased space in a building owned by an independent landlord. The original term of the lease expires in February 2013 with two five-year renewal options as currently written. The lease includes a rental rate equal to $33.10 per sq. ft or $27,583 per month and currently includes an annual increase equal to 3%. The lease includes a guaranty from Symbion for the remainder of the term that will be assumed by THVG (with a guaranty fee being charged to the physicians). The present value obligation of the guaranty of the lease through the remainder of the term is $713 thousand.

## Transaction Overview

THVG will purchase a 50.1% interest and enter into a management agreement for cash consideration equal to $1,226,250 in the aggregate. This is based on an equity valuation equal to $1,250,000 (or $626,250 for 50.1%) and a management fee valuation equal to $600,000, both as independently verified by Value Management Group.

Page 2
Approval Request – Surgery Center of Duncanville, Duncanville, Texas

Based on the proximity of SCD with our DeSoto center, it is believed that there are operational and cost synergies available through a merger of SCD into our DeSoto facility with operations continuing at the DeSoto facility. The transaction documents will include an agreement from the Duncanville physicians to a merger with the DeSoto facility sometime prior to the first anniversary of the closing of the purchase transaction. However, the merger will remain subject to a vote of the DeSoto partnership. Based on the due diligence results, certain capital improvements will need to be made to the Duncanville facility if the facility is not closed at the conclusion of the initial lease term.

This transaction allows us to move in line with Symbion's expectations from a timing perspective while remaining strategic with the transition and potential merger process. The remaining lease term on the SCD lease agreement provides time needed to work on the potential merger in order to maximize operational processes as well as qualitative processes of patient care.

## Physician Profile

There are currently 18 physician partners whose ages range from 40 – 58 with an average age of 47 years old. There are currently three L1 physicians, one L2 physician and fourteen L3 physicians.

The agreement requires that all physician partners must attest annually that they meet the Safe Harbor criteria. The physician partners have a very good clinical reputation in the market and are very interested in further improvement by partnering with a company that has greater operational leverage within the metroplex.

## Payor and Specialty Mix

| Specialty Distribution * | # Phys | # Partners | % Revenue |
|---|---|---|---|
| Pain Management | 4 | 3 | 59% |
| General | 7 | 1 | 9% |
| Podiatry | 13 | 4 | 8% |
| Colon & Rectal Surgery/GI | 1 | 1 | 6% |
| Urology | 4 | 3 | 6% |
| Orthopedic | 5 | 2 | 4% |
| Radiology | 3 | 1 | 2% |
| OBGYN | 5 | 1 | 2% |
| ENT | 2 | 1 | 2% |
| Plastic | 4 | 1 | 1% |
| GI | 1 | - | 0% |
| TOTAL | 49 | 18 | 100% |
| * TIM June 2010 | | | |

| Payor Mix * | % Revenue |
|---|---|
| Mgd Care-In Network | 60% |
| Medicare/Medicaid | 28% |
| Worker's Comp | 8% |
| Self-Pay | 2% |
| Mgd Care-OON | 1% |
| TOTAL | 100.0% |
| * TIM June 2010 | |

Currently, the center is 1% out-of-network.

D_001731
CONFIDENTIAL

Page 3
Approval Request – Surgery Center of Duncanville, Duncanville, Texas

## Historical Financial Performance

|  | TTM Dec 07 | TTM Dec 08 | TTM Dec 09 | TTM Aug 10 |
|---|---|---|---|---|
| Cases | 3,163 | 3,408 | 3,194 | 2,740 |
| Net Revenue per Case | $1,768 | $1,465 | $1,403 | $1,159 |
| EBITDA | $276,044 | $65,026 | $110,140 | -$207,021 |
| EBITDA Margin | 5% | 1% | 3% | -7% |

The center currently has $250 thousand of equipment financing debt with Key Bank, De Lage Landen and Siemens. In connection with the transaction, we will be putting a $450 thousand non-recourse line of credit in place with Siemens for any potential cash needs during the initial transition months. Therefore, it is anticipated that, as of the closing of the transaction or shortly thereafter, the center could have up to $700 thousand of debt outstanding. All of the existing debt will be assigned prior to closing.

## Valuation

VMG conducted an independent valuation of the center and determined the value of the current equity to be $1,250,000 and the value of the management fee to be $600 thousand. Our capital contribution will result in the ownerships noted above.

As part of this transaction, a 10 mile non-compete covenant is included for all selling parties for three years following close or two years after ceasing to own an interest in the center.

The facility will be charged a 7% management fee with USPI retaining 64.3% of the management fee and the remainder being paid to Baylor. The governing board will be made up of eight members, four from THVG and four physician representatives. Each member will vote according to ownership represented.

## Capital Priorities

We ranked this acquisition as number six on our capital priorities and give it a high strategic, high upside and medium risk rating. The center is strategic to THVG as there is an opportunity for consolidation within the market. The center has high upside with access to THVG's operational oversight. The risk is medium, which rating takes into consideration the minimal investment for the transaction offset by the risks associated with the potential merger into DeSoto.

## Due Diligence

- Physician arrangements – The center has an anesthesia contract and a medical director agreement and we will retain the same anesthesia group/medical director and terms. No other physician arrangements exist.

- Clinical – Dr. Zarin and Jeannie Montgomery conducted the clinical due diligence and noted the following issues, all of which we believe can be addressed. The diligence report indicated that anesthesia often leaves the center prior to the time that the patient is discharged. We are discussing with Dr. Wasserman and will implement procedures to ensure that this does not carry forward. The center essentially does not have a formal quality program in place which will be

D_001732
CONFIDENTIAL

Page 4
Approval Request – Surgery Center of Duncanville, Duncanville, Texas

immediately addressed by USPI's clinical team. The report also notes that the equipment is dated and the facility will require capital improvements if we do not merge with DeSoto.

- Pain Screens – The pain screens have been run with no exceptions noted.

- Coding/Billing – Gale Gonzalez reviewed the business office functions and while concerns were raised in regard to the lack of attention the business office has been receiving, all deficiencies found can be corrected going forward. We will transition the billing and collections process to the Dallas CSO within 45 days of close. In addition, we will transition the center's accounts payable processing to the CSO as soon as possible. Staffing changes may also be needed for the center but this will need to be reviewed further in connection with any merger with DeSoto. Carolyn Exley and Gale Gonzalez will evaluate changes needed in the business office staff post-closing in connection with any potential transition to the DeSoto facility. The coding audit score was 81% on CPT codes and an 89% on ICD-9 codes, which although not stellar, is not a cause for major alarm. The coding will transfer to the CSO with the other business office functions.

- Managed Care – Currently, the center is almost fully contracted. The plan is for the center to be converted to THVG contracts starting at close and we anticipate that the center will be fully converted by month seven of the first year.

## Financial Projections

We have prepared two pro forma financial projections. The first scenario assumes SCD stays as a freestanding center, independent of DeSoto. The second assumes SCD stays freestanding for only one year and then merges with DeSoto.

## Scenario 1

We have projected year 1 EBITDA at $602 thousand, which includes management fees to THVG of $307 thousand. This assumes no additional physician recruitment for year 2.

| | Base Year | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cases | 2,668 | 2,670 | 2,750 | 2,833 |
| Net Rev / Case | $1,249 | $1,645 | $1,941 | $1,980 |
| EBITDA | $ (329,453) | $ 601,790 | $ 1,279,771 | $ 1,340,367 |
| USPI EBITDA Contribution | | 235,735 | 415,606 | 426,254 |
| USPI Investment | | $ 698,299 | $ 698,299 | $ 698,299 |
| USPI EBITDA Multiple | | 2.96 | 1.68 | 1.64 |
| Multiple w/ Mgt Fee at 100% | | 2.46 | 1.47 | 1.43 |
| Available Cash (b) | | $ 449,094 | $ 881,669 | $ 796,317 |

(a) Mgt Fee at 75% margin

(b) Net of capital expenditures of $200K in Year 1, $500K in Year 2 and $200K in Year 3

The center does not consolidate to USPI.

Page 5
Approval Request – Surgery Center of Duncanville, Duncanville, Texas

Scenario 2

As mentioned above, there are potential operational and cost synergies available with a merger of SCD into our current surgery center in DeSoto. This scenario includes the same year 1 results as Scenario 1, but in year 2, the center merges into DeSoto. The assumption regarding no additional physician recruitment remains in place for year 2.

| | Base Year | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Cases | 2,668 | 2,670 | 6,215 | 6,339 |
| Net Rev / Case | $1,249 | $1,645 | $2,033 | $2,094 |
| EBITDA | $ (329,453) | $ 601,790 | $ 4,067,822 | $ 4,471,963 |
| USPI EBITDA Contribution [a] | | 235,735 | 1,535,036 | 1,685,729 |
| Available Cash [b] | | $ 449,094 | $ 3,768,551 | $ 4,216,356 |

(a) Mgt Fee at 75% margin
(b) Net of capital expenditures of $200K in Years 1 - 3

The center does not consolidate to USPI.

In order to convey some of the benefits of the operational and cost synergies associated with a merger of the two facilities, set forth below is a table comparing the projected results of DeSoto and Duncanville as stand-alone facilities in Year 2 with that of the combined entity.

| | DeSoto | Duncanville | Combined | Variance: Combined vs Stand-Alone |
|---|---|---|---|---|
| | Year 2 | Year 2 | Year 2 | Year 2 |
| Cases | 3,464 | 2,750 | 6,215 | 3,464 |
| Net Rev / Case | $2,119 | $1,941 | $2,033 | $92 |
| Management Fee | $502,001 | $366,817 | $864,227 | $497,409 |
| EBITDA | $ 2,222,343 | $ 1,279,771 | $ 4,067,822 | $ 2,788,050 |
| Available Cash | $ 1,877,392 | $ 881,669 | $ 3,768,551 | $ 2,886,882 |

Strengths

- Physician partners enjoy a high-quality reputation within the community and with our hospital partner.
- Center is a strategic transaction for THVG.
- Turnaround transaction requires a relatively small investment and immediate issues can be addressed with a prompt transition THVG's operational structure.
- Additional operational and cost synergies are available with a potential merger into THVG's existing surgery center in DeSoto.

D_001734
CONFIDENTIAL

Page 6
Approval Request – Surgery Center of Duncanville, Duncanville, Texas

## Risks

- It is anticipated that additional working capital will be needed during the initial transition months. We have a proposal from Siemens regarding a working capital line of credit for $450 thousand with documents to be finalized over the next few weeks.
- There is some risk that unknown liabilities may arise as a result of vendor payables not being properly recorded. As a part of the transaction, Symbion has agreed to bring all accounts payable current to within 60 days of invoice due date. Additionally, we have performed a search for unrecorded liabilities and believe we have identified all material amounts.

## Exhibits

I.      Pro Formas (Scenario 1 and Scenario 2)


**APPROVED BY:**

_____          _____
Jonathan Bond                             LaVone Arthur

Sworn Record 0242

# EXHIBIT B

Sworn Record 0243



**Contact:**     **Jason B. Cagle**
                 **Chief Financial Officer**
                 **(972) 713-3500**

### UNITED SURGICAL PARTNERS INTERNATIONAL
### ANNOUNCES THIRD QUARTER 2014 RESULTS

**Dallas, Texas (November 5, 2014)** – United Surgical Partners International, Inc. ("USPI" or the "Company") today announced results for the third quarter and nine months ended September 30, 2014.

**Third Quarter Financial Results**

For the quarter ended September 30, 2014, consolidated net revenues increased 5% to $159.2 million compared with $151.0 million in the prior year period. Operating income for the third quarter increased 2% to $64.4 million, as compared with $63.1 million for the prior year period. EBITDA less noncontrolling interests increased 9% to $53.9 million in the third quarter of 2014 compared with $49.3 million for the prior year period.

Cash flows from operating activities for the third quarter of 2014 totaled $53.9 million compared with $50.7 million in the prior year period. During the third quarter of 2014, the Company and its consolidated subsidiaries invested $3.5 million in maintenance capital expenditures and an additional $0.3 million in the infrastructure of existing facilities.

**Nine-Month Financial Results**

For the nine months ended September 30, 2014, consolidated net revenues increased 3% to $466.1 million compared with $451.4 million in the prior year period. Operating income for the first nine months of 2014 was $183.7 million as compared with $181.9 million for the prior year period. EBITDA less noncontrolling interests was $151.7 million in the first nine months of 2014 as compared with $152.3 million for the first nine months of 2013.

Cash flows from operating activities for the nine months ended September 30, 2014, totaled $159.9 million compared with $128.1 million for the prior year period. During the first nine months of 2014, the Company and its consolidated subsidiaries invested $10.6 million in maintenance capital expenditures and an additional $2.2 million in the infrastructure of existing facilities.

**Systemwide Financial Results**

Due to the Company's partnerships with physicians and prominent healthcare systems, the Company does not consolidate the financial results of the majority of its facilities. While revenues of the Company's unconsolidated facilities are not recorded as revenues by the Company, equity in earnings of unconsolidated affiliates is a significant portion of the Company's overall earnings. To help analyze results of operations, management uses systemwide operating measures such as systemwide revenue growth, which includes revenues of both consolidated and unconsolidated facilities. In addition to overall systemwide revenue growth, the Company calculates growth rates and operating margins for the facilities that were operational in both the current and prior year periods, a group the Company refers to as same-store or same-facility. This group also consists of both consolidated and unconsolidated facilities. At September 30, 2014, 155 of the 219 facilities the Company operated were not consolidated.

-MORE-

Sworn Record 0244

United Surgical Partners Announces Third Quarter 2014 Results
Page 2
November 5, 2014

For the third quarter, the systemwide revenues of the facilities operated by the Company increased 11% on a year-over-year basis. On a same-store basis, systemwide net revenue increased 5% in the third quarter compared with the prior year period. For the first nine months of 2014, the systemwide revenues of the facilities operated by the Company increased 5% on a year-over-year basis. On a same-store basis, systemwide net revenue increased 3% for the first nine months of the year.

## Development Activity

The Company acquired an interest in three facilities during the third quarter and one additional facility following quarter end. The Company expects to add two to four additional facilities in the remainder of 2014.

## Conclusion

Commenting on the results, William H. Wilcox, USPI's chief executive officer, said, "The third quarter represented our strongest same-store volume performance since 2012, and we are pleased with the sequential improvement in operating and financial performance. We also continue to add new, high quality facilities and health system partners to our portfolio and anticipate an active fourth quarter from a development perspective."

The live broadcast of USPI's third quarter conference call will begin at 5:00 p.m. Eastern Time on November 5, 2014. A 30-day online replay will be available approximately an hour following the conclusion of the live broadcast. A link to these events can be found on the Company's website at www.uspi.com. Additional financial information pertaining to United Surgical Partners International may be found by visiting the Investor Relations section of the Company's website.

USPI, headquartered in Dallas, Texas, currently has ownership interests in or operates 220 facilities, of which 154 are jointly owned with not-for-profit healthcare systems.

*The above includes forward-looking statements based on current management expectations. Numerous factors exist that may cause results to differ from these expectations. Many of the factors that will determine the Company's future results are beyond the ability of the Company to control or predict. These statements are subject to risks and uncertainties relating to the Company, including without limitation, (i) reduction in reimbursement; (ii) the Company's ability to attract physicians and retain qualified management and personnel; (iii) the Company's significant leverage; (iv) geographic concentrations of certain of the Company's operations; (v) risks associated with the Company's acquisition and development strategies; (vi) the regulated nature of the healthcare industry; (vii) the highly competitive nature of the healthcare business; and (viii) those risks and uncertainties described from time to time in the Company's filings with the Securities and Exchange Commission. Therefore, the Company's actual results may differ materially. The Company undertakes no obligation to update any forward-looking statements or to make any other forward-looking statements, whether as a result of new information, future events or otherwise.*

Sworn Record 0245

United Surgical Partners Announces Third Quarter 2014 Results
Page 3
November 5, 2014

## UNITED SURGICAL PARTNERS INTERNATIONAL, INC.
### Unaudited Condensed Consolidated Statements of Income
*(in thousands, except number of facilities)*

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | **2014** | **2013** | **2014** | **2013** |
| Revenues | $ 159,190 | $ 151,009 | $ 466,107 | $ 451,352 |
| Equity in earnings of unconsolidated affiliates | 27,527 | 20,923 | 73,599 | 63,759 |
| Operating expenses: | | | | |
| Salaries, benefits and other employee costs | 44,383 | 40,991 | 129,878 | 120,425 |
| Medical services and supplies | 27,051 | 24,945 | 78,248 | 72,831 |
| Other operating expenses | 28,251 | 24,722 | 83,487 | 75,691 |
| General and administrative expenses | 11,718 | 10,396 | 34,958 | 30,793 |
| Provision for doubtful accounts | 2,918 | 1,599 | 7,526 | 7,781 |
| Net (gain) loss on deconsolidations, disposals and impairments | 1,419 | (506) | 2,336 | 4,893 |
| Depreciation and amortization | 6,608 | 6,683 | 19,616 | 20,758 |
| Total operating expenses | 122,348 | 108,830 | 356,049 | 333,172 |
| Operating income | 64,369 | 63,102 | 183,657 | 181,939 |
| Interest expense, net | (23,697) | (23,710) | (70,090) | (76,226) |
| Loss on early retirement of debt | — | — | — | (5,536) |
| Other, net | (55) | 1 | (80) | (3) |
| Income from continuing operations before income taxes | 40,617 | 39,393 | 113,487 | 100,174 |
| Income tax expense | (8,623) | (7,462) | (21,997) | (17,903) |
| Income from continuing operations | 31,994 | 31,931 | 91,490 | 82,271 |
| Discontinued operations, net of tax | — | — | (332) | — |
| Net income | 31,994 | 31,931 | 91,158 | 82,271 |
| Less: Net income attributable to noncontrolling interests | (18,518) | (20,009) | (53,951) | (55,338) |
| Net income attributable to USPI's common stockholder | $ 13,476 | $ 11,922 | $ 37,207 | $ 26,933 |

**Supplemental Data:**

| | | | | |
|---|---|---|---|---|
| Facilities operated at period end | 219 | 214 | 219 | 214 |

Sworn Record 0246

United Surgical Partners Announces Third Quarter 2014 Results
Page 4
November 5, 2014

## UNITED SURGICAL PARTNERS INTERNATIONAL, INC.
### Unaudited Condensed Consolidated Balance Sheets
*(in thousands)*

| | Sept. 30, 2014 | Dec. 31, 2013 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 57,259 | $ 78,741 |
| Available for sale securities | 9,230 | 10,802 |
| Accounts receivable, net of allowance for doubtful accounts of $10,902 and $10,236, respectively | 49,667 | 51,608 |
| Other receivables | 24,146 | 24,191 |
| Inventories of supplies | 8,326 | 9,049 |
| Deferred tax assets, net | 22,382 | 22,333 |
| Other | 16,483 | 16,076 |
| Total current assets | 187,493 | 212,800 |
| Property and equipment, net | 128,496 | 132,474 |
| Investments in unconsolidated affiliates | 609,481 | 521,833 |
| Goodwill and intangible assets, net | 1,599,125 | 1,585,401 |
| Other | 32,459 | 28,176 |
| Total assets | $ 2,557,054 | $ 2,480,684 |
| **LIABILITIES AND EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 18,588 | $ 17,407 |
| Accrued expenses and other | 273,255 | 278,876 |
| Current portion of long-term debt | 18,940 | 18,916 |
| Total current liabilities | 310,783 | 315,199 |
| Long-term debt | 1,481,701 | 1,454,692 |
| Other liabilities | 230,303 | 217,573 |
| Total liabilities | 2,022,787 | 1,987,464 |
| Noncontrolling interests - redeemable | 179,439 | 166,578 |
| USPI stockholder's equity | 306,387 | 279,622 |
| Noncontrolling interests - nonredeemable | 48,441 | 47,020 |
| Total equity | 354,828 | 326,642 |
| Total liabilities and equity | $ 2,557,054 | $ 2,480,684 |

-MORE-

Sworn Record 0247

United Surgical Partners Announces Third Quarter 2014 Results
Page 5
November 5, 2014

## UNITED SURGICAL PARTNERS INTERNATIONAL, INC.
### Key Operating Statistics
*(in thousands, except for number of facilities, cases and percentages)*

| | Three Months Ended September 30, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | % Change |
| **Systemwide same-facility statistics[1] [2]:** | | | |
| Facility cases | 252,650 | 245,597 | 2.9% |
| Net revenue/case | $ 2,351 | $ 2,301 | 2.2% |
| Net revenue | $ 593,910 | $ 565,158 | 5.1% |
| Facility operating income margin[3] | 24.9% | 24.4% | 50 bps |
| **Other:** | | | |
| Total consolidated facilities | 64 | 65 | |
| **EBITDA less noncontrolling interests[4]** | | | |
| GAAP operating income | $ 64,369 | $ 63,102 | 2.0% |
| Depreciation and amortization | 6,608 | 6,683 | |
| Net loss (gain) on deconsolidations, disposals and impairments | 1,419 | (506) | |
| EBITDA | 72,396 | 69,279 | |
| Net income attributable to noncontrolling interests | (18,518) | (20,009) | |
| EBITDA less noncontrolling interests | $ 53,878 | $ 49,270 | 9.4% |

| | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
| | 2014 | 2013 | % Change |
| **EBITDA less noncontrolling interests[4]** | | | |
| GAAP operating income | $ 183,657 | $ 181,939 | 0.9% |
| Depreciation and amortization | 19,616 | 20,758 | |
| Net loss on deconsolidations, disposals and impairments | 2,336 | 4,893 | |
| EBITDA | 205,609 | 207,590 | |
| Net income attributable to noncontrolling interests | (53,951) | (55,338) | |
| EBITDA less noncontrolling interests | $ 151,658 | $ 152,252 | (0.4%) |

[1] Excludes de novo facilities in their first year of operations. Includes facilities accounted for under the equity method as well as consolidated facilities.

[2] Statistics for acquired facilities are included in both periods.

[3] Calculated as operating income divided by net revenue.

[4] EBITDA and EBITDA less noncontrolling interests are not measures defined under generally accepted accounting principles (GAAP). The Company believes EBITDA and EBITDA less noncontrolling interests are important measures for purposes of allocating resources and assessing performance. EBITDA, which is computed by adding operating income, depreciation and amortization, and net loss (gain) on deconsolidations, disposals and impairments, is commonly used as an analytical indicator within the healthcare industry and also serves as a measure of leverage capacity and debt service ability. EBITDA less noncontrolling interests, which is computed by subtracting net income attributable to noncontrolling interests from EBITDA, adjusts both years' EBITDA to reflect that the Company does not own 100% of each facility. EBITDA and EBITDA less noncontrolling interests should not be considered as measures of financial performance under GAAP, and the items excluded from EBITDA and EBITDA less noncontrolling interests are significant components in understanding and assessing financial performance. Because EBITDA and EBITDA less noncontrolling interests are not measurements determined in accordance with GAAP and are thus susceptible to varying calculation methods, EBITDA and EBITDA less noncontrolling interests as presented by USPI may not be comparable to similarly titled measures of other companies.

-END-

Sworn Record 0248

# EXHIBIT C

Sworn Record 0249

## Transition Plan Topics – Surgery Center of Duncanville

**Leadership Team:**
Sr. Vice or Market President:   Johnny Bond
Regional Vice President:  Carolyn Exley
Development Team: Jarod Moss, Shannon Kinder, Evie Miller
PVP: Rob Stahler

**Hot Areas –**
- Focusing on potential transition to DeSoto facility
- Successfully hiring and/or replacing key personnel.
- Transition of billing and collections to CSO
- Transition of accounts payable to CSO
- There is some risk that unknown liabilities may arise as a result of vendor payables not being properly recorded.
- Maximize new contracts by timely communication with partners about effective dates.

**On site first week –** Carolyn Exley will be the operations lead this week.

**Business Office –** We will transition the billing and collections process to the Dallas CSO within 45 days of close. Carolyn Exley and Gale Gonzalez will evaluate changes needed in the business office staff post-closing in connection with any potential transition to the DeSoto facility.
*Financial Impact: Dependant upon whether additional staff is needed. Expectations are there will be cost savings.*

**Managed care** - The center will be converted to THVG contracts starting at close and we anticipate being fully converted by month seven of the first year.

**Information Technology –** We will be converting the center to USPI's network and email once connectivity is established.
*Financial Impact: [To come]*

**Accounting/Accounts Payable** - Subsequent to closing, the accounts payable function will be transition to the CSO. Based on the staffing at the center, Carolyn Exley will approve all check runs on an interim basis to ensure proper internal controls. Facility accounting will immediately take over the general ledger function.

**Materials Management –** The center is currently on an HPG contract.

**Payroll/Benefits –** Transition to USPI payroll and benefits is expected on March 1st, 2010. Our benefits are richer than those offered currently; however, they will be more costly for the employees, so bonuses are being paid. The employer portion of the premiums will also increase.
*Financial Impact: $24K*

**Treasury** - We will change the signers on the current account at closing to add USPI representatives to the current bank account. We will be opening a new bank account at Bank of America and adding this center to our cash management system.

**Clinical –** A formal quality program will need to be put in place. Additional capital improvements will be required if the center is not merged with DeSoto.
*Financial Impact: $500K if the center is not merged with DeSoto.*

D_001728
CONFIDENTIAL

**EDGE** - The EDGE concept will be introduced to the staff and physicians during the initial post-close meetings.    Training/implementation is scheduled to begin 90 days post-close.

**Internal Controls** - The goal is to have the center fully compliant with USPI's 12 week checklists within the first six months.  We will implement applicable controls under the existing systems at the center to the extent possible, e.g. reviewing payroll reports, background checks and drug screens for new hires, refund policy.  As they convert to USPI systems, the checklists will be integrated as part of the conversions.

**Partnership Management Initiative** - PMI will be introduced to the board, partnership, and PAB over the course of the first 60 days.  The PAB will focus on 1/3 rule compliance and appropriate buybacks following the first year of operations, as needed.

D_001729
CONFIDENTIAL

Sworn Record 0251

# EXHIBIT D

| | |
|---|---|
| **From:** | Zarin, Dr. David |
| **Sent:** | Tuesday, October 05, 2010 12:08 PM |
| **To:** | Kinder, Shannon |
| **Cc:** | Miller, Evelyn; Exley, Carolyn; Montgomery, Jeannie; Moss, Jarod; Bond, Jonathan |
| **Subject:** | Duncanville |
| **Attachments:** | Duncanville ASC Physician Due Diligence Sept 28 2010.xls |

Attached is my report for the Duncanville ASC DD visit. As you will see, I have noted several issues from a clinical perspective. I have discussed this with Johnny Bond.

Please let me know if you have any questions.

DZ

## David Zarin, M.D. FACS

**SVP Medical Affairs--Medical Director**
**972-713-3501 (Dallas Office)**
**281-788-4100 (Houston Cell)**
**dzarin@uspi.com**

CONFIDENTIAL

D_000639

Sworn Record 0253

## Physician Due Diligence Report

### Duncanville Surgery Center  September 28, 2010

| * Zarin/RN means items is also reviewed by RN | Resp * | Mark when Completed | Comments |
|---|---|---|---|
| **Pre-Due Diligence** | | | |
| Complete call to Medical Director | Zarin | Done | Dr. Anna Toker (Colon and Rectal Surgery) |
| | | | |
| **Administration** | | | |
| Review Gov. Board structure | | Done | 5 MD members--Toker, Mason, Koonsman, Aronowitz, Wasserman |
| Review Gov. Board Bylaws flags from RN review | | Done | No issues |
| Review Gov Board minutes flags from RN review | | Done | Minutes are in order and well done |
| Review Med Staff Bylaws flags from RN review | Zarin | Done | No issues |
| Review Med Exec minutes | Zarin | Done | Minutes are in order and well done |
| Review QI Program | Zarin | Done | Reported as inactive--started in 08, but not active since July 09. No clinical manager to champion |
| Document communication between QI, Med Exec & Gov Board | Zarin/RN | Done | Reported in minutes (occurance reports, etc) |
| | | | |
| **Pre-Op** | | | 4 bays |
| Phone call for H & P | Zarin/RN | Done | RN calls all patients--triggers to anesthesia |
| Pre-admit visit for patient | Zarin/RN | Done | Available--approx 1/2 do on site visit to pre-admit |
| H & P on chart | Zarin/RN | Done | Routine |
| EKG protocols | Zarin | Done | per anesthesia |
| Pre-Op lab work performed | Zarin | Done | per anesthesia |
| Monitors | Zarin | Done | All preop bays |
| Post op phone calls | Zarin | Done | All pts called --message left if no answer. Use pt satisfaction survey |
| | | | |
| **OR.** | | | 4 OR and 1 Procedure room |
| General cleanliness and order | Zarin/RN | Done | OR's are small by today standards. Tables are old. Have Steris 1 system. Pentax GI scopes (MD do not like) |
| Specialty equipment purchased (e.g. Instatrak) | Zarin/RN | Done | Need ureteroscope. They share intruments with nearby centers. Major issue with autoclave |
| | | | |
| **Emergency Equipment** | | | |
| Malignant hyperthermia | Zarin/RN | Done | Center has 2 MH kits, but only keeps 1/2 of Dantrolene on site (shares with nearby center if nec) |
| Difficult intubations | Zarin/RN | Done | Avalable |
| Pediatrics | Zarin/RN | Done | Avalable |
| Crash cart | Zarin/RN | Done | Avalable-mock codes done |
| | | | |
| **PACU** | | | 6 Bays |
| Patient/Staff ratio | Zarin | Done | Varies by case load |
| Pediatrics | Zarin/RN | Done | 1:01 |
| Discharge by physician | Zarin | Done | Orders written by MD but not timely |
| Narcotic controls | Zarin/RN | Done | Had diversion issue 1 year ago--procedures amended to prevent further problems |
| Physician present till patients gone | Zarin | Done | MAJOR CONCERN--reproted that 90% of time anesthesia leaves before pt is discharged |
| | | | |
| **Staff** | | | |
| Overview of skills, capabilities and tenure | Zarin/RN | Done | 8 Clinical FTE + prn pool. They do use agency nurse sometimes |
| Background checks on RN's? | Zarin/RN | Done | Routine including drug screens |
| ACLS requirement | Zarin/RN | Done | All RN in PACU |
| PALS requirement | Zarin/RN | | RN in PACU (if pedi cases on schedule |
| | | | |
| **Accreditation** | | | |
| Joint Commission or AAAHC | Zarin/RN | Done | Surveyed in May 2009 |
| Expiration | Zarin/RN | Done | 2012 |
| Review last survey | Zarin/RN | Done | Issues with credentialling and PI program |
| | | | |
| **Medicare/State Certifcation** | | | |
| Date effective | Zarin/RN | Done | Have had 5 CMS/State surveys |
| Review last Medicare Survey | Zarin/RN | Done | Issues with Life safety and Radiology (noted to be compliant on last survey) |
| | | | |
| **X Ray** | | | |
| Rad Techs or R.N.s | Zarin | Done | Rad tech |

## Physician Due Diligence Report

### Duncanville Surgery Center  September 28, 2010

| * Zarin/RN means items is also reviewed by RN | Resp * | Mark when Completed | Comments |
|---|---|---|---|
| **EDGE™ Reportable Events** | | | |
| Infection rate | Zarin/RN | Done | Tracked by survey-low infection rate reported.IC nurse with training in place |
| Transfers | Zarin/RN | Done | 3 in last year--chest pain, possible TIA |
| Medication errors | Zarin | Done | monitored by occurrence report |
| Wrong site surgery | Zarin/RN | Done | Follow UP for surgery NOT FOR BLOCKS. Have had 2 wrong sites on pain cases |
| How does items being monitored compare to EDGE items? | Zarin/RN | Done | Participate in ASC QC reporting |
| Will EDGE reporting require physician behavior modification? | Zarin/RN | Done | No |
| For hospitals - evaluate utilization review, in particular, medica necessity documentation for Observation cases and Inpatient Admissions | Zarin/RN | NA | |
| | | | |
| **Clinical Nurse Manager / Director** | | | Hal Mayo is Admin. No clinica manager--Cindy Rogers, RN does much of the work |
| Management / Leadership Ability | Zarin | Done | Need clinical manager--no co hesive quality program, no education program. |
| Clinical skills / tenure | Zarin | Done | Hal is knowledgeable, although he does not see himself here long term |
| | | | |
| **Medical Director** | | | |
| Review Contract | Zarin | Done | Dr. Anna Toker--contract in place (according to Hal), but not seen |
| Specialty | Zarin | Done | Colon and Rectal Surgery |
| Leadership Ability | Zarin | Done | Reported as very good. She is available and has the respect of MDs |
| | | | |
| **Anesthesia** | | | Anesthesia seems to be a significant problem. Some surgeons are not happy with coverage and want to bring in own anesthesia |
| M.D | Zarin | Done | Pinnacle |
| CRNAs | Zann | Done | Reports of CRNA controlling schedule and coverage--not to satisfaction of surgeons. |
| Arrangement | Zarin | Done | Preported to be "90% exclusive" with Pinnacle |
| Review contract | Zarin/RN | Done | Not seen--should review for requirements to provide coverage and stay until discharge |
| Criteria for patient selection.. age. etc | Zarin | Done | ASA 1-3. BMI review by anesthesia for high BMI |
| Issues with patient selection, sleepapnea / BMT | Zarin | Done | none noted |
| | | | |
| **Credentials** | | | |
| Review for timeliness (selected files) | Zarin/RN | Done | No issues noted |
| On site or by contract | Zarin/RN | Done | On site--use primary source and AMA profile |
| Timing of re-credentialing | Zarin/RN | Done | Every 2 years. Use peer review |
| | | | |
| **General Comments (be sure to debrief with RN and compare notes)** | | | |

The Duncanville Surgery Center is an old facility. It opened in 1985. The facility and equipment are quite dated. There are some urgent issues with autoclaves. There are some clinical issues of concern, most importantly that there is often no physician in the ASC until the patients are discharged. There are some significant problems with anesthesia coverage. There is essentially no quality program in p ace. The center is not busy-currently doing 220 cases/month. They are closed on Tuesdays because of lack of volume. There are 18 partners, most are L3's. The partners are not committed to the center-most are splitters and this facility has had no distributions. I think that this facility will need a significant amount of capital and effort to bring up to USPI standards. If the plan is to c ose the facility and move to our DeSoto ASC it can be run for 3-6 months. Even that will require improvement with the anesthesia situation and addressing the pressing issues with the sterilization equipment.

# EXHIBIT E

# REDACTED

---

**From:** Lance Hughes [mailto:lhughes@hcmaustin.com]
**Sent:** Wednesday, February 27, 2013 1:37 PM
**To:** Zureikat, Faris
**Subject:** RE: Final Walk through and handing over the keys

You may or may not be aware that we have filed suit in regards to Tenant's abandonment of the premises, failure to maintain the building systems, and failure to comply with the legal requirements for operation of a surgery center will now require extensive renovations that are chargeable to Tenant under the Lease. If Tenant is interested in inspecting the premises and discussing the necessary scope of work, and payment for modifications required to use the facility with a new tenant, and for its intended use (a surgery center), please advise.

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Tx Hwy
Suite A-300
Austin, Texas 78746
lhughes@hcmaustin.com
Direct Line 512.615.9502
fx 512.328.0149

---

**From:** Zureikat, Faris [mailto:fzureikat@uspi.com]
**Sent:** Tuesday, February 26, 2013 12:09 PM
**To:** Lance Hughes
**Subject:** Final Walk through and handing over the keys

Dear Sir,

When would you be able to do the walk through and get the keys.

I was under the impression that the 26th was the date as per a letter you received from Case Lease Administration.

Looking forward to your response.

Thank you,

1

CONFIDENTIAL
D_000297

Faris Zureikat, MBA, CASC
Administrator
North Texas Surgery Center
7992 West Virginia Drive
Dallas, TX 75237
P: 972-283-2400
F: 972-283-0099
C: 214-226-9384

*Confidentiality Notice: This message and any attachments are for the sole use of the intended recipient (s) and may contain information that is privileged and confidential. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you are not the intended recipient or a person responsible for delivering this message to an intended recipient, please contact the sender immediately by reply email and destroy all copies of the original message.*

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

CONFIDENTIALITY NOTICE: This message and any attachments are for the sole use of the intended recipient(s). This message is confidential and may also be privileged. If you are not the intended recipient, please contact the sender immediately, delete the contents of this message and do not use it for any purpose.

2

CONFIDENTIAL
D_000298

Sworn Record 0258

# EXHIBIT F



CONFIDENTIAL
D_000075



CONFIDENTIAL
D_000076

Sworn Record 0261



CONFIDENTIAL
D_000077



CONFIDENTIAL
D_000078



CONFIDENTIAL
D_000073



CONFIDENTIAL
O_000080



CONFIDENTIAL
D_000081



CONFIDENTIAL
D_0000082

Sworn Record 0267



CONFIDENTIAL
D_C00053

Sworn Record 0268



CONFIDENTIAL
D_000084



Sworn Record 0269

CONFIDENTIAL
D_000086



Sworn Record 0271



CONFIDENTIAL
D_000087



CONFIDENTIAL
D_000088



Sworn Record 0273

CONFIDENTIAL
D_000089



CONFIDENTIAL
D_000090



CONFIDENTIAL
_000091



CONFIDENTIAL
D_000092



CONFIDENTIAL
B_000093

Sworn Record 0278



Sworn Record 0279





Sworn Record 0280

CONFIDENTIAL
D_000096

CONFIDENTIAL
D_000087



CONFIDENTIAL
D_000087



CONFIDENTIAL
D_000098



CONFIDENTIAL
D_000099



CONFIDENTIAL
D_000100



CONFIDENTIAL
D_000101



CONFIDENTIAL
D_000102



CONFIDENTIAL
D_000103



CONFIDENTIAL
D_000104



CONFIDENTIAL
D_000105



Sworn Record 0290





CONFIDENTIAL
D_000108



CONFIDENTIAL
D_000109



CONFIDENTIAL
D_000110



CONFIDENTIAL
B_C00111



CONFIDENTIAL
D_000112



CONFIDENTIAL
D_000113



CONFIDENTIAL
D_000114



CONFIDENTIAL
D_000115



CONFIDENTIAL
D_000116



CONFIDENTIAL
D_000117



CONFIDENTIAL
D_000118



CONFIDENTIAL
D_000119



CONFIDENTIAL
D_000120



CONFIDENTIAL
EL_000121



CONFIDENTIAL
D_000122

CONFIDENTIAL
D_000123





CONFIDENTIAL
D_000124



CONFIDENTIAL
D_000125



CONFIDENTIAL
D_000126



CONFIDENTIAL
D_000127



CONFIDENTIAL
D_000128



CONFIDENTIAL
D_000129



CONFIDENTIAL



CONFIDENTIAL
D_000131



CONFIDENTIAL
D_000132



CONFIDENTIAL
D_000133



CONFIDENTIAL
D_000134

Sworn Record 0319



CONFIDENTIAL
D_000135



CONFIDENTIAL
D_000136



CONFIDENTIAL
O_230137



CONFIDENTIAL
D_000138



CONFIDENTIAL
D_000139

# EXHIBIT G

Message
_____

**From:** Lance Hughes [lhughes@hcmaustin.com]
**Sent:** 10/18/2011 11:37:06 AM
**To:** Moss, Jarod [JMoss@uspi.com]
**Subject:** Duncanville Surgery Center letter
**Attachments:** Jarod Moss Chris Barnet 10.18.11.doc

Jarod, please see the attached letter. I never heard back from you regarding the removal of the Generator. Lance

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Texas Hwy.
Suite #A-300
Austin, TX 78746
lhughes@hcmaustin.com
Direct (512) 615-9502
Mobile (512) 413-8303
Fax (512) 328-0149

HUGHES 000511

*Via 1ˢᵗ Class US Mail*
October 18, 2011

Mr. Jarod Moss  (jmoss@uspi.com)
USPI
15305 Dallas Pkwy, #1600
Addison, TX  75001

Mr. Chris Barnet
Case Healthcare
14785 Preston Road, #750
Dallas, TX  75254

       Re:  Duncanville Surgery Center, Patricia Hughes Landlord

Dear Jarod:

This message is in regard to the Lease Agreement between Patricia Hughes, as Landlord, and Surgical Center of Duncanville, L.P., dated June 1, 2004, as assigned to Baylor Surgicare at Duncanville, LLC on November 1, 2010.   You are currently in default of the Lease Agreement as a result of the surgery center having been closed and your abandonment of the leased premises.  In addition, it has come to our attention that certain fixtures and equipment, including, but not limited to the generator, have been removed from the leased premises.

Pursuant to the terms of the Lease Agreement, in the event that the Tenant abandons or vacates the leased premises for a period of seven days or more, whether or not Tenant is in monetary default, an event of default occurs under the terms of the Lease.  During an event of default, the Tenant is not authorized to remove any trade fixtures or movable equipment or furniture from the leased premises.  In addition, any property affixed to the floor, walls or ceiling, including, but not limited to, the generator, all ceiling and wall mounted surgical lights, medical gas lines and the like, are always to remain on the leased premises and are to be surrendered with the leased premises at the expiration of the lease.

The generator, together with all other property removed from the leased premises, must be returned as soon as possible.  In addition to the removal of these items resulting in an additional breach of the lease, we believe that the absence of this equipment will impair our ability to attract an appropriate replacement tenant for the leased premises.  In addition, at this time you still have all keys to the leased premises which must be returned so that we can make the leased premises available to prospective tenants for inspection.

We would appreciate your immediate response to these requests so that we can identify a replacement tenant for the leased premises, which may reduce Baylor Surgicare at Duncanville, LLC's obligations under the Lease Agreement.  As you are aware, we have already been contacted by a couple of potential tenants regarding the surgery center.  It is imperative that both of us cooperate in an effort to find a replacement tenant, which will be in the best interest of all parties.

L:Lance/Duncanville/JarodMossChrisBarnet10.18.11

Sworn Record 0327

Mr. Jarod Moss/Chris Bamet
October 12, 2011
Page 2

I look forward to hearing from you at your earliest convenience. We are prepared to show the leased premises to potential tenants as soon as all missing fixtures and equipment have been returned to the leased premises and we have keys to the leased premises.

Yours very truly,

Lance R. Hughes

HUGHES 000513

# EXHIBIT H

# Kathleen Rennscheidt

| | |
|---|---|
| **From:** | Lance Hughes |
| **Sent:** | Monday, June 10, 2013 11:24 AM |
| **To:** | Kathleen Rennscheidt |
| **Subject:** | FW: contact |

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Tx Hwy
Suite A-300
Austin, Texas 78746
lhughes@hcmaustin.com
Direct Line 512.615.9502
fx 512.328.0149

**From:** Lance Hughes [mailto:lhughes@hcmaustin.com]
**Sent:** Friday, August 26, 2011 12:10 PM
**To:** Moss, Jarod
**Subject:** contact

The fellow that called me regarding the lease on the surgery center in Duncanville is anxious to see if we can move forward. His use is Imaging.  Who is my contact at USPI to get a proposal for him approved? I could also just make him an offer that I think is fair and if he takes it try and get USPI to agree. You may prefer a buyout of the remaining term but I cannot get you a number on that until I know what he will pay. Lance

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Texas Hwy.
Suite #A-300
Austin, TX 78746
lhughes@hcmaustin.com
Direct (512) 615-9502
Mobile (512) 413-8303
Fax (512) 328-0149

1

HUGHES 00301

## Kathleen Rennscheidt

| | |
|---|---|
| **From:** | Lance Hughes |
| **Sent:** | Monday, June 10, 2013 11:24 AM |
| **To:** | Kathleen Rennscheidt |
| **Subject:** | FW: Contact |

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Tx Hwy
Suite A-300
Austin, Texas 78746
lhughes@hcmaustin.com
Direct Line 512.615.9502
fx 512.328.0149

**From:** Lance Hughes [mailto:lhughes@hcmaustin.com]
**Sent:** Thursday, August 25, 2011 3:26 PM
**To:** Moss, Jarod
**Subject:** Contact

Nathan, representing Preferred Imaging has contacted me regarding a sub-lease of the building. Can you sent me the contact info for the person who will handle this request from USPI. lance

Lance R. Hughes
Hughes Capital Management, Inc.
1301 Capital of Texas Hwy.
Suite #A-300
Austin, TX 78746
lhughes@hcmaustin.com
Direct (512) 615-9502
Mobile (512) 413-8303
Fax (512) 328-0149

HUGHES 00302

# EXHIBIT I

Re: The Surgery Center
1018 E. Wheatland
Duncanville, Tx

April 18, 2013

Dear Leslie Hill,

This Letter of Intent is contingent upon the prospective Buyer's and Seller's willingness to execute a standard Purchase Agreement as well as review and approve of the details of the transaction proposed above by the appropriate principal parties of the Buyer and Seller.

IT is understood and agreed that the foregoing constitutes a *Letter of Intent* setting forth the major business points from our discussions. It is further understood that neither party intends to create any contractual rights or obligations as a result of entering into this *Letter of Intent*. No binding agreement or rights or obligations shall arise as the result of executing this letter or with respect to the proposed transactions unless and until we execute definitive documentation incorporating the provisions and other appropriate terms.

This letter expresses Purchaser's interest in purchasing the above referenced Property under the following terms and conditions:

**Purchaser:** **Dr. Tien Phan, Dr. Dung Ngoc Huynh and or Assignee which must be approved by Seller**

**Address: 4939 Soaring Eagle Ct.**

**City: Grand Prairie      State: Texas      Zip: 75052**

**Phone: 408-835-3726**

**Email: tdphan2000@yahoo.com**

**Price:** **$1,100,000**

**Earnest Money:** **As consideration for the purchase of the Property, Buyer shall deposit $50,000 ("Earnest Money") due within seventy-two (72) hours of the execution of the Contract for Sale and Purchase. Earnest Money shall become non-refundable at the expiration of the Inspection Period.**
**The "Effective Date" of this Agreement for the purpose of performance of all obligations is the date the escrow agent receives the Contract after all parties execute the Contract.**

**Inspection Period:** **Thirty (30) days from Effective Date, which shall mean the date on which the later of the parties executes a Contract for Sale and Purchase. Due Diligence Documents ("Documents") will be forwarded immediately upon Effective Date of the Contract for Sale and Purchase Agreement.**
**Option: Buyer shall have two (2) thirty (30) days extensions after the Inspection period by payment to Seller of $10,000 for each of two thirty day periods which is not refundable as is not applicable to the purchase price.**

**Due Diligence:** **Seller shall provide buyer with site plans, building plans, environment assessment or report, current tax record, insurance policy or any plans that is related to the property which are in Seller's possession.**

**Financial Information:** **Buyer's agree to provide financial information or references that verify Buyer has sufficient liquidity and financial strength to complete the proposed purchase.**

L:Lance/Duncanville/PhanLOI                 Purchaser's Initials_____ Seller's Initials

HUGHES 00129

| | |
|---|---|
| **Closing Date:** | Thirty (30) days after expiration of the Inspection Period. |
| **Closing Cost:** | Seller shall provide title policy. Buyer may elect to obtain a survey at their cost. |
| **Property Condition:** | Property is being sold "AS IS". Seller shall agree to install a serviceable backup generator and repair to serviceable on autoclave. |
| **Mineral Rights:** | Seller shall convey all mineral rights it has to the Buyer at closing of escrow. |
| **Contract Period:** | Within ten (10) business days of the Effective Date of this Letter of Intent, Purchaser and Seller shall enter into a binding Contract for Purchase and Sale (the "Contract"). Failure to reach an agreement will allow the Seller to consider this agreement void and accept offers from other parties. |
| **Broker Commission:** | Seller and Buyer acknowledge that Seller shall pay Jennifer Trab of Avignon Realty (Buyer Broker) a three (3) percent commission for the sale of the property or a 50/50 commission split. Seller shall pay all real estate commissions relating to the sale of the Property. The closing of this transaction is a condition precedent to this commission being earned by any broker. |

Please note that this Letter of Intent will be withdrawn if Purchaser has not received your acknowledgement by April 19, 2013 at 5:00 p.m. CST.

If the foregoing accurately reflects our discussions, please acknowledge same by returning a signed copy of this letter. Execution of this Letter of Intent by the undersigned agent in no way binds or obligates the Buyer or Seller of any of its principals.

Sincerely,

**Agreed and Accepted: Buyer**

By:_____

Printed:_____

Dated:_____

**Agreed and Accepted: Seller**

By: _Lance_R_Hughes_ (Agent)

Printed: Lance R Hughes (Agent) of Seller

Dated: 4/18/13

L:Lance/Duncanville/PhanLOI

Purchaser's Initials_____   Seller's Initials_____

# EXHIBIT J

# ARMBRUST & BROWN, PLLC

### ATTORNEYS AND COUNSELORS

100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TEXAS 78701-2744
512-435-2300

FACSIMILE 512-435-2360

Mark L. Hawkins
(512) 435-2309
mhawkins@abaustin.com

Certified Article Number

7196 9008 9040 1483 7891

SENDERS RECORD

Certified Article Number

7196 9008 9040 1483 7839

SENDERS RECORD

February 7, 2013

Baylor Surgicare at Duncanville, LLC
Attn: President
350 N. Saint Paul, Suite 2900
Dallas, Texas 75201-4234

*Via Certified Mail, RRR and*
*Via Facsimile No. (972) 296-1387*

Texas Health Ventures Group, LLC
Attn: President
15305 Dallas Parkway, Suite 1600-LB28
Addison, Texas 75001

*Via Certified Mail, RRR and*
*Via Facsimile No. (972) 267-0084*

Baylor Surgicare at Duncanville, LLC
Texas Health Ventures Group, LLC
c/o Registered Agent
CT Corporation
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201

*Via Certified Mail, RRR*

Certified Article Number

7196 9008 9040 1483 7723

SENDERS RECORD

Re: Lease Agreement between Patricia Hughes, as landlord and Surgery Center of Duncanville, L.P. as tenant, dated June 1, 2004 ("Lease"); Assignment and Assumption of Lease and Landlord Consent between Patricia Hughes as landlord, Surgery Center of Duncanville, L.P. as assignor, and Baylor Surgicare at Duncanvile, LLC as assignee, dated November 1, 2010 ("Assignment"); and Lease Guaranty Agreement by Texas Health Ventures Group, LLC dated November 1, 2010 ("Guaranty").

Dear Sir or Madam:

I represent Patricia Hughes in connection with claims that are being made against Baylor Surgicare at Duncanville, LLC and Texas Health Ventures Group, LLC for breach of material covenants under the referenced Lease by Baylor Surgicare at Duncanville, LLC, including without limitation, the vacation and abandonment of the leased premises in violation of paragraph 24 of the Lease and in failing to maintain the necessary building systems as required under paragraph 14 of the Lease. It is particularly objectionable that Baylor Surgicare at Duncanville, LLC failed to maintain the facility's generator (that was owned by my client), removed it, gave it to a third party, and thereafter took steps to insure the closure of the surgery center. Knowing the consequences of such action, it is hard to believe that Baylor Surgicare at Duncanville, LLC's conduct was not malicious with designs of obtaining a competitive

{W0571480.1}

HUGHES 000471

**ARMBRUST & BROWN, PLLC**
**Page 2**

advantage over a successor tenant. As you are aware and have acknowledged, these acts and omissions have compromised my client's ability to procure a replacement tenant without significant modifications to the space for the necessary licensing. At this time it is anticipated that the modifications to the premises alone will exceed $1,000,000.00.

In response to Brandy Dollenger's January 31, 2013 letter, my client does not consent to installation of a new generator or modifications to the premises, which will more than likely further disrupt my client's efforts to mitigate the inevitable loss.

If you have any interest in trying to assist in the mitigation of my client's losses, please advise; otherwise, I am instructed to initiate a lawsuit. Now that you have notice of a potential lawsuit, please takes steps to place a litigation hold on any documents or other evidence relating to the surgery center.

Very truly yours,

Mark L. Hawkins

MLH:klf

cc:    Patricia Hughes

Brandy Dollenger

HUGHES 000472

 **UNITED STATES POSTAL SERVICE**⊸  *hughes*

Date Produced: 02/18/2013

**WALZ CERTIFIED MAIL SOLUTIONS LLC**

The following is the delivery information for Certified Mail™ item number 7196 9008 9040 1483 7723. Our records indicate that this item was delivered on 02/11/2013 at 09:19 a.m. in DALLAS, TX, 75201. The scanned image of the recipient information is provided below.

Signature of Recipient:



Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,

United States Postal Service

HUGHES 000473

 **UNITED STATES POSTAL SERVICE**

*hughes*

Date Produced: 02/18/2013

**WALZ CERTIFIED MAIL SOLUTIONS LLC**

The following is the delivery information for Certified Mail™ item number 7196 9008 9040 1483 7839. Our records indicate that this item was delivered on 02/11/2013 at 09:19 a.m. in DALLAS, TX, 75201. The scanned image of the recipient information is provided below.

Signature of Recipient:



Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,

United States Postal Service

HUGHES 000474


**UNITED STATES POSTAL SERVICE.**

*hughes*

Date Produced: 02/18/2013

**WALZ CERTIFIED MAIL SOLUTIONS LLC**

The following is the delivery information for Certified Mail™ item number 7196 9008 9040 1483 7891. Our records indicate that this item was delivered on 02/11/2013 at 11:00 a.m. in ADDISON, TX, 75001. The scanned image of the recipient information is provided below.

Signature of Recipient:

Address of Recipient: /5305 Dallas Pkwy 1600

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,

United States Postal Service

HUGHES 000475

Sworn Record 0340

# EXHIBIT K

# ARMBRUST & BROWN, PLLC

ATTORNEYS AND COUNSELORS

100 CONGRESS AVENUE, SUITE 1300
AUSTIN, TEXAS 78701-2744
512-435-2300

FACSIMILE 512-435-2360

Mark L. Hawkins
(512) 435-2309
*mhawkins@abaustin.com*

June 21, 2013

VIA CERTIFIED MAIL, RRR

Nathan B. Baum
Fulbright & Jaworski, L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

> **Certified Article Number**
>
> 7196 9008 9040 1811 9023
>
> **SENDERS RECORD**

Re: Cause No. DC-13-02334-L; *Patricia Hughes v. Desoto Surgicare Partners, Ltd. and Texas Health Ventures Group, LLC*; In the 193rd Judicial District, Dallas County, Texas

Dear Mr. Baum:

Enclosed please find the following:

1. *Plaintiff's Responses to Defendants' First Set of Requests for Admissions*;

2. *Plaintiff's Responses to Defendants' First Set of Interrogatories*;

3. *Plaintiff's Responses to Defendants' First Set of Requests for Production of Documents*; and

4. CD with documents bates labeled HUGHES 00001-00444.

Very truly yours,

Mark L. Hawkins

MLH:klf
Enclosures.

{W0585732.1}

**TO:** Nathan B. Baum
Fulbright & Jaworski, L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201

**SENDER:** MLH

**REFERENCE:** Hughes/Duncanville

7196 9008 9040 1811 9023

PS Form 3800, January 2005

| RETURN RECEIPT SERVICE | Postage | |
|---|---|---|
| | Certified Fee | |
| | Return Receipt Fee | 1.25 |
| | Restricted Delivery | |
| | Total Postage & Fees | 6.07 |

**USPS®**
# Receipt for
# Certified Mail™

POSTMARK OR DATE

No Insurance Coverage Provided
Do Not Use for International Mail



ArmBrust & Brown PLLC

100 Congress Avenue • Suite 1300 • Austin, Texas 78701 • (512) 435-2300 • abaustin.com

Patricia Hughes v. Desoto
Surgical Partners, Ltd. and
Health Ventures Group, LLC

HUGHES 00001-
00444



*hughes / duncanville*

Date Produced: 07/01/2013

WALZ CERTIFIED MAIL SOLUTIONS LLC

The following is the delivery information for Certified Mail™ item number 7196 9008 9040 1811 9023. Our records indicate that this item was delivered on 06/24/2013 at 11:12 a.m. in DALLAS, TX, 75201. The scanned image of the recipient information is provided below.

Signature of Recipient:

Address of Recipient:

Thank you for selecting the Postal Service for your mailing needs. If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,

United States Postal Service

# EXHIBIT L



# REPUBLIC TITLE OF TEXAS, INC.

**REPUBLIC TITLE®**

### SELLER'S STATEMENT

DATE: 08/02/2013
GF NO: 13R01962 ND8
FAST GF: 1002-54311

SALE FROM: Patricia Hughes
SALE TO: Graphite World Investments LLC
PROPERTY: /
ADDRESS: 1018 WHEATLAND (E), Duncanville, TEXAS 75116

SALES PRICE: $ 1,100,000.00

REIMBURSEMENTS/CREDITS

| | $ |
| --- | --- |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| TOTA REIMBURSEMENTS/CREDITS | $ .00 |
| GROSS AMOUNT DUE TO SELLER | $ 1,100,000.00 |

LESS CHARGES AND DEDUCTIONS
Fees to the Title Company:

| | |
| --- | --- |
| UCC SEARCH | $ 75.67 |
| Tax Certificate | $ 75.98 |
| Escrow Fee | $ 375.00 |
| Courier | $ 25.00 |
| 1,100,000.00  Owner's Policy of Title Insurance | $ 6,317.00 |
| DISCLOSURE REQUIRED BY ARTICLE 9.53, INSURANCE CODE. | $ |
| DISCLOSURE INCLUDES TITLE PREMIUMS PAID BY ALL PARTIES. | $ |
| State of Texas Policy Guaranty Fee | $ 2.00 |
| Broker Fee Payable to : Jennifer Tran | $ 32,500.00 |
| Broker Fee Payable to : Avignon Realty & Mortgage | $ 500.00 |
| Release of Lien to : Hunter & Kramer, P.C. | $ 85.00 |
| Prorations: | $ |
| Taxes from 01/01/2013 thru 07/03/2013 | $ 17,476.86 |
| Payoff charges: | $ |
| 602,046.02 PRINCIPAL | $ |
| 7,603.84 INTEREST THRU 08/01/2013 | $ |
| Total payoff charges to : Lance Hughes & Brenda Hughes M | $ 609,649.86 |
| Partial Earnest Money Credit | $ 25,000.00 |
| Repair Credit from Seller to Buyer | $ 8,300.00 |
| Generator Credit from Seller to Buyer | $ 31,500.00 |
| TOTAL CHARGES AND DEDUCTIONS | $ 731,882.37 |
| NET AMOUNT DUE TO SELLER | $ 368,117.63 |

Seller understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. Any real estate agent or lender involved may be furnished a copy of this Statement.

Seller understands that tax and insurance prorations and reserves were based on figures for the preceding year or supplied by others, or estimates for current year, and in the event of any change for current year, all necessary adjustments must be made between Purchaser and Seller direct.

The undersigned hereby authorizes Closing or Escrow Agent to make expenditures and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and receipt of a copy of this Statement.

SEE SIGNATURE ADDENDUM ATTACHED.

REPUBLIC TITLE OF TEXAS, INC.

CLOSING OR ESCROW AGENT

ADDRESS

*Note: Interest on existing liens is figured to the date indicated. If not paid by then, additional interest will have to be collected and your statement will be adjusted to have sufficient funds to secure release from the lienholder.

Texas Dept. of Insurance Form No. T-52

DATE: 08/02/2013  TIME: 1:17 PM

HUGHES 000479

**SIGNATURE ADDENDUM
TO SELLER'S CLOSING STATEMENT
GF NO. 13RO1962 ND8**

PATRICIA HUGHES

HUGHES 000480

Sworn Record 0348

# EXHIBIT M

 **MEDLINK**

July 26, 2013

iHeart
885 East Collins Blvd.
Suite 110
Richardson, Texas 75081

Attention: Mr. George Geczy

Reference:    Proposal for iHeart South Dallas Facility

We appreciate the opportunity to submit this proposal for the planning, design, engineering and construction for the new iHeart South Dallas Facility.    We understand the proposed iHeart facility will be located at 1018 East Wheatland Road, Duncanville, Texas.    This address is the current location of the vacated Duncanville Surgery Center.    The existing facility will be renovated and expanded to incorporate an MRI & CT suite, two Cath labs and one operating room with associated spaces necessary to function as a licensed ambulatory surgery center.

The project will be delivered utilizing a fast track design and construction method to meet the project's accelerated schedule.    The iHeart facility will be completed in four phases, the first phase will include minor renovations and new finishes to the existing office area.    Phase II includes one Cath lab, one operating room, pre & post op areas, and patient waiting.    The third phase will include the second Cath lab, exam rooms, doctor offices and staff support areas.    The fourth and final phase includes the MRI and CT imaging suite and new addition to the building.    Phase I will be completed in 4 weeks from authorization to proceed; phase II completed in 11 weeks from authorization to proceed.    All construction phases of the project will be completed in 24 weeks.    We are currently working on the final design of the interior renovation (Phase I & II), so a project schedule with a July 1st start date is included for your review.

MedLink's services are further outlined as follows:

**Pre Construction Services ;**
- Geotechnical Investigation
- Architectural Interior Design, Structural and M.E.P. engineering
- TAS review and inspection
- Design review with the Texas Department of Health
- physicist report
- The architectural and engineering documents will consist of the following:
    - Building Code and Zoning Ordinance review.
    - Energy Code Analysis reports.
    - Architectural demolition plan, new floor plan, and reflected ceiling plan.
    - Interior elevations and millwork details.
    - Plan details and section details.
    - Door schedule and details.
    - Room finish schedule and interior finish specifications.

ATTORNEY EYES ONLY


- Mechanical, electrical and plumbing plans, schedules and details
- Structural engineering plans and details.
- Project Specifications

**Construction Phase Services:**
- All general trade work, electrical and mechanical work, and project management needed for the construction of the Facility.
- All required licenses are included.
- A full-time job superintendent.
- Scheduled construction meetings with the client.
- Publish and update a construction schedule.
- Clean-up and haul away all construction related debris.
- Dumpsters for disposal of construction debris and materials
- Final cleaning.
- General liability insurance.
- Sales tax is included for commercial remodeling.
- Building permit fee.
- Transportation, handling, storage and protection for all contractor provided construction materials and equipment.
- Keep a current and up to date copy of the construction documents on the job site marked with redlines for all changes that occur during work.
- All existing conditions shall be field verified and reported on prior to start of construction.

We have identified the scope of construction work required for the project. The scope of work is listed by CSI division as follows:

**DIVISION 2: SITE WORK & DEMOLITION**
- Saw cutting and removal of the existing concrete drive as required to facilitate modifications to electrical service.
- Demolition of interior partitions as required.
- Saw cutting and removal of the existing concrete floor slab for new plumbing installation.

**DIVISION 3: CONCRETE**
- Pouring back of the site paving and plumbing trenches to match the existing floor slab design.
- Concrete floor slab for MRI and concrete pads for the equipment chiller as required.

**DIVISION 4: MASONRY**
- Concrete and brick masonry units required for the MRI expansion.
- Repair / replace damaged existing masonry units

**DIVISION 5: STRUCTURAL STEEL**
- Structural steel columns, beams and roof joists for the MRI expansion.
- Floor supported structural steel and unistrut support system for both Cath Labs.



### DIVISION 6: WOOD & PLASTIC
- AWI Custom grade Cabinetry and countertops for Cath lab and MRI millwork
- Repair / resurface existing millwork currently damaged or delaminated.

### DIVISION 7: THERMAL & MOISTURE PROTECTION
- Membrane roofing system on new roof area
- Roof patching of existing roof as required for new HVAC and plumbing equipment.
- Clean and paint existing Exterior Insulation Finish System (EFIS).
- Demo gabled wall and remodel existing Canopy above main entrance.

### DIVISION 8: DOORS, FRAMES & HARDWARE
- Doors, frames and hardware for Cath Labs and MRI Suite.
- The lead lined doors where required.
- Clean and repair existing doors to remain.

### DIVISION 9: FINISHES
- All walls are to be constructed to 9'0" above the floor with 24 gauge metal studs and 5/8" fire resistant gypsum board.
- All new walls are to be textured and painted.
- Existing vinyl wall covering to be repaired and cleaned.
- Replace carpet in the waiting and office areas with carpet tile
- Replace existing VCT with new VCT tile and rubber base.
- Cath Labs will have sheet vinyl flooring with welded seams, rolled at walls to form 6" base.
- Replace existing acoustical panel ceiling tiles with new tiles
- Cath Labs to have painted gypsum board ceilings.

### DIVISION 10: SPECIALTIES
- Restroom accessories as equire
- Replace existing cubicle curt ins
- MRI Equipment Room will be 8" raised access flooring.
- Exterior Building sign ge – 2 building mounted iHeart Logo signs, 2 monument mounted iHeart signs.

### DIVISION 11: EQUIPMENT - NA

### DIVISION 12: FURNISHINGS
- $2,000 allowance for window treatments

### DIVISION 13: SPECIAL CONSTRUCTION
- Three lead lined doors (one 4'0"x 7'0" and two 3'0"x 7'0") for each Cath Lab. The doors will have 1/16" lead installed in hollow metal, lead lined frames.
- Each Cath Lab will have a 6'0"x 4'0" 1/16" lead equivalency, leaded glass in a hollow metal, lead lined frame.
- Cath Lab walls will be 1/16" lead lined gypsum board to a height of 7'0" AFF.



- MRI RF shielding for walls, ceilings, view window and door.
- 10' x 10' Non ferrous steel reinforced concrete slab for MRI magnet

**DIVISION 21: FIRE SUPPRESSION**
- Repair and update existing fire protection system to meet current code.

**DIVISION 22: PLUMBING**
- Repair or update existing fixtures as required to meet current codes.
- Relocate existing scrub sink to new Cath lab locations.

**DIVISION 23: HVAC**
- Repair existing HVAC units as required.
- New ductwork from existing HVAC units to new Cath Labs and MRI suite.
- 10 ton chiller and piping for MRI equipment.
- Re-balance all systems as required.

**DIVISION 26: ELECTRICAL**
- Site lighting (clean and relamp) $1,000 allowance.
- 480V Service and Distribution
- 480V to 208V Transformer
- Phase I area - Clean and Relamp fixtures
- Phase II & III areas – clean, tork, and IR scan.
- Phase II OR and Cath lab electrical
- Phase III Cath lab remodel
- Phase IV MRI Addition and remodel

**DIVISION 27: COMMUNICATIONS**
- Upgrade existing nurse call syst

**DIVISION 28: ELECTRONIC SAFETY AND SECURITY**
- Modifications to the existing building fire alarm system as required by current code.

**DIVISION 31 – EARTHWORK**
- Earthwork required to prep site for MRI addition to existing building.

**DIVISION 32 – EXTERIOR IMPROVEMENTS**
- Power wash existing concrete pavement
- Test and repair landscape irrigation system

**DIVISION 33 – UTILITIES - NA**

**EXCLUSIONS:**

The following are specifically excluded from our Proposal:
- Builders' All-Risk insurance is to be provided by the Owner.



- No mold or asbestos abatement or removal of any kind.
- Security system, sound system, and CCTV systems.
- Major floor preparation (floating).
- Power utility company charges.
- Emergency Generator and automatic transfer switch (ATS). (we recommend the owner assign this work to the electrical sub-contractor for continuity and quality control)
- Payment and performance bonds.
- Overtime labor rates.
- Furnishing of power conditioning or surge suppression equipment.
- Television wiring or antenna work.
- Furnishing or installing of view boxes.
- Telephone or data cabling, outlet devices or wall plates.
- Custom made wireways.
- Auto door openers
- Surgical lights and booms.

We have completed a detailed preliminary estimate for the project incorporating the design services and construction scope of work described above.    Based on our evaluation of existing conditions, we propose to complete the project for a stipulated sum of $1,560 000.00.    A Schedule of Values that details our budget for the project is attached for your review.    Upon your authorization to proceed, we will prepare AIA Document A141-2004, Standard Form of Agreement between Owner and Design-Builder for review and execution.

We appreciate the opportunity to submit this proposal for the design and construction of the iHeart South Dallas facility.    If you should have any questions concerning this proposal, please call me directly at 972-898-1246 or reply via email address noted below.    We look forward to working with iHeart on this exciting fast track project.

Sincerely,

MedLink Development, LLC.

Tim S. Kraft, AIA, LEED-AP BD+C
President

tim.kraft@medlinkdevelopment.com

Attachments

ATTORNEYS EYES ONLY

Sworn Record 0354

 **MEDLINK**

# DESIGN-BUILD CONTRACTOR'S APPLICATION FOR PAYMENT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | **APPLICATION NO:** | 10 | |

**PROJECT:** iHeart Center – South Dallas
10810 E Wheatland
Duncanville, TX 75116

**TO OWNER:** iHeart
855 East Collins Blvd.
Suite 109
Richardson, TX 75081

**FROM:** MedLink
**CONTRACTOR:** 400 East Royal Lane
Suite 290
Irving, TX 75039

**PERIOD ENDING:** 4/30/2014
**CONTRACT DATE:** 7/31/2013
**PROJECT NO:** 130103

Application is made for payment as shown below, in connection with the contract.
The Schedule of Values (SV) is attached.

| | | |
|---|---|---|
| ORIGINAL CONTRACT SUM | | $1,559,811.89 |
| NET CHANGE BY CHANGE ORDERS | | $155,229.75 |
| CONTRACT SUM TO DATE (Line 1 +/- 2) | | $1,715,041.64 |
| TOTAL COMPLETED & STORED TO DATE (Column G on SV) | | $1,600,551.84 |
| RETAINAGE: | | |

a. 10% % of Completed Work
(Column D + E on SV)  $1,600,551.84 )= $160,055.18

b. 0 % of Stored Material
(Column F on SV)  $0.00 )=

Total Retainage (Lines 5a + 5b or Total in Column I of SV)  $160,055.18

TOTAL EARNED LESS RETAINAGE  $1,440,496.66

(Line 4 less Line 5 Total)

LESS PREVIOUS APPLICATIONS FOR PAYMENT  $1,429,496.90

(Line 6 from prior Application)

CURRENT PAYMENT DUE  $10,999.76

BALANCE TO FINISH, INCLUDING RETAINAGE

(Line 3 less Line 6)  $274,544.98

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $155,229.75 | $0.00 |
| Total approved this month | $0.00 | $0.00 |
| TOTALS | $155,229.75 | $0.00 |
| NET CHANGES by Change Order | | $155,229.75 |

The undersigned D-B Contractor certifies that to the best of the D-B Contractor's knowledge, information and belief the Work coverd by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the D-B Contractor for Work for which previous Applications for Payment were issued and payments received from the Owner, and that current payment shown is now due.

**DESIGN-BUILD CONTRACTOR:**

BY: _____ DATE: 5/9/14

State of: Texas
County of: Dallas
Subscribed and sworn to before me this 9th day of May 2014
Notary Public: Sherry L. Clymore

My Commission expires: 12/21/2016


Sherry L. Clymore
My Commission Expires
12/21/2016

 iHeart 050



Sworn Record 0355

| | APPLICATION NO: | 10 |
|---|---|---|
| | APPLICATION DATE: | 5/9/2014 |
| | PERIOD TO: | 4/30/2014 |

## SCHEDULE OF VALUES - iHeart Care South Dallas

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | MATERIALS | TOTAL | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | PRESENTLY STORED TO DATE (NOT IN D or E) | COMPLETED AND STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| 00 | A/E SERVICES | | | | | | | | |
| | .1 Architectural / Engineering Fees | 70,400.00 | 70,400.00 | | | 70,400.00 | 100% | 0.00 | |
| 01 | GENERAL REQUIREMENTS | | | | | | | | |
| | .1 Project Supervision / Management | 87,600.00 | 85,310.00 | 730.00 | | 86,040.00 | 98% | 1,560.00 | |
| | .2 Cleaning | 10,800.00 | 9,720.00 | | | 9,720.00 | 90% | 1,080.00 | |
| | .3 Misc. | 4,200.00 | 3,780.00 | | | 3,780.00 | 90% | 420.00 | |
| | .4 Physicist Testing | 3,500.00 | 2,500.00 | | | 2,500.00 | 71% | 1,000.00 | |
| 02 | SELECTIVE DEMOLITION | 8,928.00 | 8,928.00 | | | 8,928.00 | 100% | 0.00 | |
| 03 | CONCRETE | 22,674.00 | 20,406.00 | | | 20,406.00 | 90% | 2,268.00 | |
| 04 | MASONRY | 24,100.00 | 21,690.00 | 2,410.00 | | 24,100.00 | 100% | 0.00 | |
| 05 | METALS | 42,696.00 | 40,576.00 | 2,120.00 | | 42,696.00 | 100% | 0.00 | |
| 06 | MILLWORK | 38,000.00 | 36,000.00 | | | 36,000.00 | 95% | 2,000.00 | |
| 07 | THERMAL & MOSITURE PROTECTION | 32,100.00 | 25,770.00 | 2,800.00 | | 28,570.00 | 89% | 3,530.00 | |
| 08 | OPENINGS | | | | | | | | |
| | .1 Doors, frames, hardware | 4,000.00 | 3,800.00 | | | 3,800.00 | 95% | 200.00 | |
| | .2 glass & Glazing | 1,800.00 | 1,620.00 | | | 1,620.00 | 90% | 180.00 | |
| | .3 Leaded Doors | 33,320.00 | 33,320.00 | | | 33,320.00 | 100% | 0.00 | |
| | .4 Leaded Glass | 6,000.00 | 6,000.00 | | | 6,000.00 | 100% | 0.00 | |
| | .5 MRI Suite Doors | 10,394.00 | 8,186.00 | | | 8,186.00 | 79% | 2,208.00 | |
| | .6 Clean and repair existing doors | 2,400.00 | 2,400.00 | | | 2,400.00 | 100% | 0.00 | |
| 09 | FINISHES | | | | | | | | |
| | .1 Framing, Drywall, Ceilings | 10,404.58 | 9,883.00 | | | 9,883.00 | 95% | 521.58 | |
| | .2 Leaded drywall | 18,531.08 | 18,531.08 | | | 18,531.08 | 100% | 0.00 | |
| | .3 Acoustical Ceilings | 6,021.12 | 5,419.00 | | | 5,419.00 | 90% | 602.12 | |
| | .4 Cath Lab Ceilings | 3,827.20 | 3,827.20 | | | 3,827.20 | 100% | 0.00 | |
| | .5 Painting | 18,500.00 | 16,650.00 | | | 16,650.00 | 90% | 1,850.00 | |
| | .6 VCT | 21,292.16 | 19,163.00 | | | 19,163.00 | 90% | 2,129.16 | |
| | .7 Floor Coverings | 38,754.59 | 36,979.00 | | | 36,979.00 | 95% | 1,775.59 | |
| | Replace ceiling tiles | 8,792.00 | 8,792.00 | | | 8,792.00 | 100% | 0.00 | |
| | .8 Window Coverings | 2,000.00 | 2,000.00 | | | 2,000.00 | 100% | 0.00 | |
| 10 | SPECIALTIES - CURTAINS | 44,231.00 | 44,231.00 | | | 44,231.00 | 100% | 0.00 | |
| 11 | EQUIPMENT | | | | | | | | |
| 12 | FURNISHINGS | | | | | | | | |
| 13 | SPECIAL CONSTRUCTION - RF Shielding | 41,600.00 | 20,800.00 | | | 20,800.00 | 50% | 20,800.00 | |
| 21 | FIRE SUPRESSION | 20,040.00 | 19,076.00 | | | 19,076.00 | 95% | 964.00 | |
| 22 | PLUMBING | 143,000.00 | 139,900.00 | | | 139,900.00 | 98% | 3,100.00 | |
| 23 | HVAC | | | | | | | | |
| | .1 Air Handlers & Ductwork | 153,000.00 | 145,350.00 | | | 145,350.00 | 95% | 7,650.00 | |
| | .2 Air Balance | 6,800.00 | 3,400.00 | | | 3,400.00 | 50% | 3,400.00 | |
| 24 | ELECTRICAL | | | | | | | | |
| | .1 Electrical | 352,841.20 | 317,557.00 | | | 317,557.00 | 90% | 35,284.20 | |
| | .2 Fire Alarms | 21,500.00 | 19,350.00 | | | 19,350.00 | 90% | 2,150.00 | |

# EXHIBIT N

Sworn Record 0357

CAUSE NO. DC-13-02334-L

PATRICIA HUGHES,                    ) IN THE DISTRICT COURT
        Plaintiff                  )
                                   )
v.                                 ) 193RD JUDICIAL DISTRICT
                                   )
DESOTO SURGICARE PARTNERS,         )
LTD. and TEXAS HEALTH              )
VENTURES GROUP, LLC                )
        Defendants                 ) DALLAS COUNTY, TEXAS


        **********************************************
                    ORAL DEPOSITION OF
                    FARIS ZUREIKAT
                      13 MAY 2014
                       VOLUME 1
        **********************************************




        ORAL DEPOSITION of FARIS ZUREIKAT, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and -numbered cause

on the 13th day of May 2014, from 10:05 a.m. to 12:19

p.m., before TAMMY DICKSON CROSS, a Certified Shorthand

Reporter in and for the State of Texas, reported by

machine shorthand, at the law offices of Fulbright &

Jaworski, LLP, 2200 Ross Avenue, Suite 2800, Dallas,

Texas  75201, pursuant to the Texas Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Sworn Record 0358

A P P E A R A N C E S


FOR THE PLAINTIFF:
       Mr. J. Bruce Scrafford
       ARMBRUST & BROWN, PLLC
       100 Congress Avenue, Suite 1300
       Austin, Texas  78701
       Telephone:  (512) 435-2300
       E-mail:  bscrafford@abaustin.com

FOR THE DEFENDANTS:
       Mr. Jeff Cody
       Mr. Nathan B. Baum
       FULBRIGHT & JAWORSKI, LLP
       2200 Ross Avenue, Suite 2800
       Dallas, Texas  75201
       Telephone:  (214) 855-8000
       E-mail:  jeff.cody@nortonrosefulbright.com

ALSO PRESENT:
       Ms. Stephanie Massman

Sworn Record 0359

I N D E X

Appearances                                                          2

FARIS ZUREIKAT

     Examination by Mr. Scrafford                               4

Changes and Signature                                               75
Reporter's Certificates                                             77


                    EXHIBITS MARKED

NO.   DESCRIPTION                                               PAGE

     Deposition Exhibit Number 1                               49
       Correspondence, United Surgical Partners
       International to Texas Department of
       Health, 6/30/11

     Deposition Exhibit Number 2                               51
       Correspondence, United Surgical Partners
       International to Texas Department of
       Health, 7/21/11

     Deposition Exhibit Number 3                               64
       Correspondence, Brown to Zureikat

     Deposition Exhibit Number 4                               66
       E-mail, Bates labeled HUGHES 00067

     Deposition Exhibit Number 5                               67
       Correspondence, Hughes Capital
       Management/Lance R. Hughes to Jarod
       Moss/USPI, and Chris Barnet, Case
       Healthcare, 10/18/11

     Deposition Exhibit Number 6                               69
       E-mail, Bates labeled HUGHES 00148
       through HUGHES 00158

Sworn Record 0360

Q    -- from your company?

A    Mr. Hughes, he might have done it while I wasn't there, but I had the keys to the building.

MR. CODY:  Hang on a second.  Hughes or Hill?

MR. SCRAFFORD:  Mr. Hill.

MR. CODY:  Yeah, yeah.

A    Yes.  Hill?

Q    Yes, sir.

A    Yes.

Q    Okay.  And was it your understanding that Mr. Hill was bringing these other doctor groups to look at the building with the idea of taking over the lease on the building?

A    With the idea of leasing the building, sir.

Q    Yes, sir.  Okay.

A    Leasing, not taking over.

Q    Okay.  And -- and back in 2011 and 2012, your company was still pay -- making lease payments on the building, correct?

A    Yes, sir.  And maintained equipment operational.

Q    But you weren't making any profits on the building at that point, were you?

A    No, sir.

Q   Were you interested in getting another doctors group in to lease the building so that you would not have to continue making lease payments on the building?

A   Sir, that was -- Les Hill was coming in with two groups.  Mr. Hughes, as far as I'm concerned, delayed, delayed, delayed.  He could have had a contract or two in that period of time.

Q   Right.

MR. SCRAFFORD:  And I'll object as nonresponsive.

Q   And I'm not -- I'm not fussing with you.  I just wanted to find out not what you think Mr. Hughes was doing, but what your interest was.  Was -- was it your interest and your company's interest helping to facilitate another doctors group coming in so that they could take over the lease and relieve you of those --

A   My understanding is --

Q   -- expenses?

A   -- we're going to meet the obligations of the lease.  And we will meet and we met the obligations of the lease.  And that was a contract that we fulfilled, sir.

Q   Okay.  And -- and that's not my question to you either.

Sworn Record 0362

MR. SCRAFFORD:  I'll object as nonresponsive.

Q    My question is, did you have an interest as a company in cooperating with Les Hill showing this building to other doctors groups so that they could come over and lease the building and relieve you of the remaining term of the lease?

A    First of all, I don't speak for the company.

Q    Okay.

A    And I met Les Hill before.  He's a nice guy and we just wanted to provide a service.  If this can be done there, that's fine.  There's -- nothing.  It's just doing service to the community.  So there is no benefits.

Q    Did -- did you ever have any communications with Mr. Hill or with Mr. Hughes about keeping the building in question licensed so that the license could be transferred to a new doctors group?

A    The license?

Q    Facility.  Yes, sir.

A    The license is for the -- the group -- the business that owns it.  It's not for the building, sir.  There is -- there is a distinction.  So the license for the business to operate in the building was current, applicable, and followed to the letter.

Sworn Record 0363

Someone else comes into the building, that's a new license and they have to meet current standards, not the time the business was licensed. It's two different things, sir.

Q    My -- my question was, your -- DeSoto Surgicare Partners, Limited, came in and purchased Baylor Surgicare at Duncanville, LLC, correct?

MR. CODY:  Objection; form.

Q    Who -- who was it that purchased Baylor Surgicare at Duncanville, LLC?

A    THVG, sir.

Q    And when THVG purchased Baylor Surgicare at Duncanville, LLC, it also purchased the rights to that company's license, correct?

A    I would imagine.

Q    Okay.  And in June of 2011, Baylor Surgicare at Duncanville, LLC, was only operating at the building in question, correct?

A    Correct.

Q    And Baylor Surgicare at Duncanville, LLC, still had an operating license as of June of 2011, correct?

A    Yes, sir.

Q    Did you have any discussions with anyone about selling Baylor Surgicare at Duncanville, LLC, to another

Sworn Record 0364

group of doctors that wanted to operate out of the building in question?

A    That is -- no, sir, that's not me.  No.

Q    You -- you never had any discussions like that?

A    Sir, I don't own it.  We -- I don't have any authority.  That's THVG's --

Q    Okay.  And you never -- did you ever have any discussions with Les Hill about any process or procedures that could take place that would enable another doctors group to continue operating out of the building in question?

A    That would only happen when they lease the facility and they bring it up to the current code and work, that is none of my business, no, I don't.

Q    My question is, did you have any discussions with Les Hill about that subject?

A    About bringing in doctors and all that?  Would you repeat that because it's...

Q    About facilitating a new group of doctors being able to operate under the existing license.

A    What do you mean facilitating?

Q    Well, for example, selling Baylor Surgicare at Duncanville, LLC.

A    I don't have the authority to do that, no,

Sworn Record 0365

sir.

Q   Okay.  And I'm not asking if you had authority or not.  I'm just asking if you had any communications with Les Hill about that subject matter.

A   No, sir.  Les Hill brought in people.

Q   Okay.

A   And he had his own -- he had two sets of groups that were interested in purchasing to -- and leasing the facility.

Q   Okay.  Did Mr. Hill ever talk to you about any of the details of these groups purchasing or leasing the facility?

A   The only thing that was discussed was their specialty.

Q   Okay.

A   I know orthopedics group and a pain management group.

Q   Okay.  But he didn't have any discussions with you about whether this -- this group of doctors would be interested in also buying Baylor Surgicare at Duncanville, LLC?

A   No, sir.

Q   Okay.

A   Mr. Hill knows the -- the business and he knows THVG.

Sworn Record 0366

Q    Okay.

MR. CODY:  Getting close to a break?

MR. SCRAFFORD:  Sure.  Sure thing.

(Recess taken from 11:17 to 11:32 a.m.)

(Exhibit No. 1 marked.)

Q    (BY MR. SCRAFFORD)  Sir, let me show you what's been marked as Exhibit No. 1, ask you have you seen that document before?

A    I believe this is the first time I see it.

Q    Okay.  Do you know Alex Jenkins?

A    I know of her.  I met her once.

Q    Okay.  Who -- who is United Surgical Partners International?

A    That's the managing entity of the facility.

Q    Okay.  Do you see in the first paragraph of this letter, Exhibit No. 1, this letter will serve as notice that Surgery Center of Duncanville owned by Surgicare Duncanville, LLC, has closed.  Enclosed per your request, the facility license.  Do you see that?

A    Yes, sir.

Q    And in whose name was the facility license?

A    In whose name the facility license?

Q    Yes, sir.  What -- what was the name of the entity that held the facility license?

A    The license name is Surgery Center of

Sworn Record 0367

Duncanville.  That's the name on the license.

Q    And Baylor Surgicare at Duncanville, LLC, never held a facility license; is that correct?

A    Doing business as Surgery Center of Duncanville.

Q    I'm sorry?

A    When THVG bought the facility --

Q    Yes.

A    -- they -- they were operating under Duncanville name and it was -- internally, it was called Baylor Surgicare at Duncanville.

Q    My question is, there was never a license issued by the Texas Department of Health to Baylor Surgicare at Duncanville, LLC, correct?

A    I don't know that, sir.  The license was list -- issued to the owners of Surgery Center of Duncanville.

Q    Okay.  And you're not aware of Baylor Surgicare at Duncanville, LLC, ever holding a license from the Texas Department of Health in its own name, are you?

MR. CODY:  Objection; form.

A    I saw the license.

Q    Okay.

A    And it says Surgery Center of Duncanville and

Sworn Record 0368

I surrendered the license.

Q    And as a company representative, can you confirm that Baylor Surgicare at Duncanville, LLC, had closed as of June 30th, 2011?

A    Yes.

Q    Okay.

(Exhibit No. 2 marked.)

Q    I'll show you what's been marked as Exhibit No. 2 and ask have you ever -- take a moment to review that and tell me if you've seen that document before.

A    I've never seen this before.

Q    All right.  I'd like to take you sentence by sentence through this.

A    This is June '11.  It's not June '10.

Q    Right.  And I'm going to take you sentence by sentence through this to determine what's accurately stated, to the best of your knowledge as a company representative, in this letter and what's inaccurate. Okay?

A    I -- okay.

Q    First sentence, effective November 1, 2010, the LLC acquired the surgery center known as Surgery Center of Duncanville, License 007245.  Is -- is this accurate?

MR. CODY:  As a company rep?

Sworn Record 0369

MR. SCRAFFORD: Yes, sir.

MR. CODY: I don't know that he's designated on something like that.

MR. SCRAFFORD: Well, I think he was designated to talk about the operations of the entities during that time frame.

MR. CODY: Yeah, but this is -- this is the effective date of the acquisition and he's already said he didn't know about the acquisition. I mean, I -- and -- and I'm not messing with you.

MR. SCRAFFORD: Okay.

MR. CODY: He's here on operational stuff and the condition of the property and all that, but as we get into the -- he's not here to testify about the transaction, the licensing, that kind of thing.

MR. SCRAFFORD: Well, I -- I think the licensing was part of his job in the administration and that would be part of the operations to know whether or not it was licensed in operations in that time.

MR. CODY: He can -- and he can testify about it to -- to the extent there's overlap there, but in terms of the application fee and the application itself and stuff, that -- I don't -- I didn't read and I don't believe that's part of the topics.

MR. SCRAFFORD: That's okay. If he

Sworn Record 0370

doesn't know something, I'm just trying to get an answer that I can rely on.  If he doesn't know, that's fine if I need to get it from somebody else.  These are just kind of objective facts I want to get confirmed.

MR. CODY:  I -- and I'm with you.  I guess the only trick to that, though, is as -- when you -- when you prefaced that question with as a representative, it -- it has a little more weight than it would just in his individual capacity.

MR. SCRAFFORD:  Okay.

Q    Let me ask you this:  As a representative, did you do any research to be able to tell us today whether or not a license application and fee were submitted to the Texas Department of Health Services to reflect a change in ownership of the -- the facility in question from Duncanville -- excuse me -- from Surgery Center of Duncanville to Baylor Surgicare at Duncanville, LLC?

A    I did not, no.

Q    Okay.  Who -- who -- who in your organization would have submitted the license application and fee for the change in an ownership?

A    There's a whole department that specializes in that and I don't know who would be involved there.

Q    Okay.  That -- that's not something that you personally handled?

Sworn Record 0371

A   No, sir.

Q   Okay.  Do you recall ever seeing the license application and fee that were submitted to the Texas Department of State Health Services with respect to the change in ownership of the facility?

A   No, sir.

Q   Okay.  And does it appear in this third sentence that there's a typo where it says, effective June 2010, the LLC -- the closing of the facility effective 2010, that -- that should be June 2011, correct?

A   Yes, sir.

Q   And do you have any knowledge whether or not the change of ownership ever received final approval and whether a new license was ever issued to Baylor Surgicare at Duncanville, LLC?

A   I'm not aware of that, sir.

Q   Okay.  If you wanted to find the answer to that question, is there any -- anybody besides Alex Jenkins that you would call to find out that information?

A   No, sir.  I would go through the person that wrote this.

Q   Okay.  You told me before about Mr. Patel being -- that's the building engineer being assigned to

Sworn Record 0372

go out to the building every Saturday --

A   Yes, sir.

Q   -- to look over the systems.

A   Yes.

Q   Do you know for a fact whether he went to the building every single Saturday from June of 2011 up until February of 2013?

A   I trust the man.  I worked with him and I trust him, yes.  And I know he went to the building on other times whenever the alarm went off because he would go in for me and check on things.

Q   My question is, do you know for a fact that he went to the building every Saturday during that time frame from June of 2011 until February of 2013?

A   If -- I -- I don't think anybody can speak to that.

Q   Okay.  In other words, have you gone back to review his time records or his billing records to determine whether he was there for that whole time period or if he took any vacations during that time period or if he might have missed a Saturday here and there?

A   I know I have things for him to do and I assign him little things to do in the facility and he maintained that and made sure that everything was kosher

Sworn Record 0373

and he arranged for a lot of the repairs in the place.
I can't speak whether he was there all the time.  All I
can say is his service has been impeccable and because
of him, we are enjoying the benefits of being in code in
this office currently they own and then in that
facility.

Q    Okay.

MR. SCRAFFORD:  I'll object as -- as
nonresponsive.

Q    My question is, have you gone back to review
his time records or any other records to determine if,
in fact, he went out to the building in question every
single Saturday?

A    Again, I get his bill every month, I review it
every month, and I approve it every month.  So was he
there at Saturday X?  I don't know.  Was the work done?
I am sure it has because when he -- when I was -- had
the facility closed, I made sure that I did walk through
at least once a week.

Q    You walked through the building at least once
a week?

A    Yes, sir.  It's my responsibility.  I take
care of my responsibility.

Q    Okay.  And -- and tell me, you walked through
the building once a week from June of 2011 through

Sworn Record 0374

February of 2013?

A    I had people in every day till August -- the end of August, so I walked through.  And the rest of the time, yes.

Q    You personally walked through every single week from August of 2011 until February of 2013?

A    I made it a point to walk through on a regular basis.  Whether I walked through every single week or not, I know the place is locked, it's secured and all that, but we had a walk-through on a regular basis.  I don't have a time clock there to clock by.

Q    Right.  Did you keep any records of the dates that you did a walk-through in the building?

A    For what purpose, sir?

Q    My -- my question is just, did you keep any records?

A    Again, for what purpose?  No.

Q    Did you take any vacations or trips out of the country at any time between June of 2011 --

A    No, sir.

Q    -- and February of 2013 --

MR. CODY:  Let him finish.

THE WITNESS:  Thank you.

Q    -- for more than a week?

A    No, sir.

Sworn Record 0375

Q   Were you ever out of the state for more than a week from June of 2011 till February of 2013?

A   No, sir.

Q   Okay.  Do you keep any kind of time records or logs or diaries that state your whereabouts or the tasks that you perform on a day-to-day basis?

A   No, sir.

Q   And do you still have copies of Mr. Patel's billing records from 2011 to present?

A   For Duncanville?

Q   Yes, sir.

A   No, sir.

Q   What happened to those records?

A   Those records were scanned and put into electronic archive.

Q   All right.  Do you have an electronic archive of Mr. Patel's billing records from 2011 to 2013?

A   Probably somewhere.

Q   Okay.  Who -- who maintains that electronic archive?

A   I think it's on the hard drive in -- at USPI.

Q   And is there a particular department there that maintains those records?

A   It will be accounts payable.

Q   Okay.  And do you recall when the generator

was removed from the building in question?

A     I want to say probably around July.  I'm not exactly sure when.

Q     Probably around July of?

A     July '11, something like that.

Q     2011?

A     Yes, sir.

Q     And did you authorize the generator to be removed from the building?

A     Yes, sir.

Q     And why was the generator removed from the building back in July of 2011?

A     Because I didn't feel comfortable that it was -- it was just old.  It looked terrible.  I couldn't feel comfortable, rely -- I -- I just didn't like -- it just seemed like it really was, you know, just old and not in good shape.

Q     Were you using the generator?

A     No, sir.

Q     And was it -- your -- your operations of the building were finished at that time, weren't they?

A     Yes, sir.

Q     So why remove the generator?

A     I made a mistake.

Q     And what happened to the generator?

Sworn Record 0377

A    It's scrapped.

Q    And where did it go?

A    I think Diversified Power got -- just scrapped it.

Q    And what -- what is Diversified Power?

A    It's the people I called to maintain the generator.

Q    Is that a -- a company in the Dallas/Fort Worth area?

A    Yes, sir.

Q    And what's the name of the person that you deal with at Diversified Power?

A    Bill Bertrand.

Q    And did Diversified Power pay anything for the generator?

A    No, sir.

Q    Okay.  Is Mr. Bertrand a friend of yours?

A    He's someone that I've used in -- at DeSoto Surgicare and he's one that I trust in his judgment.  He maintained the facility, the generator we have there in excellent condition, and I asked him to look at the other generator.

Q    All right.  Why -- why did you ask him to look at the other generator?

A    Because I trusted his judgment.

Sworn Record 0378

Q  Okay.  But why were you concerned about the other generator in July of 2011?

A  I don't recall why.  It's just -- I wanted to -- to look at the -- the place -- I mean, look at the generator.  That's all I asked.

Q  All right.  And --

A  Said would you take a look at it next time you're in the area?  Okay.

Q  And what did he tell you about the generator?

A  It's very old, it's rusty, lot of the lines are cracking, which I saw -- saw that and he said it's -- it's scrap, it's something you can't count on.

Q  Okay.  Did he charge you or the company anything to remove the generator?

A  No, sir.

Q  Prior to removing the generator, did -- did you tell anybody at the land -- on behalf of the landlord that you were going to remove the generator?

A  I asked Carolyn Exley if I can remove it.  It's -- I told her the condition of it.  She goes, yeah, okay, get rid of it.  It was my --

Q  Okay.

A  -- thing.

Q  But you didn't have any communications with

Sworn Record 0379

the landlord?

A   No, no.

Q   Okay.  And did you ever investigate replacing that generator with a new generator?

A   Several times, sir.

Q   All right.  When -- when did you first look at getting a replacement generator put in?

A   The -- the day they took it because Les was in the place, was witness to the extraction, and said, you know, they probably need a new one here, could you work up something?  Sure.

Q   You asked Les to work something up?

A   No.

Q   He asked you --

A   I --

Q   -- to work something up?

A   I -- I asked Diversified.  I said would you do that and maybe you can talk to him about that.

Q   So that was Mr. --

A   Bertrand.

Q   Bertrand?

A   Yes, sir.

Q   And did Mr. Bertrand ever get you a price for a replacement generator?

A   He got me a quote on two replacements.

Sworn Record 0380

Q   And when did he get you the quotes on the replacement generators?

A   I do not recall, but I have a -- a record and I think it's -- somewhere.  I want to say it was September.

Q   September of 2011?

A   2011.

Q   And why didn't you order a replacement generator at that time?

A   You know, I was talking to Les at the time and I said, you know, we'll -- we'll get one, we'll replace it.  And he said, well, let's just wait and see what's going to be the pull on these things, how many rooms they're going to have and what they will need.

Q   And -- and did that conversation with Les occur over the phone or in person or by e-mail?

A   I -- I don't know.  I think at that time then, I wasn't aware -- I mean, I just -- I -- I talked -- Les was there, he came by, walked through, and he says, you know, I would wait on the generator, let's see what else we'll -- we'll do there.  And he was just talking to himself this, you know, I would want to wait on this and see what happens.

Now, I was not aware that -- I made the mistake and let go of the generator.  I don't know when

Sworn Record 0381

they came to me and said, hey, you shouldn't have gotten that -- gotten rid of that.  At that time, I said, I'll replace it.

Q    And did --

A    So I don't have the time line for you.

Q    Okay.

(Exhibit No. 3 marked.)

Q    Let me show you what's been marked as Exhibit --

A    Okay.

Q    -- 3 and ask -- well, I'll represent this is a document that was produced by your company.

A    Okay.

Q    Have you seen this e-mail before?  Is this an e-mail, first of all, Exhibit 3?

A    I don't know if it's a fax or an e-mail.  I can't tell you which one it is.

Q    And I didn't see a date on the document.  Do you recall when you got that document that's been marked as Exhibit 3?

A    September.  Because I have it in PDF format. September 2011.

Q    Okay.  Okay.  Who is Jarod Moss?

A    He's in USPI.

Q    You know what his position is at USPI?

Sworn Record 0382

A    I -- I -- right now, I don't know what it is now, but my recollection in the past, he was in the legal department.

Q    Okay.  Before I mark these, I'm just -- I'm going to hand you a stack of photographs that were produced in discovery --

A    Yes, sir.

Q    -- that are Bates number D00075 to D000139. Do you know who took these photographs or what they're of?

A    I did take some photos the day that we were supposed to hand over the building that Mr. Hughes didn't show up, but I don't recognize some of these pictures.  It's -- I -- these are -- I mean, it -- it could be some of my photographs, but looking at this, it looks like stuff is dirty.  I left the place -- the place spotless.  So this does not show a spotless clean place.  The black and white does not.  So I don't know if these are my pictures or not, sir.

Q    Okay.  But you took some photographs in -- in February of 2013?

A    Yes, sir.

Q    Did you take any photographs of the building prior to February of 2013?

A    No, sir.

Sworn Record 0383

I, FARIS ZUREIKAT, have read the foregoing deposition, or have had it read to me, hereby affix my signature that same is true and correct, except as noted above.

_____
FARIS ZUREIKAT

THE STATE OF Texas )

COUNTY OF Dallas )

Before me, Michele Zamarripa, on this day personally appeared FARIS ZUREIKAT, known to me (or proved to me under oath or through TX DL ) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 2nd day of June , 2014.

MICHELE ZAMARRIPA
Notary Public
STATE OF TEXAS
My Comm. Exp. 10-12-15

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF Texas

Sworn Record 0384

CAUSE NO. DC-13-02334-L

PATRICIA HUGHES,                    ) IN THE DISTRICT COURT
     Plaintiff                      )
                                    )
v.                                  ) 193RD JUDICIAL DISTRICT
                                    )
DESOTO SURGICARE PARTNERS,          )
LTD. and TEXAS HEALTH               )
VENTURES GROUP, LLC                 )
     Defendants                     ) DALLAS COUNTY, TEXAS

REPORTER'S CERTIFICATION
DEPOSITION OF FARIS ZUREIKAT
13 MAY 2014

I, TAMMY DICKSON CROSS, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

That the witness, FARIS ZUREIKAT, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by

the witness;

That the deposition transcript was submitted on

_May 23, 2014_ to the witness or to the attorney

for the witness for examination, signature and return to

me by _June 12, 2014_.

That the amount of time used by each party at the

deposition is as follows:

     Mr. J. Bruce Scrafford    -    01:59

That pursuant to information given to the

deposition officer at the time said testimony was taken,

the following includes counsel for all parties of

Sworn Record 0385

record:

FOR THE PLAINTIFF:
        Mr. J. Bruce Scrafford
        ARMBRUST & BROWN, PLLC
        100 Congress Avenue, Suite 1300
        Austin, Texas   78701
        Telephone:  (512) 435-2300
        E-mail:  bscrafford@abaustin.com

FOR THE DEFENDANTS:
        Mr. Jeff Cody
        Mr. Nathan B. Baum
        FULBRIGHT & JAWORSKI, LLP
        2200 Ross Avenue, Suite 2800
        Dallas, Texas   75201
        Telephone:  (214) 855-8000
        E-mail:  jeff.cody@nortonrosefulbright.com

        I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

        Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

        Certified to by me this 23rd day of May, 2014.

                                            TAMMY DICKSON CROSS, Texas CSR #6925
                                            Expiration Date:  12/31/15
                                            Firm Registration No. 660
                                            HUSEBY, INC.
                                            7000 Mopac Expressway, 2nd Floor
                                            Austin, Texas   78724
                                            (800) 333-2082

Sworn Record 0386

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition (was) was not returned to the deposition officer on 6|9|14 ;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. J. Bruce Scrafford, Custodial Attorney;

That $665.35 is the deposition officer's charge to the Plaintiff for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this 9th day of June, 2014.

TAMMY DICKSON CROSS, Texas CSR #6925
Expiration Date: 12/31/15
Firm Registration No. 660
HUSEBY, INC.
7000 Mopac Expressway, 2nd Floor
Austin, Texas 78724
(800) 333-2082

Sworn Record 0387

# EXHIBIT O

| | | Task Name | Start | Finish | Notes | Resource Names |
|---|---|---|---|---|---|---|
| | | Surgery Center of Duncanville | | | | Sun 10/10/10 |
| 1 | | Development Activities | Mon 8/2/10 | Thu 10/21/10 | | |
| 2 | ✓ | Negotiate terms with seller and execute term sheet | Mon 8/2/10 | Mon 8/2/10 | | |
| 3 | | Due Diligence Process | Mon 8/2/10 | Wed 10/20/10 | | |
| 4 | ✓ | Conference call with Dr. to review project | Mon 8/2/10 | Wed 9/1/10 | 8/18/10 Call scheduled for 9/1/10.... | Kinder |
| 5 | ✓ | Send signed term sheet to Legal | Mon 8/2/10 | Mon 8/2/10 | 8/19/10 Sent... | Kinder |
| 6 | ✓ | Conduct conference call w/ Ops to review DD and Transition Processes | Thu 8/5/10 | Thu 8/5/10 | Schedule 8/30/10 @ 4.00 p.m.... | Kinder |
| 7 | ✓ | Send full due diligence request list to seller | Mon 8/2/10 | Wed 8/4/10 | On call, discuss pain screen process and send write up | Kinder |
| 8 | ✓ | Send e-mail to Project Support Team to notify of new project | Wed 8/4/10 | Wed 8/4/10 | | Kinder |
| 9 | ✓ | Have local RVP talk to experienced turnaround RVP | Mon 8/2/10 | Fri 8/6/10 | 8/17/10 NA... | Kinder |
| 10 | ✓ | Have Dev Officer talk to experienced turnaround Dev Officer | Mon 8/2/10 | Fri 8/6/10 | 8/17/10 NA... | Kinder |
| 11 | ✓ | Receive due diligence documents from seller | Thu 8/5/10 | Fri 9/10/10 | | Kinder |
| 12 | ✓ | Schedule internal DD kick off call | Mon 8/2/10 | Mon 8/2/10 | 8/4/10 Scheduled for August 10th at 3:30 p.m.... | Kinder |
| 13 | ✓ | Schedule recurring external conference calls with Seller | Mon 8/2/10 | Fri 9/10/10 | 9/10/10 Set up bi-weekly calls on Thursdays.... | Kinder |
| 14 | ✓ | Distribute due diligence data per distribution checklist | Fri 9/10/10 | Fri 9/10/10 | | Kinder |
| 15 | | Begin site visits to validate processes and purchase price | Mon 8/2/10 | Wed 10/20/10 | | |
| 16 | ✓ | Schedule on site visits | Tue 8/3/10 | Mon 8/16/10 | | Kinder |
| 17 | ✓ | Schedule monthly internal DD calls, subsequent to on site visits | Wed 8/25/10 | Wed 8/25/10 | 8/22/10 Scheduled a post on site call for Wednesday at 1:30 p.m. | Kinder |
| 18 | | Send Clinical check list to RVP or Imaging Ops Contact | Thu 8/5/10 | Mon 8/23/10 | 8/22/10 E-mailed to Carolyn.... | Kinder |
| 19 | | Information Technology | Tue 8/17/10 | Tue 8/31/10 | | |
| 20 | ✓ | On site visit-IT | Tue 8/17/10 | Fri 8/20/10 | | Fichtner |
| 21 | ✓ | Review Hardware and Software to assess cost of integration to USPI and/or | Tue 8/17/10 | Mon 8/30/10 | Include phone system in assessment | Fichtner |
| 22 | | Send IT report to full team | Tue 8/31/10 | Tue 8/31/10 | | Kinder |
| 23 | ✓ | Business Office | Tue 8/17/10 | Fri 9/24/10 | | |
| 24 | ✓ | On Site visit - Bus Off | Tue 8/17/10 | Fri 8/20/10 | | Gonzalez |
| 25 | ✓ | Document business office processes for transition planning and internal Cont | Mon 8/23/10 | Wed 9/1/10 | | Gonzalez |
| 26 | ✓ | Send report to full team | Thu 9/2/10 | Fri 9/24/10 | | Kinder |
| 27 | ✓ | Engage third party to perform coding and billing audit | Thu 9/9/10 | Thu 9/9/10 | 9/3/10 Sent e-mail to Melinda Taylor. | Gonzalez |
| 28 | ✓ | Send audit score to full team | Thu 9/9/10 | Fri 9/24/10 | 9/24/10 They received a 80% of CPT codes and 89% on ICD9 cod | Kinder |
| 29 | ✓ | Managed Care | Tue 8/17/10 | Fri 9/24/10 | | |
| 30 | ✓ | On site visit-managed care | Tue 8/17/10 | Fri 8/20/10 | | Pimper |
| 31 | ✓ | Document managed care processes for transition planning and Internal Cont | Mon 8/23/10 | Tue 9/21/10 | Report on implant charges and reimbursement | Pimper |
| 32 | ✓ | Send report to full team | Wed 9/22/10 | Fri 9/24/10 | | Kinder |
| 33 | ✓ | Analyze and report on historical collections per case | Mon 9/13/10 | Tue 9/21/10 | | Pimper |
| 34 | | Clinical Operations | Tue 8/3/10 | Wed 9/29/10 | Includes pain screens | |
| 35 | ✓ | Run pain screens / filters and send to Pain Committee | Tue 8/17/10 | Fri 9/10/10 | 8/27/10 Chris Martin is working on. Should be completed by next | Martin |
| 36 | ✓ | Send report to RVP and Pain Comm Coordinator | Mon 9/13/10 | Mon 9/13/10 | Corey Hooks | Kinder |
| 37 | ✓ | Obtain Pain Screen clearance from Pain Committee | Wed 9/15/10 | Wed 9/15/10 | 9/13/10 Received e-mail from Corey Hooks that it looks good. The | Hooks |
| 38 | ✓ | On site visit-Clinical | Tue 8/17/10 | Tue 9/28/10 | 9/9/10 Dr. Zarin, Julie Gunderson and Carolyn Exley will be visiting | Exley |
| 39 | ✓ | Document clinical review and plan for transition and internal control implemer | Tue 9/28/10 | Tue 9/28/10 | Investigate and understand implant usage | Exley |
| 40 | | Send report to full team | Wed 9/29/10 | Wed 9/29/10 | | Kinder |
| 41 | ✓ | On site visit-Medical | Tue 8/17/10 | Tue 9/28/10 | 9/9/10 Dr. Zarin, Julie Gunderson and Carolyn Exley will be visiting | Zarin |
| 42 | ✓ | Document medical review and transition plan | Tue 9/28/10 | Tue 9/28/10 | | Zarin |
| 43 | | Send report to full team | Tue 9/28/10 | Tue 9/28/10 | | Kinder |
| 44 | ✓ | Determine notification for DEA and State Narcotics Control license | Tue 8/3/10 | Mon 8/16/10 | May need to notify state in advance | Exley |
| 45 | | Physician Relations | Tue 8/17/10 | Thu 10/14/10 | | |
| 46 | ✓ | On site visit-Physician relations (surgical facilities) | Tue 8/17/10 | Thu 10/7/10 | 9/30/10 Sent Hal Mayo an e-mail to coordinate the physician intervi | Exley |
| 47 | | For Imaging Centers, review referral sources and marketing plan | Tue 8/17/10 | Mon 8/23/10 | | Exley |
| 48 | ✓ | Identify preferred PAB members | Tue 8/24/10 | Mon 8/30/10 | Surgical facilities only | Exley |
| 49 | ✓ | Brett, Niels or Bill to meet entire partnership | Fri 10/8/10 | Thu 10/14/10 | Review DD, trnsin plan, pass thru exp, accnt tax return | Kinder |
| 50 | | Payroll and Employee Benefits | Mon 9/13/10 | Fri 10/8/10 | | |
| 51 | ✓ | On site discussion by RVP with all employees | Mon 9/13/10 | Mon 9/13/10 | With Shelly/Shannon; see power point presentation | Exley |
| 52 | ✓ | Review payroll register to payroll census | Mon 9/13/10 | Fri 9/17/10 | Check for employees on payroll, not on census and vice verse | Taylor |
| 53 | ✓ | Review and compare benefits to determine cost of integrating employees into | Mon 9/13/10 | Thu 10/7/10 | Note: In Colorado, if ee's are term'd PTO must be paid out (term'd f | Taylor |
| 54 | ✓ | Conference call to review and approve benefit plans | Fri 10/8/10 | Fri 10/8/10 | 10/7/10 Scheduled review on Tuesday, October 12th. | Taylor |
| 55 | ✓ | Materials Management | Tue 8/17/10 | Fri 9/24/10 | Surgical Facilities Only | |
| 56 | ✓ | On site visit-materials management | Tue 8/17/10 | Thu 9/2/10 | | Eich |
| 57 | ✓ | Document materials management processes for transition planning and Inter | Fri 9/3/10 | Fri 9/10/10 | 9/24/10 Sent report out. Will determine structure later.... | Eich |
| 58 | ✓ | Send report to full team | Mon 9/13/10 | Fri 9/24/10 | | Kinder |
| 59 | | Financial | Fri 8/6/10 | Tue 10/19/10 | | |

D_001723
CONFIDENTIAL

D_001724
CONFIDENTIAL

| | | Surgery Center of Duncanville | | | | Sun 10/10/10 |
|---|---|---|---|---|---|---|
| ID | ⊙ | Task Name | Start | Finish | Notes | Resource Names |
| 60 | ✓ | On Site - Financials | Tue 8/17/10 | Tue 8/17/10 | | Pfunder |
| 61 | | Document financial processes for transition planning and Internal Control Imp | Mon 9/13/10 | Fri 9/24/10 | | Pfunder |
| 62 | | Reconcile Cash to Posted Pmts to Net Revenue | Mon 9/13/10 | Tue 9/21/10 | | Pfunder |
| 63 | ✓ | Prepare working capital schedule | Mon 9/27/10 | Wed 9/29/10 | 10/4/10 Changed wording in the C&PA not to include WIC Adjustr | Kinder |
| 64 | ✓ | Prepare target cash calculation | Mon 9/27/10 | Wed 9/29/10 | NA We have changed the wording in the C&PA because | Kinder |
| 65 | ✓ | Calculate current cash burn rate, if a Turnaround | Mon 9/13/10 | Fri 9/17/10 | Only if a turn around center | Kinder |
| 66 | ✓ | Confer on future tax returns being accrual based | Mon 9/13/10 | Fri 9/17/10 | If curr is cash based, notify current preparer so they can advise clie | Kinder |
| 67 | | Review Insurance Policies, obtain quote for nose insurance and compare to t | Mon 9/13/10 | Wed 9/29/10 | | Hayden |
| 68 | ✓ | Send insurance report to full team | Thu 9/30/10 | Mon 10/4/10 | 10/4/10 Cost of tail insurance is $12,865. | Kinder |
| 69 | ✓ | Meeting to review Financial due diligence | Tue 10/5/10 | Mon 10/11/10 | 10/7/10 Scheduled for 10/12/10.... | Kinder |
| 70 | | Fixed Asset Review | Mon 9/13/10 | Tue 10/19/10 | | |
| 71 | ✓ | Conduct independent appraisal of fixed assets | Mon 9/13/10 | Tue 10/5/10 | 9/16/10 MERC is going to visit the center on October 5th. | Belue |
| 72 | ✓ | Obtain sign off from RVP on assets in poor condition | Wed 10/6/10 | Tue 10/19/10 | RVP to thoroughly investigate and respond via e-mail with commer | Kinder |
| 73 | | Project depreciation expense for PF | Mon 9/13/10 | Fri 10/8/10 | | Belue |
| 74 | | Develop Historical Trends | Wed 8/18/10 | Mon 10/4/10 | | |
| 75 | ✓ | Develop historical cases by specialty | Wed 8/18/10 | Fri 8/27/10 | | Kinder |
| 76 | ✓ | Develop historical cases by financial class | Fri 9/10/10 | Fri 9/10/10 | | Kinder |
| 77 | ✓ | Develop historical P&L by month | Fri 8/20/10 | Fri 8/20/10 | | Kinder |
| 78 | | Confirm recent financial results support offer valuation | Thu 9/30/10 | Mon 10/4/10 | Perform monthly until project closes | Kinder |
| 79 | ✓ | Complete Partnership Profile (surgical facilities only) | Mon 9/13/10 | Mon 10/4/10 | Send to RVP, Development officer and Evie | Kinder |
| 80 | ✓ | Leases | Fri 8/20/10 | Wed 10/6/10 | | |
| 81 | ✓ | Send e-mail to Corp Acctg, noting whether USPI will guarantee facility le | Mon 9/13/10 | Wed 10/6/10 | 10/5/10 Sent to JJ Walker.... | Kinder |
| 82 | ✓ | Confirm accounting for facility leases | Mon 9/13/10 | Wed 10/6/10 | 10/5/10 Per report from JJ, the lease will remain an operating leas | Walker |
| 83 | ✓ | Confirm accounting for equipment leases | Mon 9/13/10 | Wed 9/29/10 | 9/29/10 Received e-mail from Christa. The Siemens lease is an op | Pfunder |
| 84 | ✓ | Obtain FMV opinion on lease rate, if physicians own real estate | Fri 8/20/10 | Thu 9/9/10 | NA... | Kinder |
| 85 | | Debt | Fri 8/6/10 | Fri 9/24/10 | | |
| 86 | ✓ | Review debt and capital leases with Legal and Treasury | Fri 8/20/10 | Thu 9/2/10 | 9/2/10 Jason sent e-mail that Key Equipment needed assignment a | Kinder |
| 87 | ✓ | Calculate guarantees vs. debt balances | Mon 9/13/10 | Wed 9/15/10 | Determine if guarantees cover all debt or only specific notes... | Erwin |
| 88 | ✓ | Generate amortization schedules on all debt, including leases | Mon 9/13/10 | Fri 9/17/10 | 9/2/10 Matt Kline generated amortization schedule on Key Finance | Erwin |
| 89 | ✓ | Conference call with Sellers to review next steps on debt | Mon 9/20/10 | Fri 9/24/10 | 9/2/10 Sent e-mail to Danny Bundren to determine if they would lik | Kinder |
| 90 | ✓ | Perform UCC Lien search | Fri 8/6/10 | Fri 8/6/10 | | Moran |
| 91 | ✓ | Send UCC Lien search results to Bob Mosher's firm | Fri 8/6/10 | Wed 8/18/10 | | Kinder |
| 92 | ✓ | Reconcile UCC lien to pledged assets | Fri 8/6/10 | Fri 9/24/10 | 9/24/10 He forwarded me the lien. UCC reconciled.... | Kinder |
| 93 | | Legal | Mon 9/13/10 | Fri 9/24/10 | | |
| 94 | | Review Real Estate Lease | Mon 9/13/10 | Fri 9/24/10 | | Mosher |
| 95 | | Prepare legal summary of physician arrangements | Mon 9/13/10 | Fri 9/17/10 | | Mosher |
| 96 | | Verify whether or not any existing USPI facilities in the market have a USPI n | Mon 9/13/10 | Fri 9/17/10 | | Kinder |
| 97 | ✓ | Change of Ownership and CON regulations | Tue 8/3/10 | Wed 10/20/10 | Tied to Funding | |
| 98 | ✓ | Set up new entity and obtain new tax ID | Tue 8/3/10 | Fri 10/1/10 | 10/1/10 Jen Moran set up new legal entity Baylor Surgicare at Dun | Jenkins |
| 99 | ✓ | Open new bank accounts, as needed | Mon 10/4/10 | Fri 10/8/10 | 10/6/10 Sent new bank account form to Carol Koch. Need bank ac | Koch |
| 100 | ✓ | Prepare new signature card on current bank account | Mon 9/27/10 | Fri 10/8/10 | 10/6/10 Since the center is currently with BofA, Carol does not nee | Koch |
| 101 | | Complete Medicare application for change of control | Thu 9/23/10 | Wed 10/20/10 | | Jenkins |
| 102 | ✓ | Prepare application for change of ownership with CON Board | Tue 8/3/10 | Mon 9/27/10 | NA... | |
| 103 | | Other Processes | Mon 8/2/10 | Fri 10/8/10 | | |
| 104 | ✓ | Obtain FMV opinion of purchase price | Mon 8/2/10 | Wed 8/18/10 | If hospital partners is Baylor, Memorial Hermann, CHW, Legacy | Moss |
| 105 | ✓ | Obtain FMV opinion of minority interest valuation | Thu 8/12/10 | Wed 8/18/10 | Confer with Evie on need, particularly if going fm OON to IN and if V | Moss |
| 106 | | Background Checks | Mon 8/2/10 | Fri 10/8/10 | | |
| 107 | ✓ | Request form be completed and get them back | Mon 8/2/10 | Fri 9/24/10 | 9/24/10 Sent e-mail to Carolyn Exley.... | Kinder |
| 108 | ✓ | Submit forms for process to be run | Mon 9/27/10 | Fri 10/1/10 | 10/7/10 Sent Carolyn an e-mail on status of Hal's background chec | Kinder |
| 109 | ✓ | Receive forms back and review | Mon 10/4/10 | Fri 10/8/10 | RVP will confirm if OK or not | Exley |
| 110 | | Transition Plan | Tue 10/12/10 | Wed 10/13/10 | | |
| 111 | | Draft plan from due diligence reports | Tue 10/12/10 | Tue 10/12/10 | | Kinder |
| 112 | ✓ | Re-review detailed transition plan section w/ RVP | Tue 10/12/10 | Tue 10/12/10 | One week or so, pre close | Kinder |
| 113 | | Complete transition plan | Tue 10/12/10 | Tue 10/12/10 | | Exley |
| 114 | ✓ | Present to Brett as Dry Run | Tue 10/12/10 | Tue 10/12/10 | Only needed if project is high risk or complicated | Exley |
| 115 | | Present to Sr. Management | Wed 10/13/10 | Wed 10/13/10 | | Exley |
| 116 | ✓ | Pro forma | Fri 10/8/10 | Fri 10/8/10 | | |
| 117 | ✓ | Prepare three year proforma | Fri 10/8/10 | Fri 10/8/10 | Take into account due diligence adjustments and results of physici | Kinder |
| 118 | ✓ | Perform QA on proforma | Fri 10/8/10 | Fri 10/8/10 | | Miller |

| | | Surgery Center of Duncanville | | | | Sun 10/10/10 |
|---|---|---|---|---|---|---|
| **ID** | **O** | **Task Name** | **Start** | **Finish** | **Notes** | **Resource Names** |
| 119 | ✓ | Internal review meeting with RVP and SVP | Fri 10/8/10 | Fri 10/8/10 | | Kinder |
| 120 | | Approval | Thu 10/14/10 | Tue 10/19/10 | | |
| 121 | ∪ | Prepare Board Approval Package which includes Proforma | Thu 10/14/10 | Thu 10/14/10 | ... | Moss |
| 122 | | Send to RVP, SVP then CDO for review prior to Board submission | Fri 10/15/10 | Tue 10/19/10 | | Moss |
| 123 | ✓∪ | Present to Board for project approval | Thu 10/14/10 | Thu 10/14/10 | NA. Does not require Board Approval. | Moss |
| 124 | | **Definitive Agreements, Drafting and Negotiations** | Mon 8/2/10 | Mon 10/11/10 | | Mosher |
| 125 | | Contribution and Purchase Agreement | Mon 8/2/10 | Fri 10/1/10 | | Mosher |
| 126 | | Schedules to Contribution and Purchase Agreement | Mon 9/27/10 | Fri 10/1/10 | | Seller |
| 127 | ∪ | Partnership or Operating Agreement | Mon 8/2/10 | Fri 10/1/10 | For buy ins to existing entity, be sure USPI person is an officer,... | Mosher |
| 128 | | Management Agreement | Mon 8/2/10 | Fri 10/1/10 | | Mosher |
| 129 | | **Resolve outstanding issues prior to closing** | Mon 9/27/10 | Mon 10/11/10 | | |
| 130 | | Transition call with Symbion | Mon 9/27/10 | Fri 10/1/10 | | |
| 131 | ✓∪ | Review and agree on distributions at closing - amount and to whom | Mon 10/11/10 | Mon 10/11/10 | NA | Kinder |
| 132 | ∪ | **Transaction Close and Funding** | Thu 9/30/10 | Thu 10/21/10 | 10/7/10 Be sure to let them know we need all of the financial n | |
| 133 | ∪ | Send Legal Transaction Information to Legal | Thu 9/30/10 | Thu 9/30/10 | Send to Jim Muthie 3 wks b4 close, if possible | Kinder |
| 134 | | Prepare purchase price payout schedule per final Purchase Agreement | Mon 10/4/10 | Tue 10/5/10 | | Kinder |
| 135 | | Obtain wiring instructions from seller | Wed 10/6/10 | Thu 10/7/10 | | Kinder |
| 136 | | Inform Treasury of estimated funds needed at close a few days prior to actual close da | Fri 10/8/10 | Fri 10/8/10 | | Kinder |
| 137 | ∪ | Send e-mail to Lucratia Robinson for basket & compliance poster | Fri 10/8/10 | Fri 10/8/10 | She will need to know how many employees | Kinder |
| 138 | | Send e-mail to Project Support Team notifying them of pending close | Fri 10/8/10 | Fri 10/8/10 | | Kinder |
| 139 | ∪ | Determine who will be on site support for first day and week of acquisition | Fri 10/8/10 | Fri 10/8/10 | Send Benefits presentation to RVP for 1st employee meeting | Kinder |
| 140 | ∪ | Send USPI and EDGE Intro presentations to RVP for use on Day 1 | Mon 10/11/10 | Wed 10/13/10 | Send to Evie to review for currency first | Kinder |
| 141 | ∪ | Re-run net revenue analysis | Mon 10/11/10 | Wed 10/13/10 | Send to accounting post close for revenue recognition | Kinder |
| 142 | | Prepare to change locks on facility, if warranted | Fri 10/8/10 | Fri 10/8/10 | | Kinder |
| 143 | | Present signed Board Approval to Treasury with notice from CDO that all document are | Wed 10/20/10 | Wed 10/20/10 | | Kinder |
| 144 | | Fund Transaction | Wed 10/20/10 | Wed 10/20/10 | | Kinder |
| 145 | ∪ | E-mail new center roster form to Everyone-Home Office and area DD team | Thu 10/21/10 | Thu 10/21/10 | Be sure to include BOM and Clinical Director | Kinder |
| 146 | | Send out approval memo per standard distribution list | Thu 10/21/10 | Thu 10/21/10 | | Kinder |
| 147 | | **Begin Transition** | Thu 10/21/10 | Mon 2/28/11 | | |
| 148 | | Add to USPI Insurance Policy | Thu 10/21/10 | Wed 10/27/10 | | Hayden |
| 149 | ∪ | Cancel previous commerical insurance policies | Thu 11/11/10 | Wed 12/8/10 | GL/PL/Property. Work Comp when Payroll shifts | Exley |
| 150 | | **Establish weekly conference calls to track progress over first 90 days** | Thu 10/21/10 | Thu 10/28/10 | | |
| 151 | | First meeting of Transition Team | Fri 10/22/10 | Thu 10/28/10 | | Kinder |
| 152 | ∪ | E-mail final electronic copies of agreements | Thu 10/21/10 | Mon 10/25/10 | RVP, Accountants-Facility, Corporate, Tax | Kinder |
| 153 | ∪ | Send copy of any third party valuations to corporate accounting | Tue 10/26/10 | Tue 10/26/10 | Erin Bloyed | Kinder |
| 154 | | **Legal** | Fri 10/29/10 | Thu 11/18/10 | | |
| 155 | ∪ | Obtain minute books and be sure they are on site | Fri 10/29/10 | Thu 11/18/10 | Only if entity being acquired remains. If we set up a new entity, we | Kinder |
| 156 | ∪ | Wind down any previous partnerships, if necessary | Fri 10/29/10 | Thu 11/18/10 | Old entity needs to stay in place for employee leasing term. Then, | Kinder |
| 157 | | **Information Technology** | Fri 10/29/10 | Fri 1/14/11 | | |
| 158 | | Order router and circuit | Fri 10/29/10 | Thu 11/4/10 | | Riffe |
| 159 | | Review detailed implementation plan with RVP and Administrator | Fri 11/5/10 | Thu 11/11/10 | | Riffe |
| 160 | | Install router and circuit | Fri 11/12/10 | Thu 12/23/10 | | Riffe |
| 161 | ∪ | Confirm understanding by center of USPI e-mail retention policy | Fri 12/24/10 | Fri 12/24/10 | Deletes > 180 days Inbox, 60 days Deleted Items, 90 days Sent Ite | Kinder |
| 162 | | Connect to USPI network | Mon 12/27/10 | Fri 1/7/11 | | Riffe |
| 163 | | Plan for continued access any retired patient accounting systems | Mon 1/10/11 | Fri 1/14/11 | | Riffe |
| 164 | | **Accounting - Corporate level** | Thu 10/21/10 | Fri 11/5/10 | | |
| 165 | ∪ | Meeting with Accounting to review terms of agreements | Mon 11/1/10 | Mon 11/1/10 | Facility, Tax and Corporate accounting: need an hour | Kinder |
| 166 | | Review distributions made at closing - amount and to whom made | Thu 10/21/10 | Thu 10/21/10 | | Kinder |
| 167 | | Prepare target cash and working capital true up | Mon 11/1/10 | Fri 11/5/10 | | Kinder |
| 168 | | Tax Returns - determine who will be responsible for short year, prior to USPI effective | Fri 10/29/10 | Fri 10/29/10 | | Kinder |
| 169 | | **Treasury** | Fri 10/29/10 | Fri 1/21/11 | | |
| 170 | | **Bank Account** | Fri 10/29/10 | Fri 1/21/11 | | |
| 171 | | Submit new signature card to change signers on bank account | Fri 10/29/10 | Tue 1/2/10 | | Exley |
| 172 | | Send deposit slips for new bank account to center | Fri 12/24/10 | Fri 12/24/10 | | Koch |
| 173 | ∪ | Update acceptable payer list for an existing lock boxes | Mon 12/27/10 | Fri 12/31/10 | If ctr has existing lock box, add new ctr name to acceptable list so t | Exley |
| 174 | | Notify electronic payors to change bank account (i.e. Medicare, etc) | Mon 1/3/11 | Mon 1/3/11 | | Exley |
| 175 | | Notify credit card merchants of new account or change vendors | Mon 12/27/10 | Fri 1/21/11 | | Koch |
| 176 | | **Accounting - Facility level** | Thu 10/21/10 | Thu 2/17/11 | | |
| 177 | | **Oracle General Ledger** | Thu 10/21/10 | Fri 12/24/10 | | |

D_001725 CONFIDENTIAL

| ID | ⓘ | Task Name | Start | Finish | Notes | Resource Names |
|---|---|---|---|---|---|---|
| 178 | | Set up Oracle ID for new company | Thu 10/21/10 | Thu 11/11/10 | | Martin |
| 179 | ✓ | Send historical monthly P&L to accounting with monthly cases | Fri 10/29/10 | Fri 10/29/10 | Send to facility accountant and to Matt Kline in Corp Acctg | Kinder |
| 180 | | Load historical P&L into Oracle | Mon 11/1/10 | Fri 11/5/10 | | Kline |
| 181 | ✓ | Provide proforma to accounting for budget input | Fri 10/29/10 | Fri 10/29/10 | Facility and corporate | Kinder |
| 182 | | Load monthly budget from pro forma | Mon 11/1/10 | Mon 11/8/10 | | Kline |
| 183 | | Send historical balance sheet to facility accountant | Fri 10/29/10 | Fri 10/29/10 | | Kinder |
| 184 | ✓ | Forward e-mail from Seller with ending balance sheet to Corp Acctng | Mon 11/1/10 | Mon 11/1/10 | Erin Bloyed and Lisa Rodriguez... | Kinder |
| 185 | | Load opening balance sheet | Tue 11/2/10 | Mon 11/8/10 | | Pfunder |
| 186 | ✓ | Send bank reconciliations and statements to accountant for month prior to close | Fri 10/29/10 | Fri 10/29/10 | Be sure to get full vendor name and address for OS checks... | Kinder |
| 187 | ✓ | Obtain full vendor name, address and EIN/SSN for outstanding checks | Mon 11/1/10 | Fri 12/24/10 | For chks prior to effective date, need full data in case they need to b | Kinder |
| 188 | | Establish protocol for expenses related to old entity and related cash funding | Fri 10/29/10 | Fri 10/29/10 | | Kinder |
| 189 | ✓ | Facility Controller and Manager to review transition plan with Administrator | Fri 10/29/10 | Thu 11/4/10 | Including monthly reporting needs | Pfunder |
| 190 | ✓ | RVP to add center to his/her financial reports list in Secure Access | Fri 11/12/10 | Thu 11/18/10 | RVP submits Support Center ticket, will need Oracle ID | Exley |
| 191 | | Train center personnel to obtain monthly financial statements | Fri 11/26/10 | Fri 11/26/10 | | Exley |
| 192 | | Review intercompany bill (mo 1) via conference call with Administrator and Lead Physi | Fri 11/26/10 | Thu 12/23/10 | | Pfunder |
| 193 | | Review intercompany bill (mo 2) via conference call with Administrator and Lead Physi | Fri 12/24/10 | Thu 1/20/11 | | Pfunder |
| 194 | | Review intercompany bill (mo 3) via conference call with Administrator and Lead Physi | Fri 1/21/11 | Thu 2/17/11 | | Pfunder |
| 195 | | Oracle Accounts Payable | Mon 12/27/10 | Fri 1/21/11 | | |
| 196 | | Set up Oracle A/P | Mon 12/27/10 | Wed 12/29/10 | | Pfunder |
| 197 | | Designate individual responsible for accounts payable | Thu 12/30/10 | Thu 12/30/10 | | Exley |
| 198 | | Request user access to Oracle AP and GL | Fri 12/31/10 | Fri 12/31/10 | | Exley |
| 199 | | Schedule training | Mon 1/3/11 | Mon 1/3/11 | | Exley |
| 200 | | Begin entering vendors | Mon 1/10/11 | Fri 1/14/11 | | Exley |
| 201 | ✓ | Cancel all credit cards in name of center | Mon 1/17/11 | Fri 1/21/11 | After new petty cash is established, post AP conversion | Exley |
| 202 | | Payroll and Employee Benefits | Fri 10/29/10 | Mon 1/31/11 | | |
| 203 | ✓ | Set up center on Hire Right | Fri 10/29/10 | Thu 11/4/10 | Contact Lucretia Robinson | Kinder |
| 204 | | Establish responsibility for payroll and employee benefits at center | Fri 10/29/10 | Fri 10/29/10 | | Reinert |
| 205 | ✓ | Establish first date on USP payroll | Fri 10/29/10 | Fri 10/29/10 | Compete PAF for any ee moving from sep. mgt co | Reinert |
| 206 | | Order Kronos time clock | Mon 11/1/10 | Wed 11/3/10 | | Reinert |
| 207 | | E-mail Barbara Hayden regarding first day on USP payroll | Thu 11/4/10 | Thu 11/4/10 | | Kinder |
| 208 | | Train staff on ADP Enterprise and Kronos | Fri 11/5/10 | Tue 12/14/10 | | Reinert |
| 209 | | Conduct initial employee benefit presentations | Thu 1/20/11 | Tue 1/25/11 | | Reinert |
| 210 | | Set up and complete employee benefit enrollment | Tue 1/25/11 | Mon 1/31/11 | | Reinert |
| 211 | | First day on USPI payroll | Mon 1/24/11 | Mon 1/24/11 | | Reinert |
| 212 | | Reimbursement | Fri 10/29/10 | Thu 11/25/10 | | |
| 213 | | Notify of new tax ID and change of ownership, if applicable | Fri 10/29/10 | Thu 11/25/10 | | Pimper |
| 214 | | Create or update managed care grids | Fri 10/29/10 | Thu 11/25/10 | | Pimper |
| 215 | | Review fee schedule versus other centers in the area to determine if changes are need | Fri 10/29/10 | Thu 11/25/10 | | Pimper |
| 216 | | Business Office | Fri 11/5/10 | Thu 12/30/10 | | |
| 217 | ✓ | Send e-mail to add center to coding audit schedule | Fri 11/5/10 | Fri 11/5/10 | Serena Doyal in CSO. Include Oracle ID in message | Kinder |
| 218 | | Train center staff on new processes and reports required to meet USPI standard close | Tue 12/28/10 | Thu 12/30/10 | | Exley |
| 219 | | Materials Management | Thu 12/2/10 | Mon 2/28/11 | | |
| 220 | ✓ | Send notice of termination to current GPO | Thu 12/2/10 | Thu 12/2/10 | Wait until new DEA has been received | Eich |
| 221 | | Send notice to HPG to add to USPI contract | Fri 12/3/10 | Fri 12/3/10 | | Eich |
| 222 | | Perform physical count of medical supply inventory | Fri 12/10/10 | Tue 12/14/10 | | Eich |
| 223 | | Notify vendors of change of ownership, if not on GPO previously | Mon 12/6/10 | Tue 12/7/10 | | Eich |
| 224 | | Convert to HPG contracts | Mon 2/28/11 | Mon 2/28/11 | | Eich |
| 225 | | Train on use of system for inventory | Tue 2/8/11 | Mon 2/28/11 | | Eich |
| 226 | | Notify Michael Rogers to add center to utility contractor review process | Fri 12/3/10 | Fri 12/3/10 | | Kinder |
| 227 | | Administration | Thu 10/21/10 | Wed 1/19/11 | | |
| 228 | | General | Thu 10/21/10 | Mon 12/6/10 | | |
| 229 | ✓ | Send completed partnership roster to Kim Tiller | Thu 10/21/10 | Thu 10/21/10 | Include purchase allocation schedule | Kinder |
| 230 | ✓ | Establish and conduct meeting with center's staff | Fri 10/29/10 | Fri 10/29/10 | Present employee benefits power point | Exley |
| 231 | | Review expectations with Administrator, review EDGE and KnowlEDGE | Mon 11/1/10 | Mon 11/1/10 | | Exley |
| 232 | | Establish date for Administrator orientation at Home Office | Thu 10/21/10 | Thu 10/21/10 | | Exley |
| 233 | | Communicate and validate compliance with USPI document retention standards | Tue 11/2/10 | Tue 11/2/10 | | Exley |
| 234 | ✓ | Post compliance poster in facility | Mon 11/8/10 | Fri 11/19/10 | Mailed by Lucretia in Home Office | Exley |
| 235 | ✓ | Review governing body by laws and medical staff by laws | Tue 11/30/10 | Mon 12/6/10 | Compare to new op agrmnt to determine if changes are needed | Exley |
| 236 | | Review and discuss process for distributions under USPI and how this is coordina | Mon 11/1/10 | Mon 11/1/10 | | Exley |

D_001726
CONFIDENTIAL

| | | | | | |
|---|---|---|---|---|---|
| | | Surgery Center of Duncanville | | | Sun 10/10/10 |

| ID | ⓘ | Task Name | Start | Finish | Notes | Resource Names |
|---|---|---|---|---|---|---|
| 237 | ✓ | Review new operating agreement w/ administrator | Fri 11/26/10 | Fri 11/26/10 | One month post close. to be lead by RVP | Exley |
| 238 | ✓ | Notify governmental agencies of new legal name and tax ID | Thu 10/21/10 | Wed 1/19/11 | cc. Paralegal on Medicaid, DEA, CLIA, JC/AAAHC, Pharmacy | |
| 239 | | State department of health | Thu 10/21/10 | Wed 11/10/10 | | Reed |
| 240 | | Local business license | Thu 10/21/10 | Wed 10/27/10 | | Exley |
| 241 | | Medicare | Thu 10/28/10 | Wed 11/10/10 | | Reed |
| 242 | | Medicaid | Thu 11/11/10 | Wed 11/24/10 | | Exley |
| 243 | | DEA | Thu 11/25/10 | Wed 12/1/10 | | Exley |
| 244 | ✓ | State DEA or equivalent | Thu 12/2/10 | Wed 12/8/10 | If MO. include Setter POA | Exley |
| 245 | | CLIA | Thu 12/9/10 | Wed 12/22/10 | | Exley |
| 246 | ✓ | Texas Health Information Collection (THIC) registration | Thu 12/23/10 | Wed 1/5/11 | Only if in Texas | Exley |
| 247 | ✓ | Accreditation-Joint Commission or AAAHC | Thu 1/6/11 | Wed 1/12/11 | Alex/Jen will send out notice to accrediting body | Reed |
| 248 | | Pharmacy | Thu 1/13/11 | Wed 1/19/11 | | Exley |
| 249 | | Boiler Certifications | Thu 12/23/10 | Wed 12/29/10 | | Exley |
| 250 | | Biohazardous Waste Permit | Thu 12/23/10 | Wed 12/29/10 | | Exley |
| 251 | | State laser device registration | Thu 12/23/10 | Wed 12/29/10 | | Exley |
| 252 | | X-Ray / Radiology license | Thu 12/23/10 | Wed 12/29/10 | | Exley |
| 253 | | Name Change Issues | Fri 10/29/10 | Thu 11/4/10 | | |
| 254 | | Patient forms | Fri 10/29/10 | Mon 11/1/10 | | Exley |
| 255 | | Medical records forms | Fri 10/29/10 | Mon 11/1/10 | | Exley |
| 256 | | Signage | Fri 10/29/10 | Thu 11/4/10 | | Exley |
| 257 | | Logo | Fri 10/29/10 | Thu 11/4/10 | | Exley |
| 258 | ✓ | Send Administrator list of agreements to be reviewed for potential changes | Fri 10/29/10 | Thu 11/4/10 | Contracts to be rvwd by admin - Processes\Acquisitions | Exley |
| 259 | | Partnership Meeting | Thu 10/21/10 | Wed 11/3/10 | | |
| 260 | | Establish date for first meeting | Fri 10/29/10 | Fri 10/29/10 | | Exley |
| 261 | | At first meeting - review distribution methodology. calculation and schedule | Mon 11/1/10 | Mon 11/1/10 | | Exley |
| 262 | ✓ | Prepare for and discuss initial physician leadership survey | Thu 10/21/10 | Wed 11/3/10 | Coordinate with Kristin Blewett | Exley |
| 263 | | Sales | Fri 10/29/10 | Fri 10/29/10 | | |
| 264 | | Conduct first PAB meeting | Fri 10/29/10 | Fri 10/29/10 | | Exley |
| 265 | ✓ | Schedule EDGE training and implementation | Fri 11/5/10 | Fri 11/5/10 | At end of first 90 days. post close: Contact Cindy Klein | Exley |
| 266 | | Closing Binder | Thu 10/21/10 | Thu 12/23/10 | | |
| 267 | | Obtain final closing documents from legal | Thu 10/21/10 | Wed 12/1/10 | | Kinder |
| 268 | | Provide internal legal counsel with one copy of closing binder | Thu 12/2/10 | Thu 12/2/10 | | Kinder |
| 269 | | Prepare development closing binder | Fri 12/3/10 | Thu 12/16/10 | | Kinder |
| 270 | | Distribute development closing binder to RVP, SVP, Admin, Hosp Partner, COO | Fri 12/17/10 | Thu 12/23/10 | | Kinder |
| 271 | | Post Transition Conf Call to Debrief on Process | Fri 11/5/10 | Fri 11/5/10 | | Kinder |
| 272 | ✓ | Notify Organizational Development to send Survey | Mon 11/8/10 | Mon 11/8/10 | Alert ctr mgt of on line survey request to be received | Kinder |
| 273 | ✓ | Notify Organizational Development to send NPS survey | Mon 11/8/10 | Mon 11/8/10 | Will provide base line | Kinder |

D_001727
CONFIDENTIAL

Sworn Record 0393

# EXHIBIT P

CAUSE NO. DC-13-02334-L

| | | |
|---|---|---|
| PATRICIA HUGHES, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| DESOTO SURGICARE PARTNERS, LTD., | § | 193RD JUDICIAL DISTRICT |
| TEXAS HEALTH VENTURES GROUP, | § | |
| LLC, UNITED SURGICAL PARTNERS | § | |
| INTERNATIONAL, INC., | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S SECOND REQUEST FOR PRODUCTION TO DEFENDANTS

TO: Defendants DESOTO SURGICARE PARTNERS, LTD., TEXAS HEALTH VENTURES GROUP, LLC, and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. by and through their counsel of record, Nathan B. Baum, Fulbright & Jaworski, L.L.P., 2200 Ross Avenue, Suite 2800, Dallas, Texas 75201.

Pursuant to Rule 196 of the Texas Rules of Civil Procedure Plaintiff serves this its Requests for Production of Documents. In response to the Requests for Production, you are requested to produce responsive documents or items to the undersigned counsel of record at the address indicated below within the time period provided by the Texas Rules of Civil Procedure. All of these discovery requests are continuing and require reasonable supplementation.

### DEFINITIONS

1.    *Documents.* The term "Document" is defined to be synonymous in meaning and equal in scope to the usage of this phrase in Texas Rule of Civil Procedure 192.3(b). A draft or a non-identical copy is a separate document within the meaning of this term. The term "Document" also includes electronically or magnetically stored data, which may be produced in any format convenient for Defendant. TEX. R. CIV. P. 196.4.

2.    *Concerning.* The term "Concerning" means relating to, referring to, describing, evidencing or constituting.

{W0631142.1}

3. *Defendant or You.* The terms "Defendant" or "You" mean and refer to DESOTO SURGICARE PARTNERS, LTD., TEXAS HEALTH VENTURES GROUP, LLC, and UNITED SURGICAL PARTNERS INTERNATIONAL, INC., as well as all other persons acting or purporting to act on their behalf, including any attorney or other representative.

4. *Plaintiff.* The term "Plaintiff" means and refers to PATRICIA HUGHES, as well as all other persons acting or purporting to act on her behalf, including any attorney or other representative, including but not limited to: Lance Hughes, Hughes Capital Management, and its employees or representatives.

5. *Premises.* The term the "Premises" means and refers to the land, building, and improvements located at 1018 East Wheatland Road, Duncanville, Texas 75116.

6. *Lease.* The term the "Lease" means and refers to the Lease Agreement entered into between Patricia Hughes and Surgery Center of Duncanville, LP on or about June 1, 2004, and any amendments, modifications, assignments, or guaranties thereof, including but not limited to (a) the Assignment and Assumption of Lease and Landlord Consent entered into by and among Patricia Hughes, Surgery Center of Duncanville, LP, and Baylor Surgicare at Duncanville, LLC on or about November 1, 2010; and (b) the Lease Guaranty Agreement entered into by Texas Health Ventures Group, LLC as guarantor for the benefit of Patricia Hughes on or about November 1, 2010.

## REQUESTS FOR PRODUCTION

16. The "acquisition file" identified by Jarod Moss on Page 32, Line 15 of his deposition testimony.

**RESPONSE:**

17. The "closing binder for [the] acquisition" identified by Jarod Moss on Page 32, Line 18 of his deposition testimony.

**RESPONSE:**

{W0631142.1}                                          2

18.    The "Duncanville/DeSoto merger file" identified by Jarod Moss on Page 36, Line 5 of his deposition testimony.

**RESPONSE:**

19.    The "approval memo" identified by Jarod Moss on Page 37, Line 15 of his deposition testimony.

**RESPONSE:**

20.    All emails or other written or electronic communications sent during the calendar year 2010 between or among Defendants and Symbion, Inc. (including its subsidiaries, employees and agents) concerning the Lease or the Premises.

**RESPONSE:**

21.    All emails or other written or electronic communications sent during calendar years 2010, 2011, 2012, or 2013 to or from the individual custodians identified below that (a) contain one or more of the keywords identified below, and (b) concern the Lease, the Premises, or the subject matter of this litigation.

Custodians:    Jarod Moss; Carolyn Exley; Jonathan ("Johnny") Bond; Brad Brodnax; Faris Zureikat; Shannon Kinder; Niels Vernegaard; Dr. David Zarin

Keywords:    "Duncanville"; "DeSoto"; "Hughes"; "Baylor Surgicare"

**RESPONSE:**

22.    All "maintenance service contracts" entered into by any Defendant (as required by Paragraph 14 of the Lease) concerning the backup electrical generator at the Premises.

Respectfully submitted,

**MARK L. HAWKINS**
State Bar No. 00790843
**ANDREW F. YORK**
State Bar No. 24066318
**ARMBRUST & BROWN, PLLC**
100 Congress Avenue, Suite 1300
Austin, Texas 78701
(512) 435-2300 – telephone
(512) 435-2360 – facsimile

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was delivered via certified mail, return receipt requested on this the 29 day of August, 2014 to the following attorney of record:

Nathan B. Baum
Jeff Cody
Fulbright & Jaworski, L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

_____
ANDREW F. YORK
MARK L. HAWKINS

Sworn Record 0398

# EXHIBIT Q

CAUSE NO. DC-13-02334-L

PATRICIA HUGHES,                        §   IN THE DISTRICT COURT OF
                                        §
        Plaintiff,                      §
                                        §
v.                                      §
                                        §   DALLAS COUNTY, TEXAS
DeSOTO SURGICARE PARTNERS, LTD.,        §
TEXAS HEALTH VENTURES GROUP,            §
LLC, and UNITED SURGICAL                §
PARTNERS INTERNATIONAL, INC.            §
                                        §
        Defendants.                     §   193RD JUDICIAL DISTRICT

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S
SECOND REQUEST FOR PRODUCTION TO DEFENDANTS**

TO:   Plaintiff Patricia Hughes, by and through her attorneys of record, Mark L. Hawkins,
      Andrew F. York; Armbrust & Brown, PLLC; 100 Congress Avenue, Suite 1300, Austin,
      Texas 78701; 512/45-2300; facsimile: 512/435-2360.

Pursuant to the Texas Rules of Civil Procedure, Defendants DeSoto Surgicare Partners,

Ltd., Texas Health Ventures Group, LLC, and United Surgical Partners International, Inc.

(collectively, "Defendants") hereby serve their Objections and Responses to Plaintiff's Second

Request for Production to Defendants (the "Requests").

**WITHHOLDING STATEMENT**

Pursuant to Rule 193 of the Texas Rules of Civil Procedure, Defendants respond that

certain documents and information responsive to the Requests are privileged and therefore

exempt from discovery.  Defendants will not produce any materials that are protected from

discovery by the attorney-client privilege, work-product doctrine, party communications

privilege, witness statement privilege, consulting expert privilege, and/or any other privilege

existing at law.  Defendants reserve the right to assert any such privileges at such time that it

produces documents. Any disclosure, inadvertent or otherwise, of any information protected by any privilege or protection shall not be deemed a waiver of that privilege or protection with respect to such information or any other information and shall not prejudice Defendants' right to object to any subsequent use of such information.

## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

16.     The "acquisition file" identified by Jarod Moss on Page 32, Line 15 of his deposition testimony.

**RESPONSE:** Defendants object to this Request as it calls for information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

17.     The "closing binder for [the] acquisition" identified by Jarod Moss on Page 32, Line 18 of his deposition testimony

**RESPONSE:** Defendants object to this Request as it calls for information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

18.     The "Duncanville/DeSoto merger file" identified by Jarod Moss on Page 36, Line 5 of his deposition testimony.

**RESPONSE:** Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

19.     The "approval memo" identified by Jarod Moss on Page 37, Line 15 of his deposition testimony.

**RESPONSE:** Defendants object to this Request as it calls for information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

20.     All emails or other written or electronic communications sent during the calendar year 2010 between or among Defendants and Symbion, Inc. (including its subsidiaries, employees and agents) concerning the Lease or the Premises.

**RESPONSE:** Defendants object to this Request as it is overly broad and unduly burdensome. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

21. All emails or other written or electronic communications sent during calendar years 2010, 2011, 2012, or 2013 to or from the individual custodians identified below that (a) contain one or more of the keywords identified below, and (b) concern the Lease, the Premises, or the subject matter of this litigation.

Custodians: Jarod Moss; Carolyn Exley; Jonathan ("Johnny") Bond; Brad Brodnax; Faris Zureikat; Shannon Kinder; Niels Vernegaard; Dr. David Zarin

Keywords: "Duncanville"; "DeSoto"; "Hughes"; "Baylor Surgicare"

**RESPONSE:** Defendants object to this Request as it is overly broad and unduly burdensome. Defendants also object to this Request because the phrase "subject matter of this litigation" is vague, ambiguous, and confusing. Defendants further object to this Request as it calls for information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Defendants also object to this Request as it is not reasonably limited in time or scope. Defendants further objects to this request as it calls for attorney-client and/or work product privileged information/materials. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

22. All "maintenance service contracts" entered into by any Defendant (as required by Paragraph 14 of the Lease) concerning the backup electrical generator at the Premises.

**RESPONSE:** Defendants object to this Request as it is vague, overly broad, and unduly burdensome. Subject to and without waiving the foregoing objections, Defendants have produced or will produce all non-privileged, responsive documents that could be located following a reasonably diligent search of their documents.

---

Dated: September 29, 2014

FULBRIGHT & JAWORSKI LLP

Jeff Cody
State Bar No. 04468960
jcody@fulbright.com
Nathan B. Baum
State Bar No. 24082665
nbaum@fulbright.com
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Telephone:(214) 855-8000
Facsimile: (214) 855-8200

*Attorneys for DeSoto Surgicare Partners, Ltd.
and Texas Health Ventures Group, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 29, 2014, a true and correct copy of the foregoing document was served via electronic mail and certified U.S. mail on the following counsel of record:

Mark L. Hawkins
Andrew York
ARMBRUST & BROWN, PLLC
100 Congress Avenue, Suite 1300
Austin, TX 78701
mhawkins@abaustin.com
ayork@abaustin.com

Nathan B. Baum

---

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION TO DEFENDANTS** **Page 5**
58099288.1/11303393

# EXHIBIT R



**Sterling Barnett □ Little, Inc.**
Architecture / Planning / Interior Design / Consulting

December 23, 2011

Lance Hughes
Hughes Capital Management
1301 Capital of Texas Highway Ste: A300
Austin, TX 78746

Re: Duncanville ASC
**201136.00 Duncanville ASC Code Deficiency Study**

Dear Mr. Hughes:

Provided in this package is the **Sterling Barnett Little, Inc.** Code Deficiency Study and supporting narrative and plan documents as requested for the Duncanville ASC located at 1018 W. Wheatland Road. The facility is currently not licensed and has not been operational for the last several months. SBL has been commissioned to investigate the existing facility to identify code deficiencies in order to reopen the facility on which this study is based.

The architectural and engineering team consisting of **Sterling Barnett Little, Inc.**, reviewing architectural portions of the project and Fratto Engineering, conducting reviews of the mechanical, electrical and plumbing systems. The study is based on code deficiencies identified according to current State and City model building codes which include, but are not limited to the Texas Department of State Health Services (TDSHS) ASC Licensing Rules and Texas Department of License and Regulation (TDLR Accessibility). In order to reopen the facility, the owner will need reviews and approval from these two authorities having jurisdiction in addition to City of Duncanville requirements for Certificate of Occupancy.

We appreciate the opportunity to participate in providing the investigation services and study narrative to assist in identifying deficiencies with the facility. We look forward to the possible next steps in providing design solutions and documents to assist in making the Duncanville ASC operational. Should you have any questions or require additional information, please do not hesitate to call.

Sincerely,
**Sterling Barnett Little, Inc.**

Michael Barnett, AIA
Principal

Attachment(s):  Floor Plan
                Site Plan

HUGHES 00088



## SBL Memo

**Sterling Barnett □ Little, Inc.**
Architecture / Planning / Interior Design. / Consulting

Date: December 21, 2011

To: Lance Hughes; Hughes Capital Management

Subject: Duncanville Ambulatory Surgery Center

Project: **201136.00 Duncanville ASC Code Deficiency Study**          File #: 3.0

### Duncanville Ambulatory Surgery Center

SBL has been commissioned to study the required code compliance needed for the building to have modification completed for reopening of the facility. This report only identifies the deficiencies according to authorities having jurisdiction over the project. AHJ for the Duncanville ASC will be the Texas Department of State Health Services (TDSHS - ASC Licensing Rules), NFPA 101 Life Safety Code, Texas Department of License and Regulation (TDLR - Handicapped Accessibility), and the City of Duncanville for model building and building system codes references and the basis of this deficiency study.

The building reviewed is a 1 story existing facility of approximately 9,969 SF located at 1018 W. Wheatland Rd in Duncanville, Texas, consisting of four (4) OR's with typical prep, recovery, waiting, admin, typical support, central sterile, equipment and locker rooms etc. for a functional Surgery Center. The existing site accommodates thirty-six (36) standard parking spaces with four (4) accessible parking spaces. The roof is minimally sloped with applied membrane roofing over existing modified bituminous roof system. There are two existing canopy systems in place for drop off and discharge.

We have noted the architectural deficiencies with bold text and corresponding plan note numbering in the context of relevant TDSHS code requirements:

**TDSHS ASC Rules (State AHJ):**

(d) Spatial requirements.

(1) Administration and public areas.

(A) Entrance. Entrances shall be located at grade level, be accessible to individuals with disabilities, and be protected against inclement weather from the point of passenger loading/unloading to the building entrance.
**[1] The existing canopies do not protect passenger from inclement weather since they do not extend out over where a car could pull up.**

(B) Waiting area. A waiting area or lobby shall be provided within the ASC and include having the

---

Sterling Barnett Little, Inc.          1000 Ballpark Way, Suite 200          Arlington, TX 76011
Phone: 817.792.2100                    Fax: 817.461.1362                     Page 1 of 11

HUGHES 00089

following rooms and items:

(iii) access to potable drinking water.

**[2] Assume user will provide bottled water since there is no water cooler.**

(F) Medical records area. The medical records area shall have adequate space for reviewing, dictating, sorting, or recording records. If electronic imaging devices are employed (i.e., microfilm, digital, or optical disc), the medical records area shall have adequate space for transcribing records in the electronic format. Medical record storage space shall be located within a secure designated area under direct visual supervision of administrative staff.

**[3] The Medical Records area is not secure; it is open to the remainder of the Reception / Administrative area.**

(G) General storage room.

(i) A minimum of 30 square feet per operating room shall be provided exclusive of soiled holding, sterile supplies, clean storage, drug storage, locker rooms, and surgical equipment storage. General storage may be located in one or more rooms or closets, and shall be located outside of the patient treatment areas.

**[4] This area of 120 square feet does not exist; it would need to be provided "outside of the patient treatment areas" per the rules.**

(H) Wheelchair storage space or alcove. Storage space for wheelchairs shall be provided and shall be out of the direct line of traffic.

**[5] The loveseat needs to be removed from this alcove.**

(2) Engineering services and equipment areas. Equipment rooms with adequate space shall be provided for mechanical and electrical equipment. These areas shall be separate from public, patient, and staff areas.

**[6] The engineering areas are accessed through the Supply Room. A door from the exterior may be required to satisfy the State.**

(3) Examination room. An examination room is not required, but when provided, the room shall have:

**[7] There are several challenges with this room. First of all, the plan labels this room as an "exam room" but the signage on the door states it is a "special procedures." Exam rooms do not have gases (per Table 3 of the Rules); this room has gases on the wall. If this room appears to be something more than "exam," the State will inquire of the owners how it is to be used. Second, if this room requires gurney access, the corridor leading to this room is not 8' wide. Third, a toilet may not be permitted to be accessed directly off of this room (based on previous conversations with the State on a different project.) If the use of this room requires the patient to prep and recover, additional stations will need to be provided in the appropriate areas. If this room is a "Treatment Room" in reality, there are issues as well -- including the requirement for an additional soiled utility room which can be accessed from the non-sterile side (see below).**

*Rebecca Read called back from the State and left me a detailed message. The following is added based on this information:*
*The Exam Room can not have direct access to a Toilet as it currently does for*

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 2 of 11

HUGHES 00090

*infection control reasons.*

*DSHS does not have a specific line item for "Special Procedure" rooms; however they do have some specific requirements if the ASC has one even though one of them is not minimum square footage or clearance. A seamless floor and hard ceiling are required, A thermostat and humidistat gages need to be provided in the room. Two low air returns are required, and air supply must come from the ceiling. There can be no drain or waste line above the ceiling unless there is a secondary protection system in place; likewise, it can not be located beneath an exercise or recreation room (we're safe from the latter, I don't have a clue about the former.) If digital equipment is used, a 2-panel film illuminator is not required; if digital equipment is not used, a 2-panel film illuminator in the room is minimum. Four receptacles have to be on the critical branch as well as one normal outlet. With regards to medical gases, a Special Procedures Room needs at least 2 Oxygen, 2 Vacuum, 1 Air*

*The Special Procedure room needs to be positive . . . and it needs at least one recovery station.*

*If this room is used for Endoscopy, there are similar requirements . . . and a Endoscopy work room is needed (probably near the Endo Room rather than assuming dirty scopes are taken through to the Decontam Room within the Surgical Suite. The tables in the back of the ASC rules book do address specific requirements for med gas and air flow which would need to be addressed.*

*So, our "owner" needs to tell us how we are to look at this room that is labeled "Exam" on the plan but "Special Procedure" on the door before we can really cite deficiencies unless you are willing to cite both . . .*

(A) a minimum clear floor area of at least 80 square feet exclusive of fixed or moveable cabinets, counters, or shelves; and

(B) a work counter with space for writing and a hand washing fixture with hands-free operable controls.

(4) Janitor's closet. In addition to the janitor's closet exclusive to the surgery suite, a sufficient number of janitor's closets shall be provided throughout the facility to maintain a clean and sanitary environment. The closet shall contain a floor receptor or service sink and storage space for housekeeping supplies and equipment.

(5) Laboratory.
**[8] The area designated "blood draw" on the plans is not a separate room; rather it appears to be a nurse work area within the Prep area. If the latter assumption is correct, it is assumed that lab services are contracted. If the latter assumption is not true, a "room" needs to be provided per the code as it is written.**

(A) General. Laboratory services shall be provided within the ASC or through a contract or other arrangement with a hospital or accredited laboratory.

(B) Off-site linen processing. When linen is processed off site, the following rooms or items shall be provided:

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 3 of 11

HUGHES 00091

(i) a storage room for clean linen located within the surgical suite. Clean linen storage may be combined with the clean work room; and

**[9] There is not space within the clean work room in the surgery suite to store linen; the clean linen closet in the Prep area would need to have shelf / cart for clean linen – right now, there are outdated supplies in this room.**

(ii) a soiled linen holding room or area located within the surgical suite. Soiled linen holding may be combined with the soiled workroom.

**[10] The only place to accommodate soiled linen is in the Prep area; it is currently filled with bio-hazardous wastes that need to be removed and stored in separate (nonexistent place).**

(7) Medical waste processing. Space and facilities shall be provided for the safe storage and disposal of waste as appropriate for the material being handled and in compliance with all applicable rules and regulations.

**[11] This space needs to be provided; one was not found.**

(8) Pharmacy. A pharmacy work room or alcove shall be provided and located separate from patient and public areas and under the direct supervision of staff. A work counter, refrigerator, medication storage, and locked storage for biologicals and drugs shall be provided. A hand washing fixture with hands-free operable controls shall be located in the pharmacy room or alcove.

**[12] The pharmacy was locked and could not be accessed. The plans show there to be a counter with sink in this space, however this could not be confirmed. What was observed was that the corridor to this room was not at least 4' wide and the door was not at least a 3' wide door. From an accessibility perspective, there is not sufficient door clearance for this door.**

(9) Postoperative recovery suite.

(B) Postanesthesia care unit. A minimum of one patient station per operating room, plus one additional station, shall be provided.

(i) In a multiple-bed postoperative recovery area, the clearance between the side of a bed/gurney and a wall/partition shall be a minimum of three feet. The clearance between sides of beds/gurneys shall be a minimum of four feet six inches. The minimum distance at the foot of the bed/gurney shall not be less than six feet for single load area/room or nine feet for double load area/room. Four feet of the passage space at the foot of the bed may be shared between two beds/gurneys. The fixed and moveable cabinets and shelves shall not encroach upon the bed/gurney clear floor space/area.

**[13] These required clearances do not exist. The primary clearance issue is one of width; therefore the number of stations would need to be reduced from 8 to 5, maybe 6 (which would satisfy post-op for OR stations assuming "special procedure" patients are not recovered in this area).**

(D) Hand washing fixture. One hand washing fixture with hands-free operable controls shall be provided for every four recovery beds or fraction thereof in open wards. Fixtures shall be uniformly distributed. One hand washing fixture shall be provided within each single-bed recovery room.

**[14] There are not enough handwashing fixtures to meet this ratio.**

(ii) When an open or ward area for extended observation is provided, the minimum clearance from the bed or recliner to the side wall shall not be less than three feet; and a space of four feet shall be provided

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 4 of 11

HUGHES 00092

at the foot of each bed or recliner. The minimum clearance between beds or recliners shall not be less than three feet.

**[15] Number of recliners will be limited by clearances.**

(10) Preoperative patient holding room.

(A) General. A preoperative holding area shall be provided and arranged in a one-way traffic pattern so that patients entering from outside the surgical suite can change, gown, and move directly into the restricted corridor of the surgical suite. The holding area shall be separate from the postoperative recovery suite and the restricted corridor.

(B) Patient station. A minimum of one patient station per operating room shall be provided.

**[16] Four are provided for the four operating rooms; none is provided for the "special procedure" room.**

(ii) In a multiple-bed preoperative holding area, a minimum area of 60 square feet shall be provided for each patient station. The minimum clearance from the gurney or bed to a sidewall shall not be less than three feet. A space of four feet shall be provided at the foot of the gurney or bed and the minimum clearance between gurneys or beds shall not be less than four feet six inches.

**[17] The spacing for stretcher locations on the south wall needs to be adjusted to meet these clearances and the gurneys can not be wider than 30" (which works for typical stretchers).**

(iii) Space shall be made available for storing and securing patient's personal effects.

**[18] There are no lockers provided as indicated on the drawings.**

(iv) One hand washing fixture with hands-free operable controls shall be provided for every four preoperative beds or fraction thereof in open wards. Fixtures shall be uniformly distributed. One hand washing fixture shall be provided within each single-bed preoperative holding room.

**[19] The only handwashing fixture in this area is in the "blood draw" area (see separate note under "Laboratory".) Since the space does not meet laboratory requirements, this sink should suffice; if however, a Laboratory / Blood Draw room is desired by the Owner, an additional handwashing sink will need to be added to comply.**

(12) Soiled workroom. In addition to the soiled workroom provided in the surgical suite, a separate soiled workroom(s) shall be required when a treatment room is provided, except as allowed in subparagraph (B) of this paragraph.

(A) Special requirements. The workroom(s) shall contain a clinical sink or equivalent flushing type fixture, work counter, designated space for waste and linen receptacles, and a hand washing fixture with hands-free operable controls.

**[20] If the "Special Procedures" Room is really a "Treatment room", a separate Soiled workroom needs to be provided to be in compliance.**

(B) Shared functions. The soiled workroom required in support of a treatment room may be combined with a surgical suite soiled work room with two means of entry. A separate door into the soiled workroom shall serve a treatment room located outside the surgical suite.

(13) Surgical staff clothing change area.

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 5 of 11

HUGHES 00093

(A) Surgical staff changing rooms. Appropriately sized areas shall be provided for male and female personnel working within the surgical suite. These areas shall contain lockers, showers, toilets, hand washing fixtures with hands-free operable controls, and space to change into scrub suits and boots. Separate locker/changing rooms shall be provided for male and female staff. The shower and toilet room(s) may be unisex. These areas shall be arranged to provide a traffic pattern so that personnel entering from outside the surgical suite can shower, change, and move directly into the restricted areas of the surgical suite.

**[21] The male changing room has the correct traffic pattern the female changing room does not. (Females can not move directly into the restricted area of the surgical suite upon exit from this room as there is only one door in and out.) Neither have acceptable showers from an accessibility perspective. The male room does not have a bench; the bench is the incorrect size and in the clearance for the shower in the female room (accessibility issues from the stance of TDLR).**

(B) Surgical staff lounge. When a surgical staff lounge is provided, the lounge shall be located to permit the use without leaving the surgical suite and may be accessed from the clothing changing rooms. The surgical staff lounge shall not have direct access from outside the surgical suite. When the lounge is remote from the clothing change rooms, toilet facilities and a hand washing fixture with hands-free operable controls accessible from the lounge shall be provided.

**[22] It is assumed that the staff lounge provided is not for surgical staff based on the location of the door. IF surgical staff were to use this room, they would have to go back through the staff changing rooms into the restricted corridor or relocate the door to this lounge shutting it off from the Recovery area.**

(14) Sterilizing facilities. A system for sterilizing equipment and supplies shall be provided. Sterilizing procedures may be done on site or off site, or disposables may be used to satisfy functional needs.

(A) Off-site sterilizing. When sterilizing is provided off site and disposables and prepackage surgical supplies are used, the following rooms shall be provided near the operating room.

**[23] Look at (B) since current plan accommodates Sterilization; if modifications are made to this plan and a decision is made to have off-site sterilization, this will need to be reviewed again.**

(ii) Clean workroom. A clean workroom shall be provided for the exclusive use of the surgical suite. The workroom shall contain a work counter with space for receiving, disassembling and organizing clean supplies, storage cabinets or shelving, and a hand washing fixture with hands-free operable controls.

**[24] The existing room does not have a handwashing fixture, storage cabinets or shelving.**

(iii) Sterilizer equipment. Sterilizer equipment shall be located in a separate room convenient to the operating room(s), in an alcove adjacent to the restricted corridor, or in the clean workroom.

**[25] There is one sterilizer in the clean workroom; the (flash) sterilizer in the Sterile Storage area is questionable as to if it can remain or needs to be relocated.**

(B) On-site sterilizing facilities. When sterilizing facilities are provided on site they shall be located near the operating room and provide the following rooms.

(i) Receiving/decontamination room. The receiving/ decontamination room shall be physically separate from all other areas of the surgical suite. The room shall include a work counter(s) or table(s), clinical sink or equivalent flushing type fixture, equipment for initial washing/disinfection, and a hand washing

HUGHES 00094

fixture with hands-free operable controls. Pass-through dutch doors, windows, and washer/sterilizer decontaminators shall serve in delivering material to the clean workroom. The receiving/decontamination room may be combined with the surgical suite soiled workroom.

**[26] In the existing facility, this is a combined room. There is not a handwashing fixture with hands-free controls; see note below about insufficient space.**

(ii) Clean/assembly workroom. The clean/assembly workroom shall include a counter(s) or table(s) with space for organizing, assembling, and packaging of medical/surgical supplies and equipment, equipment for terminal sterilizing, and a hand washing fixture with hands-free operable controls. Clean and soiled work areas shall be physically separated.

**[27] No handwashing fixture is provided.**

(iii) Sterile storage. A storage room for clean and sterile supplies shall be provided. The storage room shall have adequate areas and counters for breakdown of manufacturers' clean/sterile medical/surgical supplies. This room may be combined with the clean assembly/workroom.

**[28] This is a separate room; no counter is provided.**

(iv) Cart storage room or alcove. The storage space for distribution carts shall be adjacent to clean and sterile storage area(s) and close to main distribution points.

**[29] This area does not exist; it is assumed that since each OR opens to the Sterile Storage that the State will accept no designated space.**

(15) Surgical suite. The surgical suite shall be arranged to preclude unrelated traffic through the suite. The surgical suite shall contain at least one operating room and all surgical service areas required under subparagraph (B) of this paragraph.

(A) Operating room. The operating room(s) shall have a clear floor area of at least 240 square feet exclusive of fixed or moveable cabinets, counters, or shelves. The minimum clear dimension between built-in cabinets, counters, and shelves shall be 14 feet.

(B) Surgical service areas.

(i) Restricted corridor. The restricted corridor shall serve as the primary passageway for staff and patients within the surgical suite. The following rooms and areas shall have direct access to the restricted corridor:

(VII) equipment storage;

**[30] There is no "equipment storage" room; this needs to be created / provided.**

(VIII) sterilizing facilities;

**[31] As drawn, the flash sterilizer is okay in the sterile storage room. However, if this room were to become an Equipment Storage room, it would have to be relocated.**

(X) area for emergency crash cart.

**[32] None designated; a spot needs to be designated within the OR area.**

(ii) Soiled workroom. A soiled workroom shall be provided for the exclusive use of the surgical suite staff. The workroom shall contain a clinical sink or equivalent flushing type fixture, work counter, designated space for waste and linen receptacles, and a hand washing fixture with hands-free operable controls. The soiled workroom shall not have direct connection with operating room(s) or other sterile

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 7 of 11

HUGHES 00095

activity room(s).

**[33] Within the existing room, there is no space for waste and linen receptacles; the room would need to be enlarged or an additional room would need to be provided. No hands-free handwashing fixture.**

(iii) Clean linen storage. A storage room or alcove shall be provided for storing clean linen.
**[34] Area needs to be designated (or room created and designated)**

(iv) Scrub facilities. A scrub station shall be located in the restricted corridor within five feet of the entrance of each operating room. One scrub station with dual faucets with hands free operable controls may serve two operating rooms if the scrub stations are located adjacent to the entrance of both operating rooms. Scrub facilities shall be arranged to minimize any incidental splatter on nearby personnel, medical equipment, or supply carts. Viewing panels shall be provided for observation of the surgical room interior. The scrub sinks shall be recessed out of the main traffic areas. The scrub sink alcove shall be located within the restricted areas of the surgical suite. Scrub sinks shall not be located inside the sterile area.
**[35] For two of the OR's, the scrub station is not within 5' of the doors to the OR's.**

(vi) Equipment storage. A room, alcove, or designated area shall be provided for storing equipment and supplies used in the surgical suite. The storage room or area shall be a minimum of 50 square feet per operating room.
**[36] This area (200 square feet minimum for 4 OR's) needs to be provided; it does not exist within the surgical suite. Based on conversation with the State, access into "General Storage" from the Prep area will not suffice.**

(viii) Area for emergency crash cart. An area or alcove located out of traffic and convenient to the operating room(s) shall be provided for an emergency crash cart.
**[37] Area needs to be designated.**

(ix) Stretcher storage area. An area or alcove shall be located convenient for use and out of the direct line of traffic for the storage of stretchers as required. Stored stretchers shall not encroach on corridor widths.
**[38] Area needs to be created to comply.**

(16) Treatment room.
**[39] See notes above under "Exam Room" as it is called "Special Procedures." If the Owner desires a "Treatment Room" in lieu of an "Exam" or "Special Procedures" room, this section of the rules will apply.**

(A) A treatment room is not required, but when provided, it shall be used only for minor procedures.

(B) If inhalation anesthesia is administered in the treatment room, the room shall comply with NFPA 99, §14.4.1 requirements for an anesthetizing location.

(C) The treatment room shall have a clear floor area of at least 120 square feet exclusive of fixed or moveable cabinets, counters, or shelves.

(D) The treatment room shall contain an examination table, a counter for writing, and a hand washing fixture with hands-free operable controls.

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 8 of 11

HUGHES 00096

(iii) Corridors.

(I) Public corridor. The minimum clear and unobstructed width of a public corridor shall be at least four feet.
**[40] The corridor into the Pharmacy does not meet this requirement.**

(IV) The minimum clear and unobstructed width of the communicating corridor shall be eight feet.
**[41] If patients are taken to the "Exam" / "Special Procedures" room via gurney, the corridors are not wide enough. It is assumed that patients do not access this room from the toilet which needs to be closed off from this room for infection control purposes.**

(v) Door swing. Doors, except doors to spaces such as small closets which are not subject to occupancy, shall not swing into corridors in a manner that might obstruct traffic flow or reduce the required corridor width. Large walk-in type closets are considered as occupiable spaces.
**[42] As occupiable spaces, the room which are marked "Trash" and "Linen" do not have 5' of depth for turning / accessibility.**

(E) Hand washing facilities. Location and arrangement of fittings for hand washing facilities shall permit their proper use and operation. Hand washing fixtures with hands-free controls shall be provided in each examination room, treatment room, preoperative area, postoperative recovery suite, extended observation room or area, soiled utility room, fluoroscopy room, clean work room, and toilet room. Particular care shall be given to the clearances required for blade-type operating handles. Lavatories and hand washing facilities shall be securely anchored to withstand an applied vertical load of not less than 250 pounds on the front of the fixture. In addition to the specific areas noted, hand washing facilities shall be conveniently located for staff use in rooms and areas noted under spatial requirements in subsection (d) of this section and throughout the center where patient care services are provided.
**[43] Handwashing facilities are not provided in the extended observation rooms or area.**

(H) Signage. A sign shall be posted at the entrance to each toilet/restroom to identify the facility for public, staff, or patient use.
**[44] Signage does not designate users .**

(3) Floor finishes.

(A) Flooring shall be easy to clean and have wear resistance appropriate for the location involved. Floors that are subject to traffic while wet (such as shower and bath areas, and similar work areas) shall have a nonslip surface. In all areas frequently subject to wet cleaning methods, floor materials shall not be physically affected by germicidal and cleaning solutions. The following are acceptable floor finishes:

(i) painted concrete for mechanical, electrical, communication rooms, and janitor's closets;
**[45] General application for floor finishes was VCT. Existing VCT in poor shape.**

(ii) vinyl and vinyl composition tiles and sheets tiles for offices, lobbies, administrative areas, storage, staff and public toilet rooms, examination rooms, support spaces, and nontreatment areas;
**[46] VCT flooring needs to be replaced in Prep and Recovery areas where it is cracked and de-laminating from the floor substrate.**

(iii) monolithic or seamless flooring shall be provided for all operating rooms, special procedure rooms, treatment rooms, patient toilet rooms, soiled workrooms, and sterilizing facility(ies). Seamless flooring shall be impervious to water, coved and installed integral with the base, tightly sealed to the wall, and

HUGHES 00097

without voids that can harbor insects or retain dirt particles. The base shall not be less then six inches in height. Welded joint flooring is acceptable;

**[47] "Special Procedure," patient toilet rooms, and Sterile Stores (with sterilizer) and Soiled room do not have seamless flooring. Seamless flooring, where provided, does not have 6" cove.**

(4) Wall finishes. Wall finishes shall be smooth, washable, moisture resistant, and cleanable by standard housekeeping practices. Wall finishes shall be in compliance with the requirements of NFPA 101, §38.3.3, relating to flame spread.

(A) Finishes at plumbing fixtures. Wall finishes shall be water-resistant in the immediate area of plumbing fixtures.

**[48] Wall finishes need changed to comply.**

(B) Wet cleaning methods. Wall finishes in areas subject to frequent wet cleaning methods shall be impervious to water, tightly sealed, and without voids.

**[49] VCT in prep area needs replaced; cracks are not impervious . . .**

(5) Ceiling finishes. All occupied rooms and spaces shall be provided with finished ceilings, unless otherwise noted. Ceilings which are a part of a rated roof/ceiling assembly or a floor/ceiling assembly shall be constructed of listed components and installed in accordance with the listing. Three types of ceilings that are required in various areas of the ASC are:

(C) monolithic ceilings. Ceilings which are monolithic from wall to wall (painted solid gypsum wallboard), smooth and without fissures, open joints, or crevices and with a washable and moisture impervious finish shall be provided in the operating rooms, special procedure rooms, and sterilizing facilities.

**[50] "Special Procedure" room does not have monolithic ceiling; Sterile stores (where flash sterilizer is located) does not have monolithic ceiling.**

**TDLR Regulations (State AHJ)**

1. **[51] All Door knobs primarily located in the older non renovated portion of the existing building needs to be replaced to lever type hardware.**
2. **[52] Curb Ramps for patient drop off and curb ramps for handicapped parking do not comply. Slope, texture and contrasting color for ramp surface are not present on existing ramps.**
3. **[53] Handicapped parking space signage was noncompliant in mounting height, location and signage configuration**
4. **[54] Handicapped parking space striping needs restriping**
5. **[55] Countertop in staff lounge at sink is required to be 34" high in lieu of the 36" counter currently existing.**
6. **[56] There are several existing door locations which do not have the proper door clearances for wall adjacencies.**

**International Codes - IBC, IPC (City AHJ)**

1. **[57] Restriping needed for fire lane striping**
2. **[58] No exterior access provided to the fire riser room for fire department access.**
3. **[59] No overflow roof drains are provided on the existing roof drain system.**

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 10 of 11

HUGHES 00098

From: **Rob Hudson**

cc:

Sterling Barnett Little, Inc.
Phone: 817.792.2100

1000 Ballpark Way, Suite 200
Fax: 817.461.1362

Arlington, TX 76011
Page 11 of 11

HUGHES 00099

_____ Report

# CONDITION ASSESSMENT

## Duncanville ASC

**Duncanville, Texas**

**December 13, 2011**

## INTRODUCTION

On December 13, 2011, representatives from Fratto Engineering, Inc. and Sterling Barnett Little, Inc. visited the existing Outpatient Surgery Center located at 1018 E. Wheatland Rd in Duncanville, Texas. This ASC is currently not licensed.

The team was asked to perform a surface review of the facility and its systems. The intent of this report is to outline the code and operational deficiencies observed during this walk through. It is not a comprehensive review of all systems and no testing, destructive demolition, etc. was performed.

## ELECTRICAL SYSTEMS

**Code Deficiencies**

- A fire alarm pull station was not located at the exit from the main Lobby. A pull station was located around the corner in a Corridor, but this may not satisfy the fire marshal.

- Fire alarm strobes are not located in the Toilets in the Locker Rooms.

- A fire alarm strobe was not located in the Break Room.

- There are several rooms that have a light switch controlling normal fixtures and a light switch controlling emergency fixtures installed in the same box with a common cover plate. It should be confirmed that there is a divider in the box and that the normal and emergency wiring do not occupy the same space.

- The 2x4 light fixtures above the Nurse Station communicate to the above ceiling plenum.

- The exterior egress light fixtures only have one lamp.

- There is only one light fixture on emergency in Waiting, and it is at the back of the room. It is possible that a local inspector will require a light closer to the exit door.

- There are no battery operated emergency lights in the ORs.

    - There are no light fixtures connected to normal power in the ORs.

    - There are no light fixtures connected to normal power in the OR Corridors.

    - There are no light fixtures connected to normal power in the Decontamination rooms.



_Report_

- There are no receptacles connected to normal power in the ORs.
- There are no receptacles connected to normal power in the OR Corridors.
- Dedicated emergency circuits are not provided for each Recovery Bed.
- The bed location in 23 Hour only has one emergency receptacle and no normal receptacle.
- There is BX cable used for circuits connected to the life safety panel.
- There is BX cable used for circuits connected to the critical panel.
- The fire dampers are connected to the life safety panel.
- There is one ATS for the life safety and critical and one for the equipment branch in lieu of one ATS for each of the three branches.
- The generator has been removed along with feeders to the emergency distribution panel and the ATSs.
- A generator annunciator panel is not present at a 24 hour location.

**Operational Deficiencies**

- The recessed can fixtures are designed for incandescent lamps and are currently lamped with compact fluorescents.
- The 4-way light switches in the back OR Corridor do not work properly.
- The line isolation monitor for OR-2 is not operational.
- The line isolation monitor for OR-4 is not operational.
- The LIMs for OR-3 and the x-ray isolation panel have been replaced. The LIMs in the other ORs are likely at the end of their useful life.
- The remote test buttons located in each OR for the x-ray LIM are not operational.
- The electrical panels are Federal Pacific and parts will be difficult to find.
- The main panel is located outside.
- The emergency distribution panel is located outside.
- The nurse call system is beyond its useful life.

**PLUMBING SYSTEMS**

**Code Deficiencies**

- The sinks in the staff and patient Toilets do not have goose neck faucets.
- Each bed location in Recovery only has 1 vacuum outlet in lieu of 3.



- The bed location in 23 hour Recovery does not have medical gas outlets.
- The Special Procedure room only has 1 oxygen outlet in lieu of 2.
- The Special Procedure room only has 1 vacuum outlet in lieu of 2.

HUGHES 00101

_____ **Report**

- Only one medical gas master alarm panel was observed.

- The medical gas alarm panels did not have pressure gauges.

- Non medical air outlets were not observed. However, a medical air compressor was added in the sterilizer room adjacent to the electrical room. It is doubtful that this system meets new non medical air code.

- Given the age of the medical gas system and the recent changes in NFPA, it is likely that significant portions of the medical gas system do not meet current code.

## MECHANICAL SYSTEMS

### Code Deficiencies

- The Business Office Manager's Office does not have return air.

- The Corridor at the west exit has a 2x2 grille that communicates to the plenum.

- Two roof top units that appear to serve non patient space are located above Recovery. Both units are set up for non ducted plenum return and the air path is above the Recovery ceiling. This is unusual and some inspectors may deem this a code violation.

- The light fixtures in the OR suite Corridors are used for plenum return.

- A humidistat is not installed in OR-2.

- Plexiglas shields have been suspended below the supply air diffusers in the ORs. This creates a large horizontal surface that collects dust and debris and is difficult to keep sterile. it is likely that that distribution pattern of the diffusers is unacceptable to the surgeon and support team.

### Operational Deficiencies

- The exhaust fans were not operational.

- The humidifiers are located above the ceilings. This makes maintenance difficult.

- The final filters are located above the ceiling in the supply duct work. This makes changing filters difficult, and it has to be done in a critical care space like Recovery.

- The thermostat in OR-2 is not operational.

- The thermostat controlling the unit serving the OR Corridors was not observed.

- Rooftop units 6 and 8 serving two of the ORs are beyond their useful life.

- Roof top unit 8 has its outside air opening less than 3 feet above the roof.

- Roof top units 2 and 9 are beyond their useful life.

- The remaining units appear to have been installed in 1996. They appear to be in good condition but at 15 years old, they are nearing the end of their useful life.



HUGHES 00103





HUGHES 00105

Sworn Record 0423



HUGHES 00106



SITE PLAN

A2.0

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00107



HUGHES 00108



DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

DIMENSION FLOOR PLAN

A4.0

HUGHES 00109



HUGHES 00110



HUGHES 00111



HUGHES 00112



**FRAMING DETAILS**

**A8.0**

**DUNCANVILLE SURGERY CENTER REMODEL**
1018 East Wheatland
Duncanville, Texas

**Euwer & Associates**

HUGHES 00113



COVERED PICKUP CANOPY

A9.0

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00114



DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

S1

HUGHES 00115



ACCESSIBILITY STANDARDS

TAS 1

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00116

Sworn Record 0434



HUGHES 00117



HUGHES 00118

HUGHES 00119



1 FLOOR PLAN - PROPOSED POWER
SCALE: 1/8" = 1'-0"

2 PARTIAL FLOOR PLAN - PROPOSED POWER
SCALE: 1/4" = 1'-0"

NE-20    CB-41    NB-18    CB-35

NB-22

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

FLOOR PLAN - POWER

E-2



FLOOR PLAN - LIGHTING

E-3

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00120

Sworn Record 0438



ELEC. RISER DIA. & SCHED.

E-4

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00121

HUGHES 00122





HUGHES 00123



HUGHES 00124

Sworn Record 0442



SPECIFICATIONS

MEP-2

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer
& Associates

HUGHES 00125

Sworn Record 0443



HUGHES 00126



FLOOR PLAN - PLUMBING

P-2

DUNCANVILLE SURGERY CENTER REMODEL
1018 East Wheatland
Duncanville, Texas

Euwer & Associates

HUGHES 00127



# EXHIBIT S

# Lance Hughes

| | |
|---|---|
| **From:** | Bob Richey [brichey3@tx.rr.com] |
| **Sent:** | Thursday, January 10, 2013 9:37 AM |
| **To:** | Lance Hughes |
| **Subject:** | Duncanville Surgery Center Proposal |
| **Attachments:** | CCE01102013_0000.pdf |

Good morning , Lance.

Attached is the proposal for the renovation to Duncanville Surgery Center. I have included the spread sheet with the individual divisions of work along with the clarifications , alternates for your review , schedule and my bid tabulation sheets showing the subcontractor pricing for each division.

If you have any questions, please give me a call today ( 817-307-4792 ). I will be tied up tomorrow working on a proposal that turns in at 2:00 pm. I'll certainly be available after that time.

I appreciate the opportunity of working with you on the Duncanville project.

Bob

1

HUGHES 00410

HUGHES 00411

**DUNCANVILLE SURGERY CENTER**
January 9, 2013

| | |
|---|---:|
| General Conditions | 86,065 |
| Demolition - Sitework | 3,500 |
| Concrete | 11,375 |
| Masonry | 5,800 |
| Steel | 4,300 |
| Carpentry | 17,206 |
| Thermal - Moisture Protection | 4,400 |
| Doors | 16,403 |
| Finishes | 83,513 |
| Specialties | 5,905 |
| Special Construction | 18,240 |
| Mechancal | 149,128 |
| Electrical | 149,530 |
| | 555,365 |
| 8.25% renovation tax | 45,818 |
| | 601,183 |

General Conditions Duncanville Surgery Center

| | Labor | Material | Total |
|---|---|---|---|
| Permit | | 1,500 | 1,500 |
| Project Manager 20 weeks - $3,450/week | 69,000 | | 69,000 |
| Travel 25 miles/day X 100 days - 2,500 X.57 | | 1,425 | 1,425 |
| Schedule | | | included |
| Construction Photos -$6.00/week X 20 weeks | | 120 | 120 |
| Temporary Toilets - 100.00/month - 4 months | | 400 | 400 |
| Safety/First Aid | | 200 | 200 |
| Temporary Fire Protection - Recharge | | 200 | 200 |
| Barricades | | 100 | 100 |
| Storage Trailer - 180.00/month X 4 months | | 720 | 720 |
| Field Office Expenses | | 125 | 125 |
| Printing - 125 X 5 sets | | 625 | 625 |
| Postage - Delivery | | 200 | 200 |
| Fuel-Oil-Generator | | 100 | 100 |
| Small Tool Purchase | | 300 | 300 |
| Equipment Rental | | 300 | 300 |
| General Cleanup | 720 | | 720 |
| Dumpster 10 X 500.00 | | 5,000 | 5,000 |
| Final Clean - 10,000 square feet X $0.50 | | 5,000 | 5,000 |
| As Built Plans | included | included | included |
| O & M Manual | included | 30 | 30 |
| | 69720 | 16,345 | 86,065 |

HUGHES 00412

Duncanville Surgery Center

| | Labor | Material | Sub | Total |
|---|---|---|---|---|
| Demolition/Sitework | | | | |
| Miscellaneous Demo | 2000 | | | 2,000 |
| Interior Demo - Rice Drywall | | | | |
| Pavement Marking | | | 1,200 | 1,200 |
| Lawn Sprinkler System - East Side | | 300 | | 300 |
| | 2000 | 300 | 1200 | 3,500 |
| | | | | |
| Concrete | | | | |
| Miscellaneous Concrete | | | 11,245 | 11,245 |
| Sealed Concrete | 100 | 30 | | 130 |
| | 100 | 30 | 11,245 | 11,375 |
| | | | | |
| Masonry | | | | |
| CMU @ Column | | | 5,800 | 5,800 |
| Sawcut-Toothin 2 openings | | | | |
| Medallions | | | | |
| | | | | |
| Steel | | | 4,300 | 4,300 |
| Columns + 2 angle iron headers | | | | |
| | | | | |
| Carpentry | | | | |
| Bolts/Screws | | 200 | | 200 |
| Interior Blocking | 300 | 150 | | 450 |
| Miscellaneous Carpentry - Allowance | 1,200 | | | 1,200 |
| Framing - Canopy | | | 10,270 | 10,270 |
| Millwork | | | 5,086 | 5,086 |
| | 1500 | 350 | 15356 | 17206 |
| | | | | |
| Roofing | | | | |
| Roofing | | | 3,400 | 3,400 |
| Fire Caulking | 500 | 500 | | 1,000 |
| | 500 | 500 | 3,400 | 4,400 |

HUGHES 00413

| | Labor | Material | Sub | Total |
|---|---|---|---|---|
| **Doors and Windows** | | | | |
| Hollow Metal Frames | | 3,495 | | 3,495 |
| P. Lam Doors | | 3,072 | | 3,072 |
| Door Hardware/Install | 2,880 | 6956 | | 9836 |
| | 2880 | 13,523 | | 16,403 |
| | | | | |
| **Finishes** | | | | |
| Lathe-Plaster | | | 7,000 | 7,000 |
| Drywall | | | 23,500 | 23,500 |
| Floor Covering | | | 35,565 | 35,565 |
| Paint | | | 17,448 | 17,448 |
| | | | 83,513 | 83,513 |
| | | | | |
| **Specialties** | | | | |
| Wall & Corner Guards | 1,000 | 1,200 | | 2,200 |
| Cubicle Curtain Track | 1,020 | 480 | | 1,500 |
| Toilet Accessories | 470 | 745 | | 1,215 |
| Lockers | 790 | 200 | | 990 |
| | 3,280 | 2,625 | | 5,905 |
| | | | | |
| **Special Construction** | | | | |
| Fire Alarm | | | 7,400 | 7,400 |
| Fire Sprinkler | | | 10,840 | 10,840 |
| | | | 18,240 | 18,240 |
| | | | | |
| **Mechanical** | | | | |
| Medical Gas | | | 77,801 | 77,801 |
| Plumbing | | | 40,150 | 40,150 |
| HVAC | | | 24,427 | 24,427 |
| Test and Balance | | | 6,750 | 6,750 |
| | | | 149,128 | 149,128 |
| | | | | |
| Electrical | | | 132,045 | 132,045 |
| Nurse Call | | | 17,485 | 17,485 |
| | | | 149,530 | 149,530 |

HUGHES 00414

DUNCANVILLE SURGERY CENTER
CLARIFICATIONS
JANUARY 9, 2013

1. We exclude the upgrading of the existing telephone and data system.
2. We exclude the painting of the exterior plaster finish.
3. We exclude the furnishing of new cubicle curtains.
4. We have priced all new doors as plastic laminate finish to match the surgical suite doors.
5. We have priced the new door hardware with Sargent hardware.
6. We have priced the existing VCT flooring in the existing toilets to remain.
7. We were unable to receive a price from the facility's fire alarm contractor. A fire alarm price from Ideal Fire and Security is included.
8. We exclude adding expansion joints for the new door frames. The existing walls do not have expansion joints at the door frame locations.
9. The new ductwork for the surgical staging corridor may need to be revised due to the existing sprinkler main in the same area.
10. We have priced the new drywall partitions to penetrate the ceilings as opposed to the detail showing the partitions to stop below the acoustical ceiling.

DUNCANVILLE SURGERY CENTER
ALTERNATES
JANUARY 9, 2013

1. Cost to clean the remaining items in the existing
   reception and offices 101, 102, 103, 104 and 105.     $520.00
2. Cost to remove the existing vinyl composition tile
   noted to remain as existing and furnish and install
   new vinyl composition tile and cove base.             $7,247.00
3. Cost to repaint the existing OR ceilings with latex
   paint.                                                 $1,011.00
4. Cost to clean and reseal the existing 16 wood doors.  $2,322.00

HUGHES 00416

Sworn Record 0454

# PROPOSED CONSTRUCTION SCHEDULE

DUNCANVILLE SURGERY CENTER

| DESCRIPTION | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PERMIT | | | | | | | | | | | | | | | | | | | | |
| HPM - LETTERS OF INT. | | | | | | | | | | | | | | | | | | | | |
| CONTRACTS BY HPM | | | | | | | | | | | | | | | | | | | | |
| SUBMITTALS | | | | | | | | | | | | | | | | | | | | |
| ORDER GENERATOR | | | | | | | | | | | | | | | | | | | | |
| GENERATOR DELIV. - INSTALL | | | | | | | | | | | | | | | | | | | | |
| MEDICAL GAS DELIV. | | | | | | | | | | | | | | | | | | | | |
| HM DOOR FRAMES | | | | | | | | | | | | | | | | | | | | |
| INTR. DEMOLITION | | | | | | | | | | | | | | | | | | | | |
| SIDEWALK / RAMPS | | | | | | | | | | | | | | | | | | | | |
| CANOPY FOOTINGS / COL / BEAMS / STEEL | | | | | | | | | | | | | | | | | | | | |
| WALL LAYOUT | | | | | | | | | | | | | | | | | | | | |
| SAWCUT SLAB - PLMB. | | | | | | | | | | | | | | | | | | | | |
| INTR. WALLS - 1 SIDE | | | | | | | | | | | | | | | | | | | | |
| ELECTRICAL ROUGH IN | | | | | | | | | | | | | | | | | | | | |
| PLMB. ROUGH IN | | | | | | | | | | | | | | | | | | | | |
| MED GAS ROUGH IN | | | | | | | | | | | | | | | | | | | | |
| INSPECTION | | | | | | | | | | | | | | | | | | | | |
| INTR. WALLS - 2 SIDE | | | | | | | | | | | | | | | | | | | | |
| DUCTWORK DEMO | | | | | | | | | | | | | | | | | | | | |
| NEW DUCTWORK | | | | | | | | | | | | | | | | | | | | |
| ABV. CLG. ELEC. | | | | | | | | | | | | | | | | | | | | |
| ABV. CLG. INSPECTION | | | | | | | | | | | | | | | | | | | | |
| NURSE CALL / FIRE ALARM | | | | | | | | | | | | | | | | | | | | |
| TAPE - BED - PRIME | | | | | | | | | | | | | | | | | | | | |
| REPLAC. CLG - NEW CLG. | | | | | | | | | | | | | | | | | | | | |
| LIGHT FIXTURES - HVAC GRILLES | | | | | | | | | | | | | | | | | | | | |
| FINAL PAINT | | | | | | | | | | | | | | | | | | | | |
| FLOOR COVERING / CER. TILE | | | | | | | | | | | | | | | | | | | | |
| DOORS / HDWE | | | | | | | | | | | | | | | | | | | | |
| PLMB. FIXTURES | | | | | | | | | | | | | | | | | | | | |
| ELEC. TRIMOUT | | | | | | | | | | | | | | | | | | | | |
| FINAL INSPECTION - C OF O | | | | | | | | | | | | | | | | | | | | |
| FIGURE 100 % | | | | | | | | | | | | | | | | | | | | |

HUGHES 00417

DUNCANVILLE SURG. CNTR.

| | | | Initials | Date |
|---|---|---|---|---|
| Prepared By | | | | |
| Approved By | | | | |

© WILSON JONES    G7204 GREEN

| | BID | RENOV. TAX | |
|---|---|---|---|
| PAVEMENT MARKING | | | |
| | | | |
| CONCRETE | | | |
| JMC | | X | |
| SAWCUT - FDN TRENCH | | | |
| 8EB x 10" | $1400 | | |
| | 1,245 | | |
| MASONRY | | | |
| SMITH CUST. MSY. | 5950 | X | INCL. SAWCUT + TOOTH IN FRAME |
| ☆ GG&S | 5800 | | |
| GRN | 1299 | X | NO PRICE TO CUT DOOR + TOOTH |
| KMCS | 2445 | X | NO SAW CUT - BOTH IN |
| STEEL | | | |
| BRANCH | 4300 | OK | 2 HEADER @ DOOR |
| CISCO | 470 | X | HEADER |
| | | | |
| FRAMING PORTE COCHE | | | |
| OAS | 10,270 | X | |
| KIWITEX | 13,350 | ✓ | |
| | | | |
| MILLWORK | | | |
| MILLWORK SOL. | 5,354 | X | |
| | | | |
| ROOFING | | | |
| LARRY MILLER | 3025 | X | |
| RAMON FRANKLIN | 3400 | | |
| STAZ-ON ROOFING | 6990 | X | ADD 4260 FOR |
| | | | ROOF'S MAT'L. |
| ROOFS, FR., HOME | HM | WOOD | HAVE |
| HALLGREN | 3475 | 7172 | 6950 | WE PAY |

HUGHES 00418

2

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

## DUNCANVILLE

© WILSON JONES     G7206 GREEN

| | | BID | RENOV. TAX | | |
|---|---|---|---|---|---|
| **PLASTER** | | | | | |
| * CG&S | | 7800- | x | * 600- | TILE @ CANOPY |
| GRW | | 7881- | x | | |
| KMGS | | 6960- | x | | |
| | | | | | |
| **DRYWALL** | | | | DEMO | F $/ DE/SR/HOWE |
| L&W | | 37,500 | x | ✓ | |
| RKE | | 25,500 | * | ✓ | |
| CAS | | 36,770 | | ✓ | |
| | | | | | |
| **FLOOR COV.** | | | | | |
| LCID | | 35,565- | | PUT. 6675- | |
| DMCA | | 36,000 | | | |
| | | | | | |
| **PAINT** | | | | | |
| TANNER | | 18,480- | | | |
| CAS | | 17,448 | | | |
| S&R TRICE | | 18,157- | | ADD 1577 TO PAINT OR CUSE. | |
| GREATER DALLAS | | 17,230- | | CLEAN, RESEAL DOORS 2145- | |
| | | | | REPAINT HM FRAMES 1815- | |
| | | | | | |
| | | | | | |
| | | | | | |
| **CUBICLE CURTAIN RETRO.** | | | | | |
| | | | | | |
| **TOILET ACCESS.** | | | | | |
| | | | | | |
| | | | | | |
| **FIRE PROTECTION** | | | | | |
| IDEAL (ARGYLE) | | 10,840- | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **MED GAS** | | | | | |
| QUINTECH | | 77,801- | | | |

HUGHES 00419

DUNCANVILLE

© WILSON JONES    G7206 GREEN

| | Initials | Date |
|---|---|---|
| Prepared By | | |
| Approved By | | |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| PLUMBING | | BID | TAX | SAWCUT | | |
| DENALI | | 47,505 | X | ✓ | | |
| NEW GEN. | | 46,550 | X | ✓ | | |
| | | | | | | |
| HVAC | | | TAX | INSP. REPORT | | TEST & BAL |
| DENALI | | 49,281 | X | ? | | ? |
| NEW GEN. | | 29,427 | X | | | NO |
| | | | | | | |
| TEST & BAL. | | | | | | |
| ENGR. AIR BAL. | | 11,65? | | | | |
| NEW GEN | | 6,750 | | | | |
| | | | | | | |
| ELECTRICAL | | BID | TAX | GENERAL | ATS? | |
| TUDOR | | 84,500 | X | 49,000 | | 133,500 |
| KT ELEC. | | 96,??? | X | NO | | |
| BENTZLER | | 49,945 | X | 81,600 | | 131,545 |
| PATRIOT | | 72,525 | X | 78,000 | | 150,528 |
| | | | | | | |
| FIRE ALARM | | | | | | |
| IDEAL | | 7,400 | ✓ | | | |
| | | | | | | |
| NURSE CALL | | 117,480 | X | | | |

# EXHIBIT T

## ASSIGNMENT AND ASSUMPTION OF LEASE
## AND LANDLORD CONSENT

This **ASSIGNMENT AND ASSUMPTION OF LEASE AND LANDLORD CONSENT** ("Assignment and Consent") is entered into effective as of November 1, 2010 ("Effective Date"), by and among PATRICIA HUGHES ("Landlord"), SURGERY CENTER OF DUNCANVILLE, L.P., a Texas limited partnership, f/k/a Duncanville Surgery Center, L.P. ("Assignor"), and BAYLOR SURGICARE AT DUNCANVILLE, LLC, a Texas limited liability company ("Assignee").

### RECITALS:

A.  Landlord, as landlord, and Assignor, as tenant, are parties to that certain Lease Agreement dated June 1, 2004 ("Lease"). Pursuant to the Lease, Landlord has leased to Assignor space currently containing approximately 10,000 rentable square feet ("Premises") located at 1018 East Wheatland Road, Duncanville, Texas 75116. Capitalized terms not defined herein shall have the meanings assigned to them in the Lease.

B.  On June 1, 2004, Symbion, Inc. executed a Lease Guaranty Agreement whereby Symbion, Inc. guaranteed the obligations of Assignor under the Lease.

C.  Assignor desires to assign, and Assignee desires to assume, all of Assignor's right, title and interest in and to the Lease, and Assignor and Assignee have requested Landlord's consent to such assignment and assumption.

D.  Landlord has agreed to give such consent upon the terms and conditions contained in this Assignment and Consent.

E.  Concurrently with the execution of this Assignment and Consent, Texas Health Ventures Group L.L.C., a Texas limited liability company that is an indirect member of Assignee ("THVG"), is assuming the personal guaranty obligations of Symbion, Inc. under the Lease.

**NOW THEREFORE**, in consideration of the foregoing recitals which by this reference are incorporated herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord, Assignor and Assignee agree and represent as follows:

1.  Assignment. Assignor hereby assigns to Assignee all of Assignor's right, title, and interest under the Lease and in and to the Premises as therein defined for and during the remainder of the Term of the Lease.

2.  Representations.

    (a)  Assignee hereby represents and warrants to Landlord as follows:

1

398296_1.DOC

HUGHES 00001

(i)     Assignee has full power and authority to enter into this Assignment and Consent and to perform its obligations under this Assignment and Consent and the Lease;

(ii)    Assignee is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas;

(iii)   The execution of this Assignment and Consent has been approved by all necessary action of the Assignee, and upon execution of this Assignment and Consent, it will be valid, binding and enforceable against the Assignee;

(iv)    The person signing this Assignment and Consent has the authority to execute this Assignment and Consent on behalf of Assignee; and

(v)     The execution of this Assignment and Consent does not violate any agreement to which Assignee is a party, any law, rule or regulation of any governmental authority, or its certificate of formation or company agreement.

(b)     Assignor and Landlord each represent, warrant and acknowledge to Assignee as follows:

(i)     Each has full power and authority to enter into this Assignment and Consent;

(ii)    Each has not transferred or conveyed its interest in the Lease to any person or entity, collaterally or otherwise;

(iii)   Attached hereto as **Exhibit A** is a complete and accurate copy of the Lease (including all amendments thereto), and except as set forth on **Exhibit A**, there are no written or oral amendments, modifications, side letters, agreements, or other understandings with regard thereto;

(iv)    The Lease is in full force and effect and Assignor and Landlord are not in default under the Lease. Assignor and Landlord have not received notice that they are in default under the Lease. Assignor and Landlord have no current knowledge of any facts which would give rise to a breach or default by Landlord or Assignor under the Lease;

(v)     Rent under the Lease has been paid through October 31, 2010; and

(vi)    Assignor and Landlord acknowledge that this Assignment and Consent will be relied upon by Assignee and its successors and assigns in connection with its acquisition of Tenant's interest under the Lease.

2

398296_1.DOC

HUGHES 00002

3. Assumption. Assignee, for itself and its successors and assigns, hereby assumes and agrees to perform and be bound by all of the covenants, agreements, provisions, conditions and obligations of the tenant under the Lease, as and to the extent any such covenant, agreement, provision, condition and obligation arises on or after the Effective Date; provided, however, that Landlord and Assignor hereby expressly covenant and agree that neither Assignee nor any of Assignee's related parties shall under any circumstances or at any time be liable, responsible or obligated for any of Assignor's or any of Assignor's related parties' obligations, covenants, indemnities, claims, liabilities, duties, or agreements in, under, to, or in connection with the Lease that arise, accrue or are incurred prior to the Effective Date regardless of when they may be asserted, alleged, claimed, brought, or discovered, including, without limitation, reconciliations or undercharges of Additional Rent, or any similar charge or expense for any periods prior to the Effective Date, even if they are not ascertainable or calculated until after the Effective Date (collectively, the "Prior Claims"), but Assignor shall remain solely liable and obligated for all Prior Claims, and Assignor hereby expressly agrees to INDEMNIFY, DEFEND, and HOLD Assignee and Assignee's related parties HARMLESS from and against any and all Prior Claims.

4. Financial Statements. Within ninety (90) days from the end of each calendar year during the Lease Term, Assignee agrees to provide Landlord with annual unaudited financial statements certified by an officer or manager of Assignee.

5. Acceptance of Premises; Landlord's Disclaimer. ASSIGNEE ACKNOWLEDGES AND AGREES THAT IT HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PREMISES AND THAT IT IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION IN EXECUTING THIS ASSIGNMENT AND CONSENT AND ASSUMING THE OBLIGATIONS OF THE TENANT UNDER THE LEASE PURSUANT TO SECTION 3, AND, EXCEPT AS EXPRESSLY PROVIDED HEREIN, IS NOT RELYING ON ANY INFORMATION PROVIDED BY LANDLORD IN DETERMINING WHETHER TO ASSUME THE OBLIGATIONS OF TENANT UNDER THE LEASE PURSUANT TO SECTION 3. ASSIGNEE FURTHER ACKNOWLEDGES THAT IT IS FULLY AND COMPLETELY SATISFIED THAT THE PREMISES ARE SATISFACTORY IN ALL RESPECTS FOR ASSIGNEE'S INTENDED USE. ASSIGNEE FURTHER ACKNOWLEDGES AND AGREES THAT EXCEPT AS EXPRESSLY PROVIDED HEREIN, LANDLORD HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PREMISES, AND ASSIGNEE HEREBY WAIVES ANY SUCH REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTY EXCEPT THOSE EXPRESSLY PROVIDED HEREIN. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, ASSIGNEE IS EXECUTING THIS ASSIGNMENT AND CONSENT, ASSUMING THE OBLIGATIONS OF THE TENANT UNDER THE

3

398296_1.DOC

HUGHES 00003

LEASE PURSUANT TO SECTION 3 AND ACCEPTING THE PREMISES "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE LANDLORD, EXCEPT THOSE EXPRESSLY PROVIDED HEREIN.

6. Amendments to Lease. Landlord and Assignee hereby agree to amend the Lease as follows:

    a. Address of Premises. Notwithstanding anything contained in the Lease to the contrary, Landlord and Assignee acknowledge and agree that the correct address of the Premises is 1018 East Wheatland Road (not 1017 East Wheatland Road), Duncanville, Texas 75166, and all references in the Lease to the address of the Premises are changed to 1018 East Wheatland Road.

    b. Section 36 – Renewal Option. The second sentence of Section 36 is hereby amended to read as follows:

        "In order to exercise each Renewal Option, Tenant must give Landlord written notice of the exercise of the Renewal Option at least twelve (12) months prior to the expiration of the initial Term or the first Renewal Term, as applicable."

7. Conditional Release of Assignor. Upon the execution of this Assignment and Consent by all parties hereto, Assignor shall be relieved and released from its obligations under the Lease arising after the Effective Date; provided, however, Assignor specifically acknowledges and agrees that it remains responsible to Landlord for the discharge and performance of any and all duties and obligations to be performed and/or discharged by the tenant under the Lease prior to the Effective Date, including, but not limited to, the Prior Claims.

8. Release of Landlord. As part of the consideration for Landlord consenting to this Assignment and Consent, Assignor, on behalf of itself and its successors and assigns, hereby releases Landlord and her heirs, successors and assigns of and from any and all claims, liabilities, obligations, demands, damages, actions and causes of action of any and every nature whatsoever relating to the Lease or the Premises, and waives and releases any claim which Assignor now has or may have against Landlord arising out of or relating to the Lease or the Premises, or any and all acts, omissions or events relating thereto occurring prior to the execution of this Assignment and Consent.

9. Landlord's Consent. In reliance upon the agreements and representations contained in this Assignment and Consent, Landlord hereby consents to the assignment and assumption contained herein. This Assignment and Consent shall not constitute a waiver of the obligation of the tenant under the Lease to obtain the Landlord's consent to any subsequent assignment, sublease or other transfer under the Lease.

4

398296_1.DOC

HUGHES 00004

10. Notice Address. Any notices to Assignee shall be effective when served to Assignee at the Premises in accordance with the terms of the Lease. From and after the Effective Date, Landlord may continue to send notices to Assignor at the address(es) provided in, and in accordance with the terms of, the Lease.

11. No Effect on Lease. Except as expressly set forth herein, all of the terms, conditions and obligations contained in the Lease shall remain in full force and effect without modification from and after the Effective Date.

12. Authority. Each signatory of this Assignment and Consent represents hereby that he or she has the authority to execute and deliver the same on behalf of the party hereto for which such signatory is acting.

13. Counterparts; Signature. This Assignment and Consent may be executed in counterparts and shall constitute an agreement binding on all parties notwithstanding that all parties are not signatories to the original or the same counterpart provided that all parties are furnished a copy or copies thereof reflecting the signature of all parties. Signatures received by facsimile or via other electronic transmission system shall be accepted as original signatures.

[Signatures on following page]

5

398296_1.DOC

IN WITNESS WHEREOF, Landlord, Assignor and Assignee have executed this Assignment and Consent on the day and year first above written.

LANDLORD: _____
Patricia Hughes

ASSIGNOR:   SURGERY CENTER OF DUNCANVILLE, L.P., F/K/A DUNCANVILLE SURGERY CENTER, L.P.

By:_____
Name:_____
Title:_____

ASSIGNEE:   BAYLOR SURGICARE AT DUNCANVILLE, LLC

By:_____
Name:_____
Title:_____

6

398296_1.DOC

HUGHES 00006

IN WITNESS WHEREOF, Landlord, Assignor and Assignee have executed this Assignment and Consent on the day and year first above written.

LANDLORD: _____

Patricia Hughes

ASSIGNOR: SURGERY CENTER OF DUNCANVILLE, L.P., F/K/A DUNCANVILLE SURGERY CENTER, L.P.

By: _____
Name: _____
Title: _____

ASSIGNEE: BAYLOR SURGICARE AT DUNCANVILLE, LLC

By: _____
Name: _____
Title: _____

396892_1.DOC

**IN WITNESS WHEREOF,** Landlord, Assignor and Assignee have executed this Assignment and Consent on the day and year first above written.

LANDLORD: _____

Patricia Hughes

ASSIGNOR: SURGERY CENTER OF DUNCANVILLE, L.P., F/K/A DUNCANVILLE SURGERY CENTER, L.P.

By:_____
Name:_____
Title:_____

ASSIGNEE: BAYLOR SURGICARE AT DUNCANVILLE, LLC

By:_____
Name:_____
Title:_____

396892_1.DOC

**EXHIBIT A**

**Copy of Lease (including Amendments)**

398296_1.DOC

HUGHES 00009

LEASE AGREEMENT

BETWEEN

PATRICIA HUGHES, AS LANDLORD,

AND

SURGERY CENTER OF DUNCANVILLE, L.P., AS TENANT

JUNE 1, 2004

*Patricia Hughes*
*Signed*
9-14-04

HUGHES 00010

## TABLE OF CONTENTS

1. Granting Clause ............................................................................. 2
2. Acceptance of Premises ................................................................ 2
3. Use ................................................................................................. 3
4. Base Rent ..................................................................................... 3
5. Late Charges ................................................................................ 4
6. CPI Adjustment ........................................................................... 5
7. Additional Rent ............................................................................ 6
8. Utilities ......................................................................................... 6
9. Taxes ............................................................................................ 6
10. Insurance ...................................................................................... 7
11. Waiver of Subrogation ................................................................. 7
12. Indemnification ............................................................................ 8
13. Landlord Repairs ......................................................................... 9
14. Tenant's Repairs .......................................................................... 9
15. Tenant-Made Alterations and Trade Fixtures ............................. 9
16. Signs ........................................................................................... 10
17. Condemnation ............................................................................ 10
18. Restoration ................................................................................. 11
19. Assignment and Subletting ....................................................... 11
20. Inspection and Access ............................................................... 12
21. Quiet Enjoyment ........................................................................ 12
22. Surrender .................................................................................... 12
23. Holding Over .............................................................................. 13
24. Events of Default ....................................................................... 13
25. Landlord's Remedies ................................................................. 14
26. Tenant's Remedies/Limitation of Liability ................................. 15
27. Subordination ............................................................................ 16
28. Mechanic's Liens ....................................................................... 16
29. Estoppel Certificates ................................................................. 17
30. Environmental Requirements ..................................................... 17
31. Independent Covenants ............................................................. 18
32. No Security Services .................................................................. 18
33. Force Majeure ............................................................................ 18
34. Brokers ....................................................................................... 18
35. Landlord's Lien/Security Interest .............................................. 19
36. Renewal Option .......................................................................... 19
37. Organization and Power ............................................................ 20
38. Miscellaneous ............................................................................ 20

HUGHES 00011

Lease Agreement

THIS LEASE AGREEMENT is to be effective as of June 1, 2004, between the Landlord and the Tenant named below and is as follows:

| | |
|---|---|
| **Landlord:** | Patricia Hughes |
| **Landlord's representative, address and phone no:** | c/o Hughes Capital Management, Inc.<br>Attention: Lance R. Hughes<br>1301 Capital of Texas Highway, Suite A-306<br>Austin, Texas 78746<br>Phone: (512) 328-8211<br>Fax: (512) 328-0149<br>E-Mail: lhughes4@aol.com |
| **Tenant:** | Surgery Center of Duncanville, L.P., a Texas limited partnership |
| **Tenant's representative, address, and phone no.:** | Attention: David Gross<br>1017 East Wheatland Road<br>Duncanville, Texas 75116<br>Phone: (972) 296-6912<br>Fax: (972) 296-1387<br>E-Mail: DGross@Symbion.com |
| **Premises:** | Land, building and improvements located at 1017 East Wheatland Road, Duncanville, Dallas County, Texas, as more particularly described on Exhibit "A" attached hereto and made a part hereof for all purposes. Landlord and Tenant agree that the improvements contain approximately 10,000 square feet. |
| **Lease Term:** | Approximately 103 months, beginning on the Commencement Date and terminating on the Expiration Date |
| **Commencement Date:** | June 1, 2004 |
| **Expiration Date:** | February 28, 2013 |
| **Base Rent:** | Commencement Date through February 28, 2005 - $24,331.69 per month ($29.20 per square foot per year). Notwithstanding the foregoing, beginning on September 1, 2004, and continuing for four (4) months through December, 2004, the monthly Base Rent shall be reduced by $12,500.00 per month (for an aggregate reduction of $50,000.00) as part of the Lease Buy Down (as hereinafter defined). Further, on or before September 1, 2004, Landlord agrees to refund to Tenant $16,800.00, which represents an overpayment of Base Rent by Tenant for June, July and August, 2004 as part of the Lease Buy Down. |

1

HUGHES 00012

| | |
|---|---|
| **Adjusted Base Rent:** | Beginning on March 1, 2005, and continuing through February 28, 2008, the Base Rent will be adjusted to reflect the Lease Buy-Down (as hereinafter defined) resulting from the Healthsouth Settlement Agreement (as hereinafter defined) and shall be $20,416.67 per month (based on $24.50 per square foot per year) (the "Adjusted Base Rent"). |
| | Beginning on March 1, 2008, and continuing through February 28, 2013, the Adjusted Base Rent shall be $20,416.67 per month, plus the CPI Adjustment (as hereinafter defined) which CPI Adjustment shall be determined as if the Base Rent ($24,331.69 per month), not the Adjusted Base Rent, was in effect in February, 2008 (without adjustment for the Lease Buy-Down). |
| **Lease Buy-Down:** | As part of an agreement (the "Healthsouth Settlement Agreement") by and among Landlord, Healthsouth Surgery Center of Duncanville, L.P., Healthsouth Properties Corporation and Healthsouth Corporation (the "Prior Tenant Parties"), the Prior Tenant Parties are paying certain amounts to Landlord as consideration for the termination of the prior lease and as consideration for Landlord agreeing to the Adjusted Base Rate in this Lease (the "Lease Buy-Down"). |
| **Permitted Use:** | Ambulatory, day or outpatient surgery center, appurtenant office and administrative facility. [See Section 3] |
| **Renewal Option:** | Tenant will have two (2) five-year renewal options (each a "Renewal Term"). The Base Rate during the first five-year Renewal Term (March 1, 2013 – February 28, 2018) shall be (i) the Base Rate ($24,331.69 per month), plus (ii) the CPI Adjustment on the Base Rate determined on March 1, 2008, plus (iii) an additional CPI Adjustment on the Base Rate (as previously adjusted for the CPI Adjustment) determined on March 1, 2013. The Base Rate during the second five-year Renewal Term shall be adjusted based on the CPI Adjustment on March 1, 2018. [See Section 36] |
| **Security Deposit:** | None |
| **Guarantor:** | Symbion, Inc., a Delaware corporation, pursuant to a Lease Guaranty Agreement attached hereto as Exhibit "D". |
| **Exhibits and Addenda:** | Addendum 1 – Move Out Conditions<br>Exhibit "A" – Legal Description<br>Exhibit "B" – Insurance Requirements<br>Exhibit "C" – Certificate of the Secretary<br>Exhibit "D" – Lease Guaranty |

2

HUGHES 00013

Exhibit "E" – Certificate of the Secretary – Symbion, Inc.
Exhibit "F" – Landlord's Lien Waiver, Estoppel and Agreement

1.  Granting Clause. In consideration of the obligation of Tenant to pay Rent as herein provided, and in consideration of the other terms, covenants, and conditions hereof, Landlord leases to Tenant, and Tenant takes from Landlord, the Premises, to have and to hold for the Lease Term, subject to the terms, covenants and conditions of the Lease.

2.  Acceptance of Premises. TENANT ACKNOWLEDGES AND AGREES THAT IT HAS CONDUCTED ITS OWN INDEPENDENT INVESTIGATION AND INSPECTION OF ALL ASPECTS OF THE PREMISES AND THAT IT IS RELYING ON SUCH INDEPENDENT INVESTIGATION AND INSPECTION IN EXECUTING THIS LEASE, AND IS NOT RELYING ON ANY INFORMATION PROVIDED BY LANDLORD IN DETERMINING WHETHER TO LEASE THE PREMISES. TENANT FURTHER ACKNOWLEDGES THAT IT IS FULLY AND COMPLETELY SATISFIED THAT THE PREMISES ARE SATISFACTORY IN ALL RESPECTS FOR TENANT'S INTENDED USE. TENANT FURTHER ACKNOWLEDGES AND AGREES THAT LANDLORD HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO THE PREMISES, AND TENANT HEREBY WAIVES ANY SUCH REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTY. NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, LANDLORD IS LEASING THE PREMISES TO TENANT "AS IS", "WHERE IS", AND WITH ALL FAULTS AND SPECIFICALLY AND EXPRESSLY WITHOUT ANY WARRANTIES, REPRESENTATIONS OR GUARANTEES, EITHER EXPRESS OR IMPLIED, OF ANY KIND, NATURE, OR TYPE WHATSOEVER FROM OR ON BEHALF OF THE LANDLORD.

3.  Use. Tenant may use the Premises subject to and in accordance with the terms, covenants and conditions set forth in this Lease, and applicable governmental regulations, restrictions and permitting, solely for the Permitted Use. Tenant and Tenant's agents will not (i) do or permit to be done in or about the Premises, nor bring to, keep or permit to be brought or kept in the Premises, anything which is prohibited by or will in any way conflict with any law, statute, ordinance or governmental rule or regulation which is now in force or which may be enacted or promulgated after the Date of Lease; (ii) do or permit anything to be done in or about the Premises which is dangerous to persons or property; or (iii) cause, maintain or permit any nuisance in, on or about the Premises or commit or allow to be committed any waste in, on or about the Premises. Tenant shall procure at its sole expense and risk any permits and licenses required for the transaction of business in the Premises At its sole cost and expense, Tenant will promptly comply with (a) all laws, statutes, ordinances and governmental rules, regulations or requirements now in force or in force on or after the Commencement Date of the Lease regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises; (b) the certificate of occupancy issued for the Premises and (c) any recorded covenants, conditions and restrictions, if any, which affect the use, condition, configuration and occupancy of the Premises. Tenant, at its sole expense, shall use and occupy the Premises in compliance with all laws, including, without limitation, the Americans With Disabilities Act, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, covenants and restrictions now or hereafter applicable to the Premises (collectively, "Legal Requirements"). Tenant shall, at its expense, make any alterations or modifications, within or without the Premises that are required by Legal Requirements related to Tenant's use or occupation of the Premises.

3

4.    Base Rent. Tenant shall pay to Landlord the Base Rent (and the Adjusted Base Rent as adjusted for the Lease Buy-Down), as specified above. For purposes of this Lease, all future references to Base Rent shall include, as applicable Adjusted Base Rent. Base Rent shall be payable in monthly installments as specified above, in advance, without demand, notice, deduction, offset or counterclaim, on or before the first day of each and every calendar month during the Term; provided, however, the installment of Base Rent payable for the first full calendar month of the Term shall be due and payable at the time of execution and delivery of this Lease. Any payment made by Tenant to Landlord on account of Base Rent may be credited by Landlord to the payment of any late charges then due and payable and to any Base Rent or Additional Rent (as defined in Section 7) then past due before being credited to Base Rent currently due. No endorsement or statement on a check or letter accompanying a check or payment shall be considered an accord and satisfaction, or prejudice Landlord's right to recover the balance or pursue available remedies. Tenant shall pay Base Rent and all Additional Rent by (i) good check or in lawful currency of the United States of America to such address as Landlord designates in writing to Tenant, or (ii) electronically via automatic debit or wire transfer to such account as Landlord designates in writing to Tenant. If the Term commences on a day other than the first day of a calendar month or terminates on a day other than the last day of a calendar month, the monthly Base Rent and Additional Rent shall be prorated based upon the number of days in such calendar month. Tenant's covenant to pay Rent and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is expressly provided for and not otherwise.

5.    Late Charges. Late Charges and Default Interest. Tenant's failure to pay rent promptly may cause Landlord to incur unanticipated costs. The exact amount of such costs are impractical or extremely difficult to ascertain. Such costs may include, but are not limited to, processing and accounting charges and late charges which may be imposed on Landlord by any ground lease, mortgage or deed of trust encumbering the Property. Therefore, if Landlord does not receive any monthly Installment of Base Rent, any Additional Rent, or any other amount which becomes owing by Tenant to Landlord under the provisions of this Lease within ten (10) days after it becomes due (without in any way implying Landlord's consent to such late payment), Tenant' shall pay Landlord a late charge equal to five percent (5%) of the overdue amount, as compensation for Landlord's processing such late payment. The parties agree that such late charge represents a fair and reasonable estimate of the costs Landlord will incur by reason of such late payment. Acceptance of such late payment charge by Landlord shall in no event constitute a waiver of Tenant's default, if any, with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted by this Lease. In addition to the late charge provided above, if any sum of money due Landlord under this Lease is not paid on its due date, it shall bear interest from its due date at the rate of eighteen percent (18.0%) per annum until paid ("Default Interest"). Without limiting the generality of the foregoing, in order for Tenant or any lender of Tenant to cure any monetary default hereunder, the payment of accrued Default Interest will be required to cure such default.

In no event shall the aggregate of the interest to be paid by Tenant, plus any other amounts paid in connection with the transaction evidenced hereby which would under applicable law be deemed "interest", ever exceed the maximum amount of interest which, under applicable law, could be lawfully charged to Tenant hereunder. Landlord and Tenant specifically intend and agree to limit contractually the interest payable hereunder to not more than the amount determined at the maximum lawful nonusurious rate of interest (if any) which under applicable law is permitted to be charged from time to time (the "Maximum Rate"). Therefore, none of the terms of this Lease shall ever be construed to create a contract to pay interest at a rate in excess of the Maximum Rate, and Tenant shall not be liable for interest in excess of that determined at the Maximum Rate, and the provisions of this Section shall control all other

4

HUGHES 00015

provisions of this Lease. If any amount of interest taken or received by Landlord shall be in excess of the maximum amount of interest which, under applicable law, could lawfully have been collected under this Lease, then the excess shall be deemed to have been the result of a mathematical error by Landlord and Tenant and shall be refunded promptly to Tenant. If Tenant fails in two (2) consecutive months to make rental payments ten (10) days after due, Landlord in order to reduce its administrative costs, may require, by giving notice to Tenant (and in addition to any late charges accruing pursuant to this Section, as well as any other rights and remedies accruing under this Lease or available to Landlord at law or equity), that Base Rent be payable quarterly in advance instead of monthly.

6. **CPI Adjustment.** On March 1, 2008, the Adjusted Base Rate shall be increased by the increase in the CPI index (as described below) from February, 2003 to February, 2008. If Tenant exercises the Renewal Option, then on March 1, 2013, the Base Rent shall be increased by the increase in the CPI index from January, 2008 to January, 2013, and on March 1, 2018, the Base Rent shall be increased by the increase in the CPI index from January, 2013 to January, 2018.

6.1 **CPI Definition.** The CPI referred to above is the "Consumer Price Index for All Urban Consumers, South Region, Population Size Class A, Commodity and Service Group, All Items Index – 1982-84 = 100", as published by the U.S. Department of Labor, Bureau of Statistics. Such index can normally be obtained from any public library or from the Bureau of Business Research at the University of Texas at Austin. If no index is issued covering the dates in question, then the index published immediately prior to such dates shall be used for purposes of calculation until current index is available.

6.2 **CPI Base year Change.** If the base year of the above CPI changes, the formula described above shall be adjusted to conform to the new base so that the calculations shall have the same results as if made on the CPI described above.

6.3 **CPI Cessation.** If the publication of the above CPI ceases, Landlord and Tenant shall agree to a substitute index and formula which will produce as close as possible the same results as the application of the CPI. If Landlord and Tenant fail to so agree, a substitute index or formula shall be determined by binding arbitration. In such event, Landlord and Tenant shall each appoint an arbitrator, and the two appointed arbitrators shall elect a third, or if they cannot agree upon a third arbitrator, either party may petition a court of competent jurisdiction for the appointment of a third arbitrator. Cost of the above arbitration shall be borne equally by Landlord and Tenant.

6.4 **Delay in Implementation.** At Landlord's option, any calculation or adjustment of Base Rent may be delayed. Landlord's delay in implementing such increases shall not waive Landlord's right thereto, and the most recent monthly rent figure shall continue to be paid during such delay. If Landlord delays in timely calculating such adjustment, the Base Rent increases shall become due seven (7) days after written notice to Tenant.

6.5 **Calculation of Increase.** The CPI Adjustment will be calculated as follows:

In March, 2008:

    Base Rent $24,931.69/month    x     $\dfrac{\text{CPI for January, 2008}}{\text{CPI for January, 2003}}$

In March, 2013 (for purposes of determining Base Rent for the first Renewal Term):

5

HUGHES 00016

Base Rent ($24,931.69) plus
the March, 2008 CPI Adjustment    x    <u>CPI for January, 2013</u>
CPI for January, 2008

In March, 2018 (for purposes of determining Base
Rent for the second Renewal Term):

Base Rent for
First Renewal Term    x    <u>CPI for January, 2018</u>
CPI for January, 2013

7.     <u>Additional Rent</u>. This Lease is a "Triple Net" Lease, which means that Tenant shall be obligated to pay for all real estate taxes and other impositions (as described in Paragraph 9), all insurance premiums (as described in Paragraph 10), all repairs, maintenance and replacements to the Premises (as described in Paragraph 14), all utilities to the Premises (as described in Paragraph 8), and all other costs and expenses related to the use or operation of the Premises as otherwise provided in this Lease.

8.     <u>Utilities</u>. Tenant shall pay for all water, gas, electricity, heat, light, power, telephone, sprinkler services, refuse and trash collection, and other utilities and services used on the Premises, all maintenance charges for utilities, and water and storm and/or sanitary sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider (whether billed directly to Tenant or to Landlord), together with any taxes, penalties, charges or the like pertaining to Tenant's use of the Premises. No interruption or failure of utilities shall constitute an eviction or disturbance of Tenant's use and possession of the Premises or a breach of any of Landlord's obligations or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations (including the obligation to pay Rent). In the event of any interruption or malfunction, Landlord shall use reasonable diligence during Landlord's normal business hours to restore service when restoration is within its reasonable control.

9.     <u>Taxes</u>. Tenant shall pay all Taxes that accrue against the Premises during the Lease Term, except that Taxes for any partial calendar year during the Lease Term shall be prorated and Tenant shall be responsible for that pro rata portion covering the portion of the year this Lease is in force. To the extent that taxes are paid by Landlord in any year, Tenant shall reimburse Landlord within 30 days notice from Landlord that the monies have been expended by Landlord and are due from Tenant. Tenant agrees to pay Landlord, as Additional Rent, 1/12 of anticipated Taxes for the Premises in advance as reasonably estimated by Landlord, such payments to be made on the first day of each calendar month, beginning on the Commencement Date. Landlord shall refund any unused portions of escrowed taxes or apply to next year's escalations at Tenant's option. If any such tax or excise is levied or assessed directly against Tenant, then Tenant shall be responsible for and shall pay the same at such times and in such manner, as the taxing authority shall require. Tenant shall be liable for all taxes levied or assessed against any personal property or fixtures placed in the Premises, whether levied or assessed against Landlord or Tenant. If any of Tenant's personal property is taxed with the Premises, Tenant shall pay Landlord the taxes for the personal property within fifteen (15) days after Tenant receives a written statement from Landlord for such personal property taxes.

"Taxes" as used herein, shall mean all ad valorem taxes, assessments, special assessments, personal property taxes, transit taxes, excises, levies, license and permit fees (but not including license or permit fees associated with the production of revenue for Landlord, such as permit fees required for leasehold improvements for other tenants and all other similar charges, if any, which are levied, assessed, or imposed upon or becomes due and payable in connection with a lien upon all or any portion of the

6

HUGHES 00017

Premises and the improvements or facilities used in connection therewith, and rentals and receipts therefrom and all taxes of whatsoever nature imposed in substitution for or in lieu of any of the taxes, assessments or other charges included in this definition of taxes, excluding only franchise, death and income taxes of Landlord(but not excluding such taxes if imposed in the future either wholly or partially in lieu of present real estate, ad valorem or similar taxes). Taxes shall also include any fees payable to tax consultants and attorneys for consultation and contesting taxes.

Landlord may contest by appropriate legal proceedings the amount, validity, or application of any Taxes or liens thereof. If Tenant desires to contest any assessment of any Taxes which Tenant is required to pay hereunder and gives Landlord written notice of this intention, then Tenant may contest the assessment by appropriate proceedings diligently conducted in good faith without being in default hereunder; provided, however, if Tenant does not, as a part of such contest, pay such Taxes under protest, Tenant shall pay the amount of contested Taxes and the penalty and interest expected to accrue thereon into an interest bearing escrow account under the control of Landlord, which Landlord shall utilize to pay all Taxes and other sums finally determined to be due. Tenant shall immediately indemnify and hold Landlord harmless from all expenses and damages (including attorneys' fees and costs and court costs) resulting from such contest. At no cost to Landlord, Landlord shall cooperate with Tenant in their efforts to contest any assessment of Tax.

Whichever party receives any Tax bill attributable to the Premises and/or any notice of increase of assessment of the Premises shall forward a copy of said Tax bill to the other party within fifteen (15) days of such party's receipt of same.

10.    Insurance.

10.1    Required Policies. Tenant will, at its sole expense, procure and maintain the insurance coverages set forth in Exhibit "B" attached hereto and made a part hereof for all purposes. Tenant will, at its sole cost and expense, comply with such requirements during the term of the Lease.

10.2    Minimum Requirements. The coverages set forth in Exhibit "B" are the minimum requirements and not a determination as to all of the coverages and maximum limits Tenant should carry. The failure of Landlord to demand full compliance by Tenant with respect to the minimum coverages outlined in Exhibit "B" will not constitute a waiver by Landlord with respect to Tenant's obligation to maintain such coverages. Landlord will purchase such other insurance policies and/or endorsements or increase the policy limits of any policy set forth on Exhibit "B", if required by any mortgagee.

10.3    Special Remedy. Tenant's failure to obtain and maintain the required insurance will constitute a breach of, and default under, this Lease. If Tenant fails to remedy such breach within five (5) days after notice from Landlord, Landlord may, in addition to any other remedy available to Landlord, at Landlord's option, purchase such insurance, at Tenant's expense, and Tenant will promptly remit to Landlord the cost of such insurance as Additional Rent. Tenant will indemnify the Landlord Parties (as hereinafter defined) against any claims arising from Tenant's failure to purchase and/or maintain the insurance coverages required by this Lease.

11.    Waiver of Subrogation. Neither Landlord nor Tenant shall be liable (by way of subrogation or otherwise) to the other party (or to any insurance company insuring the other party for any loss or damage to any of the property of Landlord or Tenant, as the case may be, to the extent and only to the extent actually covered by insurance even though such loss or damage might have been caused by the negligence of the Landlord or Tenant or their respective employees, agents, servants or invitees. This

7

HUGHES 00018

provision shall be in effect only so long as the applicable insurance policies contain a clause or endorsement to the effect that the aforementioned waiver shall not affect the right of the insured to recover under such policies; and each party shall use its best efforts (including payment of an additional premium) to have its insurance policies contain a waiver of subrogation clause. Landlord and Tenant covenant and agree to obtain a waiver of subrogation from its respective insurance carriers and have such waiver contained in all policies of insurance required to be obtained under this Lease. In the event any insurance carrier of Landlord or Tenant declines to include in such carrier's policy a waiver of subrogation clause, Landlord or Tenant, as the case may be, shall promptly notify the other party in writing.

12. Indemnification.

12.1 Definitions. The "Tenant Parties" are Tenant and its shareholders, members, managers, partners, directors, officers, employees, agents, contractors, licensees and invitees. The "Landlord Parties" are Landlord, the Landlord's property manager, Landlord's mortgagee(s) and any affiliates or subsidiaries of the foregoing, and all of their respective shareholders, members, managers, partners, directors, officers, employees, agents, contractors, licensees and invitees. "Claims" means all foreseeable and unforeseeable damages (including actual, consequential, and punitive), losses, injuries, penalties, disbursements, costs, charges, assessments, legal costs and expenses (including court costs, attorneys' fees, experts' fees or other expenses incurred in investigating, preparing, prosecuting or settling any legal action or proceeding or arbitration, mediation, or other method of alternative dispute resolution), demands, litigation, settlement payments, causes of action (whether in tort, contract, or under a theory of strict liability, or whether in law, equity, statutory or otherwise) or judgments. "Injury" means (i) harm to, impairment or loss of, or impairment or loss of use of, property, including income, (ii) harm to (including sickness or disease) or death of a person, or (iii) "personal and advertising injury", as such term is defined in Insurance Services Office, Inc. ("ISO") form CG 0001 1001.

12.2 Scope of Indemnities and Waivers. All indemnities, waivers and obligations to defend, wherever contained in this Lease, (i) are independent of, and will not be limited by, each other or any insurance obligations in this Lease (whether or not complied with) or damages or benefits payable under workers compensation or other employee benefit acts, and (ii) will survive the expiration of this Lease until all related Claims against the beneficiaries are fully and finally barred by applicable law. All applicable law affecting the validity or enforceability of any indemnity, waiver or obligation to defend contained in this Lease is made a part of such provision and will operate to amend such Indemnity, waiver or obligation to defend to the minimum extent necessary to bring the provision into conformity with Applicable Law and cause the provision, as modified, to continue in full force and effect. ALL INDEMNITIES, WAIVERS AND OBLIGATIONS TO DEFEND CONTAINED IN PARAGRAPH 12.3 WILL BE ENFORCED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW FOR THE BENEFIT OF LANDLORD PARTIES, EVEN IF THE APPLICABLE CLAIM IS CAUSED BY THE ACTIVE OR PASSIVE NEGLIGENCE OR SOLE, JOINT, CONCURRENT OR COMPARATIVE NEGLIGENCE OF ANY OF THE LANDLORD PARTIES, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT OR STRICT LIABILITY IS IMPOSED UPON OR ALLEGED AGAINST SUCH BENEFICIARY, BUT WILL NOT BE ENFORCED TO THE EXTENT THAT A COURT OF COMPETENT JURISDICTION HOLDS IN A FINAL JUDGMENT THAT A CLAIM IS CAUSED BY THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY OF THE LANDLORD PARTIES.

12.3 TENANT WAIVES AS TO THE LANDLORD PARTIES, AND WILL INDEMNIFY, HOLD HARMLESS AND DEFEND THE LANDLORD PARTIES AGAINST, ALL CLAIMS ARISING ON OR AFTER THE EFFECTIVE DATE OF THIS LEASE, DIRECTLY OR INDIRECTLY, IN WHOLE OR IN PART, OR ALLEGED TO ARISE FROM (A) INJURY

8

HUGHES 00019

SUFFERED BY ANY PARTY AND OCCURRING IN THE PREMISES; (B) INJURY CAUSED BY A TENANT PARTY AND OCCURRING OUTSIDE THE PREMISES, AND/OR (C) HARM TO, IMPAIRMENT OR LOSS OF, OR IMPAIRMENT OR LOSS OF USE OF, PROPERTY, INCLUDING INCOME SUFFERED BY ANY PARTY INSIDE THE PREMISES OR CAUSED OR SUFFERED BY A TENANT PARTY OUTSIDE THE PREMISES. TENANT AGREES TO DEFEND THE LANDLORD PARTIES IN LITIGATION, ARBITRATION, MEDIATION OR OTHER PROCEEDING, WITH COUNSEL REASONABLY ACCEPTABLE TO LANDLORD, AND PAY ALL COSTS ASSOCATION WITH THE PREPARATION OR PROSECUTION OF SUCH DEFENSE.

13. Landlord Repairs. Except for damage caused by Tenant, its employees, agents, contractors, customers or invitees, during the term of this Lease, Landlord shall, at its expense, repair and maintain in good structural and workmanlike condition the roof, exterior walls, interior load bearing walls and foundation. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 13, after which Landlord shall have a reasonable opportunity to repair. Except for Landlord's specific repair obligations set forth in this Section 13, Tenant acknowledges and agrees that Landlord shall have no other obligations under this Lease to repair or maintain any portion of the Premises or the systems located in the Premises.

14. Tenant's Repairs. Subject to Landlord's limited repair obligations described in Paragraph 13, and subject to the provisions of Paragraphs 17 and 18, Tenant, at its expense, shall repair, replace and maintain in good condition all portions of the Premises and all areas, improvements and systems exclusively serving the Premises, including electric, plumbing, water and wastewater lines and related systems, fire sprinklers and fire protection systems, entries, interior and exterior doors, ceilings, windows, interior and exterior walls, and heating, ventilation and air conditioning systems. Such repairs and replacements include capital expenditures and repairs whose benefit may extend beyond the Lease Term. Tenant also shall maintain, at its expense, in good order, condition and repair, the driveways, sidewalks, parking lots and landscaping installed by Landlord or Tenant on the Premises and is responsible for removing any trash or debris in any of such areas. Heating, ventilation and air conditioning systems and other mechanical and building systems serving the Premises shall be maintained at Tenant's expense pursuant to maintenance service contracts entered into by Tenant or, at Landlord's election, by Landlord. The scope of services and contractors under such maintenance contracts shall be reasonably approved by Landlord. If Tenant fails to perform any repair or replacement for which it is responsible, Landlord may perform such work and shall be reimbursed by Tenant within ten (10) days after demand. Subject to Landlord's limited repair obligations described in Paragraph 13, and subject to the provisions of Paragraphs 17 and 18, Tenant shall bear the full cost of any repair or replacement to any part of the building located on the Premises that result from damage caused by Tenant, its agents, contractors, or invitees and any repair that benefits only the Premises.

15. Tenant-Made Alterations and Trade Fixtures. Any alterations, additions, or improvements made by or on behalf of Tenant to the Premises ("Tenant-Made Alterations") shall be subject to Landlord's prior written consent which shall not be unreasonably withheld, delayed or conditioned. Tenant shall cause, at its expense, all Tenant-Made Alterations to comply with insurance requirements and with Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Tenant-Made Alterations. All Tenant-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Landlord and only good grades of materials shall be used. All plans and specifications for any Tenant-Made Alterations shall be submitted to Landlord for its written approval. Landlord may monitor construction of the Tenant-Made Alterations. Landlord's right to review plans and specifications and to monitor construction shall be solely for its own benefit and Landlord shall have no duty to see that

9

such plans and specifications or construction comply with Legal Requirements. Tenant shall provide Landlord with the identities and mailing addresses of all contractors and subcontractors performing work or supplying materials, prior to beginning such construction, and Landlord may post on and about the Premises notices of non-responsibility pursuant to applicable law. Tenant shall make reasonable arrangements to assure payment for the completion of all work free and clear of liens and shall provide certificates of insurance for worker's compensation, if required, and other coverage in amounts and from an insurance company satisfactory to Landlord protecting Landlord against liability for personal injury or property damage during construction. Upon surrender of the Premises, all Tenant-Made Alterations and any leasehold improvements constructed by Landlord or Tenant shall remain on the Premises as Landlord's property, except to the extent Landlord requires removal at Tenant's expense of any such items or Landlord and Tenant have otherwise agreed in writing in connection with Landlord's consent to any Tenant-Made Alterations. Tenant shall repair any damage caused by such removal.

Tenant, at its own cost and expense and without Landlord's prior approval, may erect such shelves, bins, equipment and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Premises, do not overload or damage the Premises, and may be removed without injury to the Premises, and the construction, erection, and installation thereof complies with all Legal Requirements and with Landlord's requirements set forth above. Tenant may remove its Trade Fixtures, supplies, movable furniture and equipment not attached to the Premises provided: (a) removal is made prior to the expiration or termination of this Lease; (b) Tenant is not in default of any obligation or covenant under this Lease at the time of removal; and (c) Tenant promptly repairs all damage caused by removal. All other property at the Premises and any alteration or addition to the Premises and any other article attached or affixed to the floor, wall or ceiling of the Premises shall remain upon and be surrendered with the Premises at the expiration or termination of this Lease, including specifically, without limitation, the generator, all ceiling and wall mounted surgical lights, the medical gas lines, valves and containers, and the autoclaving, Tenant hereby waiving all rights to any payment or compensation. If however, Landlord so requests in writing, Tenant will, prior to expiration or termination of this Lease, remove any and all Trade Fixtures, alterations, additions, equipment and property placed or installed by it in the Premises and will repair any damage caused by such removal. If any property not belonging to Landlord remains at the Leased Premises after the expiration or termination of the term of this Lease, Tenant hereby authorizes Landlord to dispose of the property as Landlord may desire without liability to Tenant if the property belongs to Tenant. If the property does not belong to Tenant, Tenant agrees to indemnity, defend and hold Landlord harmless from all suits, actions, liability, loss, damages and expenses in connection with any removal, exercise of dominion over and/or disposition of such property by Landlord.

16.    Signs. Tenant shall not make any changes to the exterior of the Premises, install any exterior lights, or painting, or erect or install any exterior signs, without Landlord's prior written consent which shall not be unreasonably withheld, delayed or conditioned. Upon surrender or vacating of the Premises, Tenant shall have removed all signs and repair, paint, and/or replace the building facial surface to which its signs are attached. Tenant shall obtain all applicable governmental permits and approvals for sign and exterior treatments.

17.    Condemnation. If any part of the building located on the Premises, or a substantial portion of the parking for the Premises, should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and the Taking would prevent or materially interfere with Tenant's use of the Premises, then Tenant shall have the right terminate this Lease by giving written notice of such election to Landlord; provided, however, such termination shall not be effective until such time as the Taking has been finalized. Base Rent and Additional Rent shall be apportioned as of date of the final

10

Taking. If part of the Premises shall be Taken, and this Lease is not terminated as provided above, the Base Rent payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances. In the event of any such Taking, Landlord shall be entitled to receive the entire price or award from any such Taking for the Premises (excluding however any Tenant's Premises Expansion as described in Section 15 above) without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award. Tenant shall have the right, to the extent that same shall not diminish Landlord's award, to make a separate claim against the condemning authority (but not Landlord) for such compensation as may be separately awarded or recoverable by Tenant for Tenant's Premises Expansion and for moving expenses and damage to Tenant's Trade Fixtures, if a separate award for such items is made to Tenant.

18. Casualty; Restoration. If at any time during the Lease Term the Premises are damaged by a fire or other casualty, Landlord shall notify Tenant within sixty (60) days after such damage as to the amount of time Landlord reasonably estimates it will take to restore the Premises. If the restoration time is estimated to exceed twelve (12) months, either Landlord or Tenant may elect to terminate this Lease upon notice to the other party given no later than thirty (30) days after Landlord's notice. If neither party elects to terminate this Lease or if Landlord estimates that restoration will take twelve (12) months or less, then, subject to receipt of sufficient insurance proceeds, Landlord shall promptly restore the Premises, excluding the improvements installed by Tenant, subject to delays arising from the collection of insurance proceeds or from Force Majeure events. Tenant, at Tenant's expense, shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from Force Majeure events, all repairs or restoration not required to be done by Landlord and shall promptly re-enter the Premises and commence doing business in accordance with this Lease. Notwithstanding the foregoing, either party may terminate this Lease if the Premises are damaged during the last year of the Lease Term and Landlord reasonably estimates that it will take more than one month to repair such damage. Tenant shall pay to Landlord with respect to any damage to the Premises caused by Tenant the amount of the commercially reasonable deductible under Landlord's insurance policy within ten (10) days after presentment of Landlord's invoice. Base Rent and Additional Rent shall be abated for the period of repair and restoration in the proportion which the area of the Premises, if any, which is not usable by Tenant bears to the total area of the Premises. Such abatement shall be the sole remedy of Tenant, and except as provided herein, Tenant waives any right to terminate the Lease by reason of damage or casualty loss.

19. Assignment and Subletting. Tenant shall not assign this Lease or sublease the Premises or any part thereof without Landlord's prior written consent, which consent shall not be unreasonably withheld, delayed, or conditioned; provided, however, that Landlord's consent shall be subject to and conditional upon the following: (i) no Event of Default has occurred, and no event has occurred which, with the passage of time, shall constitute an Event of Default; (ii) Tenant pays to Landlord all of Landlord's costs and expenses, including legal fees, in connection with the review and approval of any proposed assignee or subtenant; (iii) Landlord has received and has had a reasonable opportunity to review all documents and agreement executed or to be executed between Tenant and the proposed assignee or subtenant; (iv) the proposes assignee or subtenant has assumed all of the Tenant's obligations under this Lease in a form and content acceptable to Landlord; (v) the proposed assignee or subtenant has, in the reasonable judgment of Landlord, a net worth equal to the net worth of Tenant as of the date of this Lease, or is otherwise satisfactory to Landlord, and has a satisfactory history of operating properties similar to the Premises; and (vi) the proposed assignee or subtenant has, in the reasonable judgment of Landlord, a satisfactory credit history and professional reputation and character. Tenant will submit in writing to Landlord: (1) the name and address of the proposed assignee or subtenant; (2) a counterpart of the proposed agreement of assignment or sublease; (3) reasonably satisfactory information as to the nature and character of the proposed assignee or subtenant, and as to the nature of its proposed use of the Premises if different from the current use; (4) banking, financial or other credit information

11

HUGHES 00022

reasonably sufficient to enable Landlord to determine the financial responsibility and character of the proposed assignee or subtenant; and (5) any other information reasonably requested by Landlord.

For purposes of this Paragraph 19, a transfer of the ownership interests controlling Tenant shall be deemed an assignment of this Lease unless such ownership interests are publicly traded. Notwithstanding the above, Tenant may assign or sublet the Premises, or any part thereof, to any entity controlling Tenant, controlled by Tenant or under common control with Tenant (a "Tenant Affiliate"), without the prior written consent of Landlord; provided, however, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease.

Tenant shall reimburse Landlord for all of Landlord's reasonable out-of-pocket expenses in connection with any assignment or sublease.

Upon Landlord's receipt of Tenant's written notice of a desire to assign or sublet the Premises, or any part thereof (other than to a Tenant Affiliate), Landlord may, by giving written notice to Tenant within thirty (30) days after receipt of Tenant's notice, terminate this Lease with respect to the space described in Tenant's notice, as of the date specified in Tenant's notice for the commencement of the proposed assignment or sublease.

Notwithstanding any assignment or subletting, Tenant and any guarantor or surety of Tenant's obligations under this Lease shall at all times remain fully responsible and liable for the payment of the rent and for compliance with all of Tenant's other obligations under this Lease (regardless of whether Landlord's approval has been obtained for any such assignments or subletting). In the event that the Rent due and payable by a subtenant or assignee (or a combination of the Rent payable under such sublease or assignment plus any bonus or other consideration or incident thereto) exceeds the Rent payable under this Lease for the Premises (excluding however any Rent Tenant receives for the Tenant's Premises Expansion), then Tenant shall be bound and obligated to pay Landlord as additional rent hereunder one-half (1/2) of all such excess rental and other excess consideration within ten (10) days following receipt thereof by Tenant; provided, however, Tenant shall not be obligated to pay any portion of Rent received on Tenant's Premises Expansion.

In the event of a permitted assignment or sublease, upon a default by Tenant hereunder Landlord may collect rent from the assignee, subtenant, or other occupant and, except to the extent set forth in the preceding paragraph, apply the amount collected to the next Rent payable hereunder; and all such rentals collected by Tenant shall be held in trust for Landlord and immediately forwarded to Landlord. No such transaction or collection of Rent or application thereof by Landlord, however, shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties, or obligations hereunder.

Tenant shall not mortgage, pledge, or hypothecate its leasehold interest or grant any concession or license within the Premises and any attempt to do any of the foregoing shall be void and of no effect.

20. Inspection and Access. Landlord and its agents, representatives, and contractors may enter the Premises at any reasonable time to inspect the Premises and to make such repairs as may be required or permitted pursuant to this Lease and for any other business purpose. Landlord and Landlord's representatives may enter the Premises during business hours for the purpose of showing the Premises to prospective purchasers and, during the last six (6) months of the Lease Term, to prospective tenants. During the last six (6) months of the Lease Term, Landlord may erect a suitable sign on the Premises stating the Premises are available to lease. Landlord may grant easements, make public dedications,

12

HUGHES 00023

designate common areas and create restrictions on or about the Premises, provided that no such easement, dedication, designation or restriction materially interferes with Tenant's use or occupancy of the Premises. At Landlord's request, Tenant shall execute such instruments as may be necessary for such easements, dedications or restrictions.

21. Quiet Enjoyment. Tenant shall, subject to the terms of this Lease, at all times during the Lease Term, have peaceful and quiet enjoyment of the Premises against any person claiming by, through or under Landlord.

22. Surrender. Upon termination of the Lease Term or earlier termination of Tenant's right of possession, Tenant shall surrender the Premises to Landlord in the same condition as received, broom clean, ordinary wear and tear and casualty loss and condemnation covered by Paragraphs 16 and 17 excepted, and in accordance with Addendum 1 attached hereto and made a part hereof for all purposes. All obligations of Tenant hereunder not fully performed as of the termination of the Lease Term shall survive the termination of the Lease Term, including, without limitation, indemnity obligations, payment obligations with respect to Additional Rent and obligations concerning the condition and repair of the Premises.

23. Holding Over. If Tenant retains possession of the Premises after the termination of the Lease Term, then unless otherwise agreed in writing by Landlord, such possession shall be subject to immediate termination by Landlord at any time, and all of the other terms and provisions of this Lease (excluding any expansion or renewal option or other similar right or option) shall be applicable during such holdover period, except that Tenant shall pay Landlord from time to time, upon demand, as Base Rent for the holdover period, an amount equal to one hundred fifty percent (150%) of the Base Rent in effect on the termination date, computed on a monthly basis for each month or part thereof during such holding over. All other payments shall continue under the terms of this Lease. In addition, Tenant shall be liable for all damages incurred by Landlord as a result of such holding over by Tenant. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease, except as otherwise expressly provided in writing, and this Paragraph 23 shall not be construed as consent for Tenant to retain possession of the Premises.

24. Events of Default. Each of the following events shall be an event of default ("Event of Default") by Tenant under this Lease:

(a) Tenant shall fail to pay any installment of Base Rent, Additional Rent or any other payment required herein when due, and such failure shall continue for a period of ten (10) days from the date such payment was due.

(b) Tenant or any guarantor or surety of Tenant's obligations hereunder shall (A) make a general assignment for the benefit of creditors; (B) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of its or its debts or seeking appointment of a receiver, trustee, custodian or other similar officials for it or for all of any substantial part of its property (collectively a "proceeding for relief"); (C) become the subject of any proceeding for relief which is not dismissed within 180 days of its filing or entry; or (D) die or suffer a legal disability (if Tenant, guarantor, or surety is an individual) or be dissolved or otherwise fail to maintain its legal existence (if Tenant, guarantor or surety is a corporation, partnership or other entity).

13

HUGHES 00024

(c)     Tenant shall abandon or vacate the Premises for a period of seven (7) days or more whether or not Tenant is in monetary or other default under this Lease.

(d)     Any insurance required to be maintained by Tenant pursuant to this Lease shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, following any applicable cure period and as otherwise permitted in this Lease.

(e)     Tenant shall assign, sublease, or transfer its interest in or with respect to this Lease, except as otherwise permitted in this Lease.

(f)     Tenant shall fail to discharge or post surety acceptable to Landlord any lien placed upon the Premises in violation of this Lease within thirty (30) days after any such lien or encumbrance is filed against the Premises.

(g)     Tenant shall fail to comply with any provision of this Lease other than those specifically referred to in this Paragraph 24, and, except as otherwise expressly provided herein, such default shall continue for more than thirty (30) days after Landlord shall have given Tenant written notice of such default, provided in the event the default is of such a nature that cannot be cured within thirty (30) days. Tenant shall have commenced to cure within the thirty (30) day period and diligently proceeds to cure such default.

25.     Landlord's Remedies. Upon each occurrence of an Event of Default and for so long as such Event of Default shall be continuing, Landlord may, at its election, terminate this Lease or terminate Tenant's right of possession, without terminating this Lease (but Tenant shall remain liable as hereinafter provided) and/or pursue any other remedies at law or in equity. Upon the termination of this Lease or termination of Tenant's right of possession, it shall be lawful for Landlord, without formal demand or notice of any kind, to re-enter the Premises by summary dispossession proceedings or any other action or proceeding authorized by law and to remove Tenant and all persons and property therefrom. If Landlord re-enters the Premises, Landlord shall have the right to alter or modify locks or fences and other security devices at the Leased Premises and remove Tenant's property and the property of others located within the Leased Premises. The provisions of this Paragraph 25 shall override and control any conflicting provisions of Section 93.002 of the Texas Property Code, as well as any successor statute governing the right of a landlord to change the door locks of a tenant under a commercial lease.

If Landlord terminates this Lease, Landlord may recover from Tenant the sum of: (i) all Base Rent and all other amounts accrued hereunder to the date of such termination; the cost of reletting the whole or any part of the Premises, including without limitation brokerage fees and/or leasing commissions incurred by Landlord, and costs of removing and storing Tenant's or any other occupant's property, repairing, altering, remodeling, or otherwise altering the Premises into a condition acceptable to a new tenant or tenants, and all other reasonable expenses incurred by Landlord in pursuing its remedies, including reasonable attorneys' fees and court costs; and (ii) the excess of the then present value of the Base Rent and other amounts payable by Tenant under this Lease as would otherwise have been required to be paid by Tenant to Landlord during the period following the termination of this Lease measured from the date of such termination to the expiration date stated in this Lease, over the present value of any net amounts which Tenant establishes Landlord can reasonably expect to recover by reletting the Premises for such period, taking into consideration the availability of acceptable tenants and other market conditions affecting leasing. Such present values shall be calculated at a discount rate equal to the ninety-(90) day U.S. Treasury bill rate at the date of such termination.

14

HUGHES 00025

If Landlord terminates Tenant's right of possession (but not this Lease), Landlord may, but shall be under no obligation to, relet the Premises for the account of Tenant for such rent and upon such terms as shall be satisfactory to Landlord without thereby releasing Tenant from any liability hereunder and without demand or notice of any kind to Tenant. For the purpose of such reletting, Landlord is authorized to make any repairs, changes, alterations, or additions in or to the Premises as Landlord deems reasonably necessary or desirable. If the Premises are not relet, then Tenant shall pay to Landlord as damages a sum equal to the amount of the rental reserved in this Lease for such period or periods, plus the cost of recovering possession of the Premises (including reasonable attorneys' fees and costs of suit) the unpaid Base Rent and other amounts accrued hereunder at the time of repossession, and the costs incurred in any attempt by Landlord to relet the Premises. If the Premises are relet and a sufficient sum shall not be realized from such reletting after first deducting therefrom, for retention by Landlord, the unpaid Base Rent and other amounts accrued hereunder at the time of reletting, the cost of recovering possession including attorneys' fees and costs of suit), all of the costs and expense of repairs, changes, alterations, and additions, the expense of such reletting (including, without limitation, brokerage fees and leasing commissions) and the cost of collection of the rent accruing therefrom to satisfy the Rent provided for in this Lease to be paid, then Tenant shall immediately satisfy and pay any such deficiency. Any such payments due Landlord shall be made upon demand from time to time and Tenant agrees that Landlord may file suit to recover any sums falling due from time to time. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect in writing to terminate this Lease for such previous breach.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Premises and/or a termination of this Lease by Landlord, whether by agreement or by operation of law, it being understood that such surrender and/or termination can be effected only by the written agreement of Landlord and Tenant. Any law, usage, or custom to the contrary notwithstanding, Landlord shall have the right at all times to enforce the provisions of this Lease in strict accordance with the terms hereof; and the failure of Landlord at any time to enforce its rights under this Lease strictly in accordance with same shall not be construed as having created a custom in any way or manner contrary to the specific terms, provisions, and covenants of this Lease or as having modified the same. Tenant and Landlord further agree that forbearance or waiver by Landlord to enforce one or more of its rights pursuant to this Lease or at law or in equity, shall not be a waiver of Landlord's right to enforce one or more of its rights in connection with any subsequent default. A receipt by Landlord of Rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been made unless expressed in writing and signed by Landlord. To the greatest extent permitted by law, Tenant waives the service of notice of Landlord's intention to re-enter as provided for in any statute, or to institute legal proceedings to that end, and also waives all right of redemption in case Tenant shall be dispossessed by a judgment or by warrant of any court or judge. The terms "enter," "re-enter," "entry," or "re-entry," as used in this Lease, are not restricted to their technical legal meanings. Any reletting of the Premises shall be on such terms and conditions as Landlord in its sole discretion may determine (including, without limitation, a term different than the remaining Lease Term, rental concessions, alterations and repair of the Premises, rental of less than the entire Premises to any tenant). Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished because of Landlord's failure to relet the Premises or collect rent due in respect of such reletting.

If Tenant fails to make any payment, perform any obligation or cure any default hereunder within the time permitted, Landlord, without being under any obligation to do so and without thereby waiving such failure or default, may make the payment, perform such obligation and/or remedy such default for the account of Tenant (and enter the Premises for such purpose). Tenant agrees to pay Landlord, upon

15

HUGHES 00026

demand, all costs, expenses and disbursements (including reasonable attorney's fees) incurred by Landlord in taking such remedial action.

26.  Tenant's Remedies/Limitation of Liability. Landlord shall not be in default hereunder unless Landlord fails to perform any of its obligations hereunder within thirty (30) days after written notice from Tenant specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of thirty (30) days, and, then only after such period of time as is reasonably necessary to cure the default as long as Landlord is diligently attempting to cure such default). Under no circumstances whatsoever shall Landlord ever be liable to Tenant for consequential damages or special damages. All obligations of Landlord under this Lease will be binding upon Landlord only during the period of its ownership of the Premises and not thereafter. The term "Landlord" in this Lease shall mean only the owner, for the time being of the Premises, and in the event of the transfer by such owner of its interest in the Premises, such owner shall thereupon be released and discharged from all obligations of Landlord thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership. Any liability of Landlord under this Lease shall be limited solely to its interest in the Premises, and in no event shall any personal liability be asserted against Landlord in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages.

In the event of any act or omission by Landlord which would give Tenant the right to exercise any remedy or take any other action against Landlord, Tenant shall not exercise any such right until (i) it shall have given notice, by registered or certified mail, of such act or omission to the Landlord's lender ("Landlord's Mortgagee") whose name and address shall have been furnished to Tenant in writing, at the last address so furnished, and (ii) the period of time allowed Landlord for remedying such act or omission plus an additional reasonable period but, in any event, not less than thirty (30) days, shall have elapsed following the giving of such notice, provided that following the giving of such notice, Landlord or Landlord's Mortgagee shall, with reasonable diligence, have commenced and continued to remedy such act or omission or to cause the same to be remedied. All of the rights and remedies provided in this Lease for the benefit of Landlord's Mortgagee shall likewise be understood to inure to the benefit of the successors and assigns of Landlord's Mortgagee.

27.  Subordination. This Lease and Tenant's interest and rights hereunder are and shall be subject and subordinate at all times to the lien of any mortgage, now existing or hereafter created on or against the Premises, and all amendments, restatements, renewals, modifications, consolidations, refinancing, assignments and extensions thereof, without the necessity of any further instrument or act on the part of Tenant. Tenant agrees, at the election of the Landlord's Mortgagee, to attorn to any such holder. Tenant agrees upon demand to execute, acknowledge and deliver such instruments, confirming such subordination and attornment as shall be requested by any Landlord's Mortgagee. In the event Tenant fails to execute any such instruments within ten (10) days, the Tenant hereby appoints Landlord as attorney-in-fact for Tenant irrevocably (such power of attorney being coupled with an interest) to execute, acknowledge and deliver any such instrument(s) for and in the name of the Tenant and to cause any such instrument(s) to be recorded. Notwithstanding the foregoing, any Landlord's Mortgagee may at any time subordinate its mortgage to this Lease, without Tenant's consent, by notice in writing to Tenant, and thereupon this Lease shall be deemed prior to such mortgage without regard to their respective dates of execution, delivery or recording and in that event such Landlord's Mortgagee shall have the same rights with respect to this Lease as though this Lease had been executed prior to the execution, delivery and recording of such mortgage and had been assigned to such Landlord's Mortgagee. The term "mortgage", whenever used in this Lease, shall be deemed to include deeds of trust, security assignments

16

HUGHES 00027

and any other encumbrances, and any reference to the Landlord's Mortgagee shall be deemed to include the beneficiary under a deed of trust.

28.     Mechanic's Liens. Tenant has no express or implied authority to create or place any lien or encumbrance of any kind upon, or in any manner to bind the interest of Landlord or Tenant in, the Premises or to charge the rentals payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises and that Tenant will indemnify, defend and hold Landlord harmless from all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the interest of Landlord in the Premises or under this Lease. Tenant shall give Landlord immediate written notice of the placing of any lien or encumbrance against the Premises and cause such lien or encumbrance to be discharged within thirty (30) days of the filing or recording thereof; provided, however, Tenant may contest such liens or encumbrances as long as such contest prevents foreclosure of the lien or encumbrance and Tenant causes such lien or encumbrance to be bonded or insured in a manner satisfactory to Landlord within such thirty (30) day period.

29.     Estoppel Certificates. Tenant agrees, from time to time, within ten (10) days after request of Landlord, to execute and deliver to Landlord or Landlord's designees any estoppel certificate requested by Landlord stating that this Lease is in full force and effect, the date to which Rent has been paid, that Landlord is not in default hereunder (or specifying in detail the nature of Landlord's default), the termination date of this Lease and such other matters pertaining to this Lease as may be requested by Landlord. Tenant's obligation to furnish each estoppel certificate in a timely fashion is a material inducement for Landlord's execution of this Lease. No cure or grace period provided in this Lease shall apply to Tenant's obligations to timely deliver an estoppel certificate. Tenant hereby irrevocably appoints Landlord as its attorney-in-fact to execute on its behalf and in its name any such estoppel certificate if Tenant fails to execute and deliver the estoppel certificate within ten (10) days after Landlord's written request.

30.     Environmental Requirements. Except for "Hazardous Materials" (hereafter defined) contained in products used by Tenant in de minimis quantities for ordinary cleaning purposes or used in the normal operations of a surgery center and as permitted by "Environmental Requirements" (hereafter defined), Tenant shall not permit or cause any party to bring any Hazardous Materials upon the Premises or transport, store, use, generate, manufacture or release any Hazardous Materials in or about the Premises without Landlord's prior written consent. Tenant, at its sole cost and expense, shall operate its business in the Premises in strict compliance with all Environmental Requirements and shall remediate in a manner satisfactory to Landlord any Hazardous Materials released on or from the Premises by Tenant, its agents, employees, contractors, subtenants or invitees. Tenant shall complete and certify to disclosure statements as requested by Landlord from time to time relating to Tenant's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Premises. The term "Environmental Requirements" means all applicable present and future statutes, regulations, ordinances, rules, codes, judgments, orders or other similar enactments of any governmental authority or agency regulating or relating to health, safety, or environmental conditions on, under, or about the Premises or the environment, including without limitation, the following: the Comprehensive Environmental Response, Compensation and Liability Act; the Resource Conservation and Recovery Act; and all state and local counterparts thereto, and any regulations or policies promulgated or issued thereunder. The term "Hazardous Materials" means and includes any substance, material, waste, pollutant, or containment listed or defined as hazardous or toxic, under any Environmental Requirements, asbestos and petroleum, including crude oil or any fraction thereof, natural gas liquids, liquefied natural gas, or synthetic gas

17

HUGHES 00028

usable for fuel (or mixtures of natural gas and such synthetic gas). As defined in Environmental Requirements, Tenant is and shall be deemed to be the "operator of Tenant's facility and the owner" of all Hazardous Materials brought on the Premises by Tenant, its agents, employees, contractors or invitees, and the wastes, by-products, or residues generated, resulting, or produced therefrom.

Tenant shall indemnify, defend, and hold Landlord harmless from and against any and all losses (including, without limitation, diminution in value of the Premises and loss of rental income from the Premises), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action, or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any asbestos brought into the property or disturbed in breach of the requirements of this Paragraph 30, regardless of whether such removal or management is required by law) which are brought or recoverable against, or suffered or incurred by Landlord as a result of any release of Hazardous Materials for which Tenant is obligated to remediate as provided above or any other breach of the requirements under this Paragraph 30 by Tenant, its agents, employees, contractors, subtenants, assignees or invitees, regardless of whether Tenant had knowledge of such noncompliance. The obligations of Tenant under this Paragraph 30 shall survive any termination of this Lease.

Landlord shall have access to, and a right to perform inspections and tests of, the Premises to determine Tenant's compliance with Environmental Requirements, its obligations under this Paragraph 30, or the environmental condition of the Premises. Access shall be granted to Landlord upon Landlord's prior notice to Tenant and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Tenant's operations. Such inspections and tests shall be conducted at Landlord's expense, unless such inspections or tests reveal that Tenant has not complied with any Environmental Requirement, in which case Tenant shall reimburse Landlord for the reasonable cost of such inspection and tests. Landlord's receipt of or satisfaction with any environmental assessment in no way waives any rights that Landlord holds against Tenant.

31.  Independent Covenants. The obligation of Tenant to pay all Rent and other sums provided under this Lease to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties under this Lease constitute independent, unconditional obligations to be performed at all times provided for under this Lease. Tenant waives any right to assert, as either a claim or defense, that Landlord is obligated to perform or is liable for the nonperformance of any implied covenant or implied duty of Landlord not expressly set forth in this Lease. Tenant agrees to perform all of its obligations hereunder (including, without limitation, the obligation to pay rent), irrespective of any breach or alleged breach by Landlord of any such implied warranty. Tenant agrees that Landlord shall incur no liability to Tenant by reason of any defect in the Leased Premises, whether apparent or latent. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien (prejudgment or otherwise) against any rent or other sums payable by Tenant under this Lease.

32.  No Security Service. Tenant acknowledges and agrees that Landlord is not providing any security services with respect to the Premises and that Landlord shall not be liable to Tenant for, and Tenant waives any claim against Landlord with respect to, any loss by theft or any other damage suffered or incurred by Tenant in connection with any unauthorized entry into the Premises or any other breach of security with respect to the Premises.

33.  Force Majeure. Neither Landlord nor Tenant shall be held responsible for delays in the performance of their respective obligations hereunder (other than the payment of Rent) when caused by strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable

18

HUGHES 00029

substitutes, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord ("Force Majeure").

34. Brokers. Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction, and that no broker, agent or other person brought about this transaction, if any, and Tenant agrees to indemnify, defend and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming commission of other form of compensation by virtue of having dealt with regard to this leasing transaction.

35. Landlord's Lien/Security Interest: Subordination: Tenant Financing. To secure the payment of all Rent due and to become due hereunder and the faithful performance of all the other covenants of this Lease required by Tenant to be performed, Tenant hereby gives to Landlord an express contract lien on and security interest in all property, chattels, trade and other fixtures, equipment, inventory, contract rights, accounts receivable or merchandise which may be placed in the Premises and also upon all proceeds thereof, and the proceeds of any insurance which may accrue to Tenant by reason of damage to or destruction of any such property, as security for all of Tenant's obligations hereunder, including, without limitation, the obligation to pay Rent. All exemption laws are hereby waived by Tenant. This lien and security interest are given in addition to any Landlord's statutory lien(s) and shall be cumulative thereto. Tenant authorizes Landlord to execute and file Uniform Commercial Code financing statements relating to the aforesaid security interest. If an Event of Default occurs, then Landlord will be entitled to exercise any or all rights and remedies under the Uniform Commercial Code, this Lease or by law and may sell any of the property described above at a public or private sale upon 10 days notice to Tenant, which notice Tenant stipulates is adequate and reasonable. Notwithstanding the foregoing, Landlord subordinates the forgoing contract lien, security interest and statutory Landlord's lien to the liens and security interests granted by Tenant in favor of Bank of America, ARC Financial Services Corporation or Tenant's other third party lenders.

Tenant shall have the right during the Term to subject Tenant's leasehold interest in the Premises and its interest in any improvements made at Tenant's expense (except to the extent such improvements become the property of Landlord under the terms of this Lease) to one or more mortgages, deeds of trust, assignments of lease, security agreement or other methods of financing or refinancing (a "Tenant Mortgage," any holder of which is referred to as a "Tenant Mortgagee"), or to any one or more extensions, modifications or renewals or replacements of a Tenant Mortgage. Tenant shall immediately notify Landlord in writing of the name and address of any Tenant Mortgagee. In connection with such financing or refinancing by Tenant, Landlord agrees to execute and deliver to Tenant Mortgagee a Landlord's Lien Waiver, Estoppel and Agreement substantially in the form attached hereto as Exhibit "F". All such Tenant financing shall be subordinate to this Lease and any financing placed on the Premises by Landlord as contemplated by Section 27 of this Lease.

36. Renewal Option. Provided that no Event of Default then exists and no condition exists which with the passage of time or the giving of notice or both would constitute an Event of Default pursuant to this Lease, and subject to Tenant being in full compliance with the terms of this Lease, Tenant shall have the right and option (the "Renewal Option") to renew and extend this Lease with respect to all of the Premises for two (2) renewal terms of five (5) years each. In order to exercise each Renewal Option, Tenant must give Landlord written notice of the exercise of the Renewal Option no earlier than twelve (12) months, and no later than nine (9) months prior to the expiration of the initial Term or the first Renewal Term, as applicable. Failure by Tenant to notify Landlord in writing of Tenant's election to exercise a Renewal Option herein granted within the time limits set forth for such

19

HUGHES 00030

exercise shall constitute a waiver of such Renewal Option. Each Renewal Term shall be upon the same provisions as for the initial Term except as follows:

     (a)    During the first Renewal Term, the Base Rate shall be as follows: (i) the Base Rate ($24,331.69 per month), plus (ii) the CPI Adjustment on the Base Rate determined on March 1, 2008, plus (iii) the CPI Adjustment on the Base Rate (as previsiously adjusted) determined on March 1, 2013.

     (b)    During the second Renewal Term, the Base Rate shall be as follows: (i) the Base Rate during the first Renewal Term (as determined in (a) above), plus (ii) the CPI Adjustment on the Base Rate determined on March 1, 2018.

     (c)    During each Renewal Term, Tenant shall pay all Base Rent, all Additional Rent, and all other amounts due under this Lease.

     (d)    Tenant shall have no further right to renew this Lease.

     (e)    Upon exercise of each Renewal Option by Tenant and subject to the conditions set forth herein, the Lease shall be extended for the period of each such Renewal Term without the necessity of the execution of any further instrument or document, although if requested by either party, Landlord and Tenant shall enter into a written agreement modifying and supplementing the Lease in accordance with the provisions hereof. Any termination of the Lease during the initial Term or the first Renewal Term shall terminate all subsequent renewal rights hereunder. The renewal rights of Tenant hereunder shall not be severable from the Lease, nor may such rights be assigned or otherwise conveyed in connection with any permitted assignment of the Lease, unless such assignment is to Tenant's subsidiary, affiliate, or successor in accordance with the provisions of Section 19. Landlord's consent to any assignment of the Lease shall not be construed as allowing an assignment of such rights to any assignee.

    37.    <u>Organization and Power</u>.

     (a)    Tenant represents and warrants to Landlord that Tenant is a Texas limited partnership, duly organized and validly existing under the laws of the State of Delaware and in good standing, and is authorized to do business in the State of Texas and in good standing in the State of Texas, (b) has paid all franchise and other taxes, if any, required to maintain its corporate existence, and (c) is not the subject of voluntary or involuntary proceedings for the forfeiture of its Certificate of Incorporation in the State of Delaware, or its Certificate of Authority in the State of Texas, or for its dissolution. Tenant represents and warrants to Landlord that Tenant's General Partner, Premier Ambulatory Surgery Center of Duncanville, Inc. ("Premier") is a Delaware corporation, duly organized and validly existing under the laws of the State of Delaware and in good standing, and is authorized to do business in the State of Texas and in good standing in the State of Texas, (b) has paid all franchise and other taxes, if any, required to maintain its corporate existence, and (c) is not the subject of voluntary or involuntary proceedings for the forfeiture of its Certificate of Incorporation in the State of Delaware, or its Certificate of Authority in the State of Texas, or for its dissolution. Tenant represents and warrants to Landlord that Symbion, Inc., the Guarantor, is a Delaware corporation, duly organized and validly existing under the laws of the State of Delaware and in good standing, and is authorized to do business in the State of Texas and in good standing in the State of Texas, (b) has paid all franchise and other taxes, if any, required to maintain its corporate existence, and (c) is not the subject of voluntary or involuntary proceedings for the forfeiture of its Certificate of Incorporation in the State of Delaware, or its Certificate of Authority in the State of Texas, or for its dissolution. Tenant represents and warrants to Landlord that this Lease is a valid and

20

HUGHES 00031

legally binding obligation of Tenant, enforceable in accordance with its terms. Simultaneously with the execution and delivery of this Lease, Tenant shall deliver a fully executed Certificate of the Secretary of Premier, as the General Partner of Tenant, with attached resolutions of its corporate board, indicating the authority of the person executing this Lease on behalf of Premier, in its capacity as the General Partner of Tenant, substantially in the form attached hereto as Exhibit "C". Simultaneously with the execution and delivery of this Lease, Tenant shall deliver a fully executed Lease Guaranty Agreement in the form attached hereto as Exhibit "D", signed by a duly authorized officer of Symbion, Inc., the Guarantor, together with a Certificate of the Secretary of Symbion, Inc., with attached resolutions of its corporate board, indicating the authority of the person executing the Lease Guaranty Agreement on behalf of Guarantor, substantially in the form attached hereto as Exhibit "E".

(b)     Landlord represents and warrants to Tenant that this Lease is a valid and legally binding obligation of Landlord, enforceable in accordance with its terms.

38.     Miscellaneous.

(a)     If and when included within the term "Tenant," as used in this instrument, there is more than one person, firm or corporation, each shall be jointly and severally liable for the obligations of Tenant.

(b)     Any notice, demand, or other communication required to be given or to be served upon any party hereunder shall be in writing and delivered to the person to whom the notice is directed, either: (i) in person; (ii) by United States Mail, as a certified item with return receipt requested; (iii) delivered by a nationally recognized delivery service (including express mail or overnight delivery services), or (iv) sent by telex, telecopy or e-mail. Notices, demands or other communications delivered by fax or e-mail shall be deemed given on the date sent as long as sent prior to 5:00 p.m. Austin, Texas time and the sender has a fax or e-mail confirmation of receipt by the recipient at the fax number or e-mail address set forth herein. Any notice, demand or other communication sent by overnight delivery shall be deemed to have been given and received on the next business day. Any notice, demand, or other communication given other than by certified or registered mail, return receipt requested, shall be deemed to have been given and received when actually delivered during normal business hours to the address of the party to whom it is addressed as set forth at the beginning of this Lease. Either party hereto may change its address for notice by giving the other party ten days' advance written notice of such change of address.

(c)     Except as otherwise expressly provided in this Lease or as otherwise required by law, Landlord retains the absolute right to withhold any consent or approval.

(d)     Neither this Lease nor a memorandum of lease shall be filed by or on behalf of Tenant in any public record. Landlord may prepare and file, and, upon request by Landlord, Tenant will execute, a memorandum of lease.

(e)     The normal rule of construction to the effect that any ambiguities are to be resolved against the party drafting this instrument shall not be employed in the interpretation of this Lease or any exhibits or amendments hereto.

(f)     The submission by Landlord to Tenant of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Premises, nor confer any right or impose any obligations upon either party until execution of this Lease by both parties.

21

HUGHES 00032

(g)    This Lease constitutes the complete agreement of Landlord and Tenant with respect to the subject matter hereof. No representations, inducements, promises or agreements, oral or written, have been made by Landlord or Tenant, or anyone acting on behalf of Landlord or Tenant, which are not contained herein, and any prior agreements, promises, negotiations, or representations are superseded by this Lease. This Lease may not be amended except by an instrument in writing signed by both parties hereto.

(h)    If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby. It is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is illegal, invalid or unenforceable, there be added, as a part of this Lease, a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(i)    If Landlord shall institute proceedings against Tenant and a compromise or settlement thereof shall be made, the same shall not constitute a waiver of any other covenant, condition or agreement herein contained, nor of any of Landlord's rights hereunder. No waiver by Landlord of any breach shall operate as a waiver of such covenant, condition or agreement itself, or of any subsequent breach thereof. No payment of Rent by Tenant or acceptance of Rent by Landlord shall operate as a waiver of any breach or default by Tenant under this Lease. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Rent herein stipulated shall be deemed to be other than a payment on account of the earliest unpaid Rent, nor shall any endorsement or statement on any check or communication accompanying a check for the payment of Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue any other remedy provided in this Lease. No act, omission, reletting or re-entry by Landlord, and no acceptance by Landlord of keys from Tenant, shall be considered an acceptance of a surrender of the Lease, shall be construed as an actual or constructive eviction of Tenant, or an election on the part of Landlord to terminate this Lease unless a written notice of such intention is given to Tenant by Landlord.

(j)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

(k)    Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture of or between Landlord and Tenant, or to create any other relationship between Landlord and Tenant other than that of landlord and tenant.

(l)    This Lease shall be construed under and enforced in accordance with the laws of the State of Texas, and all obligations of the parties hereto created by this Lease are performable in Dallas County, Texas.

(m)    If either Landlord or Tenant commences, engages in, or threatens to commence or engage in any legal action or proceeding against the other party (including, without limitation, litigation or arbitration) arising out of or in connection with the Lease or the Premises (including, without limitation (a) the enforcement or interpretation of either party's rights or obligations under this Lease (whether in contract, tort, or both) or (b) the declaration of any rights or obligations under this Lease), the prevailing party shall be entitled to recover from the losing party reasonable attorneys' fees, together

22

HUGHES 00033

with any costs and expenses, incurred in any such action or proceeding, including any attorneys' fees, costs, and expenses incurred on collection and on appeal.

(n)     Time is of the essence as to the performance of Tenant's obligations under this Lease.

(o)     All exhibits and addenda attached hereto are hereby incorporated into this Lease and made a part hereof. In the event of any conflict between such exhibits or addenda and the terms of this Lease, such exhibits or addenda shall control.

(remainder of page intentionally left blank; signature page follows)

23

HUGHES 00034

IN WITNESS WHEREOF, Landlord and Tenant have executed this lease as of the day and year first above written.

**LANDLORD:**

Patricia Hughes

**TENANT:**

Surgery Center of Duncanville, L.P.,
a Texas limited partnership

By:    Premier Ambulatory Surgery Center of Duncanville, Inc.,
       a Delaware corporation, Its General Partner

By: _Kenneth C Mitchell_
Name: _Kenneth C. Mitchell_
Title: _Vice President._

24

HUGHES 00035

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By:      */s/ Katherine D. Mackillop*
         Jeff Cody
         State Bar No. 04468960
         jeff.cody@nortonrosefulbright.com
         Nathan B. Baum
         State Bar No. 24082665
         nathan.baum@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
Telephone:  (214) 855-8000
Facsimile:   (214) 855-8200


         Katherine D. Mackillop
         State Bar No. 10288450
         katherine.mackillop@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone:  (713) 651-5151
Facsimile:   (713) 651-5246

*Counsel for Relators-Defendants*

3

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a copy of Volume 2 of the Sworn Record for Petition for Writ of Mandamus was served in compliance with Texas Rule of Appellate Procedure 9.5 on February 9, 2015, upon the following:

Honorable Carl Ginsberg,
Judge, 193rd District Court
George L Allen Sr. Courts Building
600 Commerce Street
Dallas, TX 75202
*Respondent*
**Via FedEx**

Mr. Mark L. Hawkins
Mr. Bruce Scrafford
Mr. Andrew York
ARMBRUST & BROWN, PLLC
100 Congress A venue, Suite 1300
Austin, TX 78701
***Attorneys for Real-Party-In-Interest PATRICIA HUGHES***
**Via e-Service/e-Mail**
*mhawkins@abaustin.com*
*bscrafford@abaustin.com*
*ayork@abaustin.com*

*/s/ Katherine D. Mackillop*
Katherine D. Mackillop

58343642

4